1  YAR R. CHAIKOVSKY (SB# 175421)
   yarchaikovsky@paulhastings.com
2  PHILIP OU (SB# 259896)
   philipou@paulhastings.com
3  DAVID OKANO (SB#278485)
   davidokano@paulhastings.com
4  BRUCE YEN (SB# 277920)
   bruceyen@paulhastings.com
5  PAUL HASTINGS LLP
   1117 S. California Avenue
6  Palo Alto, California 94304-1106
   Telephone: 1(650) 320-1800
7  Facsimile: 1(650) 320-1900

8  Attorneys for Defendant
   SNAP INC.
9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  WESTERN DIVISION

13

14  PALO ALTO RESEARCH CENTER         CASE NO. 2:20-cv-10755-AB-MRW
    INC.,
15                                     **DEFENDANT SNAP INC.'S
                  Plaintiff,           MEMORANDUM OF POINTS AND
16                                     AUTHORITIES IN SUPPORT OF
                                       ITS RULE 12(B)(6) MOTION TO
17        vs.                          DISMISS PLAINTIFF PALO ALTO
                                       RESEARCH CENTER INC.'S
18  SNAP INC.,                         COMPLAINT UNDER 35 U.S.C.
                                       § 101**
19                Defendant.

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

I.    Procedural Background; MEET AND CONFER .......................................... 1

II.   Legal standards ............................................................................................ 2

    A.    Rule 12(b)(6) motions to dismiss under §101 .................................... 2

    B.    Patent eligibility under 35 U.S.C. § 101 ............................................ 2

III.  Argument ...................................................................................................... 3

    A.    The '362 Patent is Invalid under 35 U.S.C. § 101 .............................. 3

        1.    The claims are directed to the abstract idea of collecting, processing, and manipulating information in association with a text-based tag ...................................................... 5

        2.    The '362 patent recites no inventive concept ............................ 9

    B.    The '439 Patent is Invalid under 35 U.S.C. § 101 ............................ 10

        1.    The claims' focus is the abstract idea of collecting, processing, and sending information, and which reflects fundamental human behavior applied to a generic mobile environment .......................................................... 13

        2.    The '439 patent recites no inventive concept ........................... 16

    C.    The '599 Patent is Invalid under 35 U.S.C. § 101 ............................ 17

        1.    The claims are directed to the abstract idea of presenting interactive content to a user based on their context ................. 19

        2.    The '599 patent recites no inventive concept ........................... 24

IV.   Conclusion ................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alice Corp Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ..................................................................................*passim*

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016) ....................................................... 5, 13

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   788 F.3d 1371 (Fed. Cir. 2015) ............................................................. 3

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................. 2

*BlackBerry Ltd. v. Facebook, Inc.*,
   -- F.3d --, 2019 WL 11670622 (C.D. Cal. Oct. 1, 2019)................................. 8, 21

*Bridge & Post, Inc. v. Verizon Communs., Inc.*
   778 F. App'x 882 (Fed. Cir. July 5, 2019) ........................................... 20

*BSG Tech, LLC v. Buyseasons, Inc.*
   899 F.3d 1291 (Fed. Cir. 2018) ............................................... 10, 16, 17

*buySAFE, Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014) ........................................................... 13

*CardioNet, LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020) ............................................................. 2

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) ...................................................... 3, 15

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat.
   Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2013) ........................................................... 14

*Credit Acceptance Corp. v. Westlake Servs.*,
   859 F.3d 1044 (Fed. Cir. 2017) ........................................................... 15

*Customedia Techs., LLC v. Dish Network Corp.*,
   951 F.3d 1359 (Fed. Cir. 2020) ................................................... 3, 8, 21

*Data Engine Techs. LLC v. Google LLC,*
   906 F.3d 999 (Fed. Cir. 2018) ...................................................................... 6

*Elec. Power Grp., LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) ............................................................ 6, 7, 13

*FairWarning IP, LLC v. Iatric Sys.,*
   839 F.3d 1089 (Fed. Cir. 2016) ............................................................... 13, 14

*First-Class Monitoring v. United Parcel Serv. of Am.,*
   389 F. Supp. 3d 456 (E.D. Tex. 2019) ........................................................... 2

*Intellectual Ventures I LLC v. Symantec Corp.,*
   838 F. 3d 1307 (Fed. Cir. 2016) ................................................................... 14

*Intellectual Ventures I v. Capital One Bank (USA), N.A.,*
   792 F.3d 1363 (Fed. Cir. 2015) ........................................................ 20, 21, 22

*Intellectual Ventures I v. Capital One Fin.,*
   850 F.3d 1335 (Fed. Cir. 2017) ..........................................................*passim*

*Interval Licensing LLC v. AOL, Inc.,*
   896 F.3d 1335 (Fed. Cir. 2018) ..........................................................*passim*

*Mayo Collab. Servs. v. Prometheus Labs,*
   566 U.S. 66 (2012) ......................................................................................... 2

*OIP Techs. Inc. v. Amazon.com, Inc.,*
   788 F.3d 1359 (Fed. Cir. 2015) ..................................................................... 6

*SAP Am., Inc. v. InvestPic,*
   898 F.3d 1161 (Fed. Cir. 2018) ............................................................... 2, 24

*Simio, LLC v. FlexSim Software Prods., Inc.,*
   983 F.3d 1353 (Fed. Cir. 2020) .................................................. 2, 3, 8, 15, 22

*State Street Bank & Trust Co. v. Signature Fin. Grp.,*
   149 F. 3d 1368 (Fed. Cir. 1998) .................................................................... 1

*Synopsys, Inc. v. Mentor Graphics Corp.,*
   839 F.3d 1138 (Fed. Cir. 2016) ..................................................................... 2

*Trading Techs. Int'l v. IBG,*
   921 F.3d 1084 (Fed. Cir. 2019) ........................................................ 6, 22, 23

*Univ. of Fl. Res. Found. Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019) ........................................................................ 6

**Statutes**

35 U.S.C. § 101 ...................................................................................*passim*

1    Defendant Snap Inc. ("Snap") moves to dismiss Palo Alto Research Center's

2    ("PARC") complaint under Rule 12(b)(6) with prejudice. All three patents asserted

3    against Snap—U.S. Patent Nos. 8,966,362 ("the '362 patent"), 9,208,439 ("the '439

4    patent"), and 8,489,599 ("the '599 patent")—are invalid under 35 U.S.C. § 101. The

5    asserted patents were all filed before the Supreme Court's landmark decision in *Alice

6    Corp Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) and reflect an environment

7    where the "transformation of data" had been patent-eligible, as long as it "produce[d]

8    'a useful, concrete and tangible result.'" *State Street Bank & Trust Co. v. Signature

9    Fin. Grp.*, 149 F. 3d 1368, 1373 (Fed. Cir. 1998). After *Alice*, transformation of

10   data—no matter the complexity or the environment—is not a patent-eligible

11   improvement. And claiming desired *results*—no matter how useful or concrete—is

12   not patentable if the claims do not sufficiently recite a particular way to achieve those

13   results. The claims of the asserted patents describe functional results of analyzing

14   data without the specificity necessary to render them patent-eligible applications of

15   abstract ideas under *Alice*. Finding the asserted patents invalid under § 101 is

16   appropriate on the pleadings and Snap's motion should be granted.

17   **I.   PROCEDURAL BACKGROUND; MEET AND CONFER**

18   PARC filed the instant complaint on November 25, 2020 alleging Snap

19   infringes three patents.[1] On January 12, 2021, Snap sent a letter to PARC explaining

20   that the asserted patents are ineligible under § 101 and requesting that PARC provide

21   any factual allegations and claim constructions it believes would impact the asserted

22   patents' § 101 eligibility. (Yen Decl., Ex. A) On January 19, in compliance with

23   Standing Order Rule 7(a) and L.R. 7-3, counsel for parties met and conferred.

24   Defendants raised concerns that PARC had omitted allegations regarding its § 101

25   positions that it may intend to add in an amended complaint after defendants had filed

26   Rule 12 motions. (Yen Decl. ¶ 2, Ex. B) PARC provided broad statements relating

27

28   _____

[1] PARC has also filed complaints against Twitter, Inc. and Facebook, Inc., Nos. 20-cv-010753, -010754, in which it asserts infringement of overlapping patents.

1    to § 101, but represented it could provide no further detail unless Snap first provided

2    the arguments it intended to make in its motion. (*Id*., Exs. C, E). Snap provided

3    additional detail on the positions it planned to take and offered to further confer with

4    PARC (Yen Decl., Exs. D, E). PARC did not respond to Snap's offer until February

5    15, one night before the motion deadline. (Yen Decl., Exs. F)

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6) motions to dismiss under §101

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Patent eligibility under § 101 is a question of law based on underlying facts and "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion." *SAP Am., Inc. v. InvestPic,* 898 F.3d 1161, 1166 (Fed. Cir. 2018). "District courts have frequently decided section 101 issues on motions to dismiss, and the Federal Circuit has approved of that procedure on numerous occasions, including in cases postdating the decisions in *Aatrix* and *Berkheimer*." *First-Class Monitoring v. United Parcel Serv. of Am.*, 389 F. Supp. 3d 456, 471 (E.D. Tex. 2019) (Bryson, C.J.) (collecting cases).

### B.   Patent eligibility under 35 U.S.C. § 101

Patent eligibility under § 101 is determined by a two-step analysis expressed in *Mayo Collab. Servs. v. Prometheus Labs*, 566 U.S. 66 (2012), and further delineated in *Alice*, 573 U.S. at 217–18. At step one, courts must determine whether claims are "directed to" a patent-ineligible concept. Whether claims are directed to an abstract idea is a legal question. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372 (Fed. Cir. 2020). This legal inquiry asks "what the patent asserts to be the focus of the claimed advance over the prior art" to determine whether the claims' "character as a whole" are directed to ineligible subject matter. *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020).

Step one "must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). The

specification cannot be used to import details "if those details are not claimed." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019). Patent-eligible claims "must embody a concrete solution to a problem having 'the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it.'" *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018). To provide a patent-eligible improvement, software-based claims must be directed to "an actual technological improvement"—"improving a computer's functionality." *Simio*, 983 F.3d at 1361. A patent-eligible technological improvement requires "improvement to computer functionality itself, not . . . other tasks for which a computer is used in its ordinary capacity." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1363 (Fed. Cir. 2020).

At step two, the Court must consider whether claim limitations, individually and in combination, "transform the nature of the claim" into a patent-eligible application. *Alice*, 573 U.S. at 217. The claims must supply an "inventive concept" that ensures the patent is "significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18. Reciting "conventional, routine and well understood applications in the art" does not supply an "inventive concept." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015). Adding "novel or non-routine components is not necessarily enough to survive a § 101 challenge." *ChargePoint*, 920 F.3d at 773.

## III.   ARGUMENT

### A.   The '362 Patent is Invalid under 35 U.S.C. § 101

The '362 patent, "Method and System for In-Document Markup In Support of Information Sharing," describes an automated process for sharing a portion of a document using descriptive natural language instructions. As the '362 patent explains, to share just a portion of a document in conventional systems "a user is typically required to manually extract the specific content to be shared" and "send[] it to the recipient as a separate document," ('362 patent, 1:20–24); it describes this

"manual process" as "cumbersome." *Id.* at 1:24. Thus, the '362 patent's stated goal is to automate the process, so as to "facilitate[s] dissemination of only a portion of a . . . document without manual extraction." *Id.* at 3:36–38.

Claim 1 of the '362 patent is recited below (12:14-31)(emphasis added):

1.  A method for facilitating content dissemination, the method comprising:

*receiving*, within a document editing system, a user input comprising one or more *tags* to insert inline within a document, wherein the document is formulated in a natural language and wherein a respective tag is at least partly formulated in natural language and is visible to the user, and indicates an action to be performed on a partial portion of the document and a receiving entity corresponding to the action;

*processing* the one or more *tags* according to one or more rules *to* determine both the action to be performed on the partial portion of the document and the receiving entity; and

*disseminating the document portion indicated by the* one or more *tags* to the corresponding receiving entity to facilitate performing the action specified in the one or more tags on the document portion.

The '362 patent recites receiving a "tag" to insert inline within a document (*id.* 13:18–22). The tag indicates an action to be performed on a portion of a document, and a receiving entity. *Id.* 12:16-23. Then the claims require the result of *processing* of those "tags" to determine a part of the document to send to a "receiving entity" (*id.* 13:26–28), and then a non-specific sending of that part of the document to the "receiving entity" to perform the action ("disseminating the document portion" to the "receiving entity") (*id.* 13:30–34).

As the '362 admits, the recited "tag" is simply "descriptive text that can be inserted in a document." *Id.* at 4:24–31. The "action specified by a tag can be any information dissemination operation, such as showing, sharing, or copying." *Id.* at 4:57–59. A "receiving entity" can be a human or "non-human recipient." *Id.* at 4:32–35. The specification broadly describes a "document" as a "piece of content," which is "a collection of information [that] can be based on any format." *Id.* at 3:64–4:1. Figure 4 illustrates the claimed system and reflects that a "tag" is as simple as "Show

Paragraph to Jeffrey," where the "action" is "Show," the "partial portion of the document" is "Paragraph," and the "receiving entity" is "Jeffrey." *Id.* at Fig. 4, 2:37–39. Such use of "tags"



mimics a handwritten annotation with similar instructions—*e.g.*, an attorney annotating a brief with "show invalidity section to Jeffrey," and giving it to staff to show the section to Jeffrey.

> **1.** **The claims are directed to the abstract idea of collecting, processing, and manipulating information in association with a text-based tag[2]**

The '362 patent claims reflect a non-technological practice of marking up a document with follow-up actions for a recipient. As one example, the specification describes an author writing an article realizing that someone else may be interested in the particular comments in the article, so he adds the text "<<Show> <paragraph><to Jane>>" into the draft "[a]s this comes to mind" and then continues typing. '362 Patent at 4:66–5:8. Although the specification describes the alleged invention as automating the task by using a computer to process the text and send the paragraph to Jane, as claimed, the author could just as easily have followed the instructions in his note and manually sent the paragraph to Jane himself. *See id.* at 1:20-24, 3:36-38. Such an automation of a manual task falls squarely at the heart of the abstract idea exception. *See, e.g., Credit Acceptance Corp. v. Westlake Servs.*,

---

[2] Twitter has filed a 12(b)(6) motion on the '362 patent. *Palo Alto Research Center Inc. v. Twitter, Inc.*, No. 2:20-cv-10754-AB, Dkt. 43-1. Snap's and Twitter's formulation of the abstract idea are different, but both capture the focus of the claims. *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1240 (Fed. Cir. 2016) (abstract idea can be described in multiple ways, including at "different levels of abstraction").

859 F.3d 1044, 1055 (Fed. Cir. 2017) ("mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology"); *Trading Techs. Int'l v. IBG*, 921 F.3d 1084, 1384 (Fed. Cir. 2019) (same); *OIP Techs. Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("automation of a fundamental economic concept" is abstract).

In *Univ. of Fl. Res. Found. Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019), a patent "seek[ing] to automate 'pen and paper methodologies'" was characterized as "a quintessential 'do it on a computer' patent" and "directed to [an] abstract idea[]." The patent there sought to describe its automation in technical terms—replacing these "pen and paper methodologies with 'data synthesis technology.'" *Id.* The Federal Circuit was unpersuaded, noting that the specification "acknowledges that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and [the patent] simply proposes doing so with a computer." *Id.* Likewise, the '362 patent claims recite a high-level automation of using notes in a document to send a portion of the document to a recipient. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1012–13 (Fed. Cir. 2018) ("mere automation" of "manually tracking" spreadsheet modifications that required "comparing new and base versions" of spreadsheet to "determin[e] which cells of data have changed" is abstract).

Significantly, the '362 patent claims are claimed at a high functional level, and lack detail for *how* the results are achieved. There is no detail on *how* the inline natural language tags are processed such that they might be distinguished from other natural language in the document, only that they are. There is no detail on *how* the system interprets the tags in the document and uses rules to determine both the action and the recipient, only that this result is achieved. There is no detail on *how* the system disseminates the document portion to the intended recipient, only that it is.

The step one inquiry often must "turn to any requirements for how the desired result is achieved." *Elec. Power Grp., LLC v. Alstom S.A.*, 850 F.3d 1350, 1355 (Fed.

Cir. 2016). Here, where the claims' focus is on results achievable through human judgment or manual action rather than a particular way to achieve those results, the claims fall into the category of software-based claims that are "so result-based that they amount[] to patenting the patent-ineligible concept itself." *Interval Licensing*, 896 F.3d at 1344; *see id.* at 1345 (claims ineligible when reciting "production of a desired result . . . without any limitation on how to produce that result").

With no detail as to how its claimed results are achieved, the '362 patent claims broadly recite the ***collection*** of information ("receiving . . . a user input comprising one or more tags to insert inline within a document," ('362 patent, 13:18–20)), ***processing*** of information ("processing the tag according to one or more rules to determine both the action to be performed on the partial portion of the document and the receiving entity," (*id.* at 13:26–28)), and ***manipulation*** of information ("disseminating the document portion" to "facilitate performing the action specified" (*id.* at 13:30–33)). Concepts such as the collection, processing, and manipulation of data have been repeatedly held to be abstract by the Federal Circuit. *See Intellectual Ventures I v. Capital One Fin.*, 850 F.3d 1335, 1341 (Fed. Cir. 2017) ("*IV/CapOne*") ("collecting, displaying, and manipulating data" is an "abstract concept"); *Elec. Power*, 830 F.3d at 1354 ("analyzing information by steps people go through in their minds," are "mental processes within the abstract-idea category").

Collecting information using "tags" that are "formulated in natural language" and "visible to the user," (*id.* at 13:21–22) like "Show Paragraph to Jeffrey" does not provide a patent-eligible improvement to computer technology. And contrary to PARC's suggestion that tagging electronic data confers a computer-specific solution to a computer-specific problem, the mere recitation of "tags" does not save the claims: the Federal Circuit has dismissed claims reciting use of more complex XML tags—a form of "specialized mark-up computer language"—for the editing of documents, as directed to the abstract idea of "collecting, displaying, and manipulating data." *IV/CapOne*, 850 F.3d at 1338, 1340.

In *IV/CapOne*, the patent disclosed a system "for editing XML documents" using "management record type[]" and "primary record type[]" data structures which would allow a user to "make changes to the data displayed in [a] dynamic document" and have those changes be "dynamically propagated back into the original XML document (despite the acknowledged compatibility problems with such documents)." *Id.* at 1339. The Federal Circuit found the "XML document" did no more than "restrict[] the invention's field of use," which "d[id] not render an otherwise abstract concept any less abstract." *Id.* at 1340. Like the *IV/CapOne* XML claims, the '362 patent's recitation of "tags"—at best—limits its field of use, which does not affect the § 101 analysis. *See also BlackBerry Ltd. v. Facebook, Inc.*, -- F.3d --, 2019 WL 11670622, at *7 (C.D. Cal. Oct. 1, 2019), *aff'd*, 831 F. App'x 502 (Fed. Cir. 2020) (claims reciting identifying information in response to triggering event and inserting meta tag for ads to be displayed with content information invalidated as abstract).

Further, alleged benefits to the user experience, without an improvement to the computer technology, do not factor into the § 101 analysis. '362 patent, 3:28–31. The Federal Circuit has made clear that on its own, a "purported improvement in user experience d[oes] not 'improve the functioning of the computer, make it operate more efficiently, or solve any technological problem'" to render a claim patent-eligible at *Alice* step one. *Customedia*, 951 F.3d at 1365; *Simio*, 983 F.3d at 1361. Particularly here, where the claims disclose no detail as to how the purported goals are accomplished, there is no disclosed improvement in the computer technology.

Finally, none of the dependent claims changes the overall focus of the claimed invention reflected in the independent claims. They merely recite various further desired results relating to the tags, timing of processing, or aspects of the document.[3]

---

[3] *See* '362 claims 2-3, 11, 13-14 , 22 (information in the tags); 4, 15 (presentation and selection of tags); 5, 16 (modifying document based on received portion), 6-8, 17-19 (processing triggers); 9-10, 20-21 (document authentication and encryption).

## 2.     The '362 patent recites no inventive concept

Nor do the '362 patent claims recite an inventive concept. As described above, the specification makes clear that none of the limitations recite a particular solution or anything other than generic technology, including describing an embodiment as including conventional document editing systems like Microsoft Word (*see, e.g.*, '362 patent, Fig. 4). The Federal Circuit's *Alice* step two analysis in *IV/CapOne* is instructive here. Similar to the '362 patent's claims, the *IV/CapOne* XML document claims recited "generic computer 'components'" and "describe[d] the functions of the abstract idea itself, without particularity." 850 F.3d at 1341. Despite the patentee's contention that the "dynamic document" facilitated modification of "XML documents of varying formats and syntax [and] departed from convention," the Federal Circuit determined it was "simply not enough under step two." *Id.*

Similar to the '362 patent's "tags," "dissemination," and "receiving entity," although the *IV/CapOne* claims were "technical sounding," the specification defined the terms to be "generic" data types and "generic" data structures. *Id.* at 1341. The Federal Circuit noted: the "mere fact that the inventor applied coined labels to conventional structures d[id] not make the underlying concept inventive." *Id.* at 1342. In view of the specification's description "coined" data structures as generic, the Federal Circuit characterized the "dynamic document" as "provid[ing] little more than an unspecified set of rules for displaying and organizing" data records in a "generic [user] interface." *Id.* Finding no inventive concept, the Federal Circuit provided a comparable description of the '362 patent's claims: "taken individually or in combination, the recited limitations neither improve the functions of the computer itself, nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept." *Id.*

So too the ordered combination of the '362 patent's claims recites at best generic data structures ("tags") and functional results ("processing") within conventional documenting editing contexts. *See, e.g.*, '362 patent, Fig. 4. With no

particular way to achieve these results and no improvements in computer functionality, there is nothing "significantly more" in the claims other than confining the abstract idea of collecting, processing, and manipulating information to a generic word processing environment. *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1291 (Fed. Cir. 2018).

The dependent claims_only recite limiting the form of information contained in the tag, including to "an abstract specification" (e.g., Claims 2–3, 11), performing conventional activities the specification does not purport to have invented, such as displaying a collection of information, and modifying, encrypting, or digitally signing a document, without specifying *how* those steps are performed in an inventive way (e.g., Claims 4–5, 9–10), and naming conventional ways the processing of the tag can be triggered (e.g., Claims 6–8). None of these claims recite additional features sufficient to transform the abstract idea of the '362 Patent claims into a patent-eligible application of the idea. *See Interval Licensing*, 896 F.3d at 1346–47.

## B.     The '439 Patent is Invalid under 35 U.S.C. § 101

The '439 patent, titled "Generalized Contextual Intelligence Platform," describes a generalized method for collecting information on a user's surroundings, modifying stored information, and sending a notification of a change. '439 patent, 1:7–12. When it was filed in 2013, "mobile devices equipped with technology to detect physical surroundings" had become "pervasive in our everyday lives," and software on these devices could make recommendations based on the device's physical surroundings. *Id.* at cover, 1:13–21. The patent asserts that such context-aware systems "var[ied] according to architecture and user model" and took "considerable time and expense to develop." *Id.* at 1:31–33. To address this alleged problem of "efficiently developing context-aware systems," the '439 patent purports to disclose "a *generic* contextual intelligence platform that may be adapted for specific applications." *Id.* at 2:49-52 (emphasis added). Thus, the '439 patent attempts to add to the admittedly known, pervasive context-aware systems, a more

generic approach.

Claim 1 recites (*id.* at 10:30–40) (emphasis added):

1. A method, comprising:

> *receiving*, from a mobile device, *event data* derived from contextual data collected using detectors *that detect a physical context* surrounding the mobile device;

> *modifying a context graph that stores* facts and assertions about a user's behavior and interests using *the event data*;

> in response to determining that there *exists a registration for notification of changes* that matches the modification to the context graph, *sending a notification of* context graph *change to a recommender.*

The specification makes clear that the terms encompass broad, result-focused concepts already known in existing context-aware systems and, ultimately, seek to replicate fundamental human behavior using existing context-aware system technology. For example, just as prior art context-aware systems could detect and make use of information about their physical surroundings, the claimed "contextual data" includes information about a mobile device's "physical surroundings" received from the phone's sensors. *Id.* at 1:13-21; 2:60-62; 3:49-51, 3:9-12. The recited "event data derived from contextual data" includes simple interpretations of contextual data, such as "a walking pattern" that is "sensed by an accelerometer" (*id.* at 3:9-11) or other contextual data such as from a GPS or compass. *Id.* at 5:36-39. Not only did context aware systems at the time also derive similar information from their sensors in their use of "user models" that "describe[] user activity and interests" (*id.* at 1:27-30), but more fundamentally, humans have long used their senses to collect, and their mind to interpret, similar contextual data.

The recited "context graph" is described as an "in-memory model that stores facts and assertions about a user's behavior and interests." *Id.* at 3:20-22. As with admitted prior art "user models" that "describe[] user activity and interests," (*id.* at 1:28-29), the "context graph" can be "a database of information about [a] user" (*id.* at 7:28–29); the claims treat the "context graph" as no more than stored information:

1    it is "modified" using "event data" interpreted from "contextual data" from the user's

2    physical surroundings. *Id.* at 10:34–36. Humans similarly add new memories and

3    knowledge when observing and learning from their physical surroundings.

4         Just like existing context-aware systems that recommended activities based on

5    context (*id.* at 1:15–21; 1:30-31), the "recommender" recited in the claims performs

6    the function of "recommend[ing] items or activities for a user" (*id.* at 3:23–25), and

7    is notified if a context graph change (which reflects user contexts) matches a

8    "registration for notification of changes." *Id.* at 10:37–39. A "registration" for

9    notification of changes can operate as a simple "yes/no" flag that controls whether a

10   notification is sent. *See id.* at 4:53–55.

11        This, too, imitates basic human behavior and practices. When someone returns

12   to their car in the parking lot and sees a dent in the door, they call their auto insurance

13   agent, who recommends next steps.  A banker sees an abnormally large withdrawal

14   request by one owner in the ledger of a joint account, and notifies the other joint

15   owner about the request. A nurse takes a patient's blood pressure and records it in

16   the patient's chart, and then notifies the patient's doctor upon seeing a sharp drop in

17   blood pressure. TV networks each year track and log the average number of viewers

18   during different segments of the Super Bowl, as well as their demographics (among

19   other things). Based on this information, TV networks sell ads to advertisers at

20   different prices based on when advertisers want their ad to run.

21        Thus, although the '439 patent purports to *add* to the existing art a "generic

22   contextual intelligence platform that may be adapted for specific applications," *id.* at

23   2:49-52 (emphasis added), as detailed above, the claims are result-oriented and

24   functionally claimed.  The claims do not disclose how to implement a genericized

25   contextual intelligence platform, nor do they claim how it might adapt to specific

26   applications. The claims simply recite high-level functional results that imitate

27   fundamental human behavior.

28

MEM. ISO DEF. SNAP INC.'S
MOTION TO DISMISS
CASE NO. 2:20-CV-10755-AB-MRW

1

        **1.**       **The claims' focus is the abstract idea of collecting, processing, and sending information, and which reflects fundamental human behavior applied to a generic mobile environment[4]**

2

3

4     Whether applied to basic human behavior or in a mobile technology

5     environment, at their core the '439 patent claims describe ***collecting information***

6     ("receiving, from a mobile device, event data derived from contextual data collected

7     using detectors that detect a physical context," *id.* at 11:4–6), ***processing information***

8     ("modifying a context graph that stores [information])" and ***sending information***

9     ("sending a notification of context graph change to a recommender" *id.* at 11:7–12).

10    These and similar concepts—e.g., "collecting information, analyzing it, and

11    displaying" are abstract ideas. *Elec. Power,* 830 F.3d at 1353 ("[W]e have treated

12    collecting information, including when limited to particular content (which does not

13    change its character as information), as within the realm of abstract ideas.").

14    As detailed above, the claimed results simply mimic fundamental human

15    behavior in the mobile technology environment: using the senses to observe one's

16    surroundings, interpreting that information in the mind, adding to or updating one's

17    knowledge, and notifying a recommender if there is a registration to do so. But

18    "merely implement[ing] an old practice in a new environment" does not render

19    claims patent-eligible under *Alice. See FairWarning IP, LLC v. Iatric Sys.*, 839 F.3d

20    1089, 1094 (Fed. Cir. 2016); *see also buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350,

21    1355 (Fed. Cir. 2014) (claims directed to human behavior of "ancient lineage" are

22    abstract when applied to "particular technological environment" involving computers

23    and networks). Concepts surrounding "data collection, recognition, and storage" are

24    "undisputedly well-known" practices: "[i]ndeed, humans have always performed

25    ─────────────────────

26    [4] Facebook has filed a 12(b)(6) motion on the '439 patent. *Palo Alto Research Center Inc. v. Facebook, Inc.*, No. 2:20-cv-10753-AB, Dkt. 34-2. Snap's and Facebook's formulation of the abstract idea are different, but both capture the focus of the claims. *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1240 (Fed. Cir. 2016) (abstract idea can be described in multiple ways, including at "different levels of abstraction").

27

28

                        MEM. ISO DEF. SNAP INC.'S
                        MOTION TO DISMISS
                        CASE NO. 2:20-CV-10755-AB-MRW

these functions." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2013); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F. 3d 1307, 1314 (Fed. Cir. 2016) (Supreme Court held that 'fundamental . . . practice[s] long prevalent' are abstract ideas"); *Interval Licensing*, 896 F.3d at 1344 ("basic, longstanding practice[s]" describing "human activity" are abstract).

In *FairWarning*, the claims recited the detection of unusual access to a user's sensitive data by analyzing audit log data on a computer and analyzing it against generalized rules. *See* 839 F.3d at 1092. Although the claims detected unusual activity by "ask[ing] whether accesses of [a user's information], as reflected in audit log data, are 1) 'by a specific user,' 2) 'during a pre-determined time interval,' or 3) 'in excess of a specific volume,'" the Federal Circuit determined the limitations merely "implement[ed] an old practice in a new environment": "These are the same questions (though perhaps phrased with different words) that humans in analogous situations detecting fraud have asked for decades, if not centuries." *Id.* at 1094–95. Like the ineligible *FairWarning* claims, the '439 patent's claims recite collecting, processing, and sending information in a particular environment—"context-aware" mobile devices.

Further, as detailed above, the '439 patent claims recite no improvements in mobile device infrastructure or context-aware technology. Nor do they recite any specific technological improvement to a way to collect, process, or send information. The specification confirms that these labels are not by themselves anything more than functional results. *See IV/CapOne*, 850 F.3d at 1343 ("The mere fact that the inventor applied coined labels to conventional structures does not make the underlying concept inventive."). The claims recite—in high-level, functional language—the receiving of a type of information, the processing of that information by modifying a storage with that received information, and sending a notification to a recommender of the change, conditioned on a registration for such a notification. As recited, the claims are devoid of "'the specificity required to transform a claim from one claiming

1    only a result to one claiming a way of achieving it.'" *Interval Licensing*, 896 F.3d at
2    1343.

3        The specification reinforces the lack of any specific technological
4    improvement in the claims. Beginning with the stated problem, it is the ***human*** "time
5    and expense" required to ***develop*** existing context-aware systems that the '439 patent
6    aims to overcome—not the ***operation*** of a context-aware system. '439 patent, 1:31–
7    33; 2:49–52, 3:43–45 ("[b]y adapting a generic infrastructure, one can save
8    considerable time and expense in developing a customized contextual intelligence
9    system"). The purported improvement to the designer's experience—without an
10   improvement to computer technology—adds nothing to the patentability of the
11   claims. *See Simio*, 983 F.3d at 1361 (rejecting argument that did not explain how the
12   technology was improved beyond the user experience of not needing to use code).

13       It is also clear from the specification that there is no improvement to context
14   aware systems, as the patent admits "context-aware systems that . . . make
15   recommendations based on the physical surroundings" already existed. *Id.* at 1:13-
16   31. The purported improvement of the '439 patent was moreover ***not*** any
17   improvement to the technological process of sensing physical surroundings, ***nor*** an
18   improvement on the derivation of "event data" from contextual data, ***nor*** through
19   determining how to use the stored information in any particular way. *See id.* at 2:49–
20   52. And even if the specification described a particular way for how to improve the
21   existing technology—it does not—that improvement is not recited in the claims.
22   *ChargePoint,* 920 F.3d at 769 (specification cannot import unclaimed details).

23       Finally, none of the dependent claims changes the overall focus of the claimed
24   invention reflected in the independent claims. They merely recite various further
25   desired results relating to the event data, context graph, and notifications. [5]

---

26   [5] *See* '439 claims 2, 8, 14 (receive additional event data and send a "second
27   notification" of a context graph change), 3, 9, 15 (use "high-level event data"), 4,
28   10, 16 (query for context graph data), 5, 11, 17 (modify the context graph based on

## 2. The '439 patent recites no inventive concept

The '439 patent's functional, result-oriented claims do not recite an inventive concept that is "significantly more" than the abstract idea and sufficient to "transform" the idea into a patent-eligible application of it. *BSG Tech*, 899 F.3d at 1290; *IV/CapOne*, 850 F.3d at 1342. Entitled "***generalized*** contextual intelligence platform," the patent repeatedly admits that the claimed approach is a generic abstraction, not a specific technological solution. *See, e.g.*, *id.* at 2:49–52 ("providing a generic contextual intelligence platform that may be adapted for specific applications"), 3:33–36 ("the disclosed generic infrastructure"). The patent describes the components of the purported invention in generalized terms with no reference to an improvement in computer technology.

As explained above, "contextual data" may include "data describ[ing]" a mobile device's "physical surroundings," *id.* at 2:60-62, that can be collected by a GPS or compass *id.* at 3:49-51, 3:9-11. "Event data" is a functional result of "deriv[ing]" something "from contextual data," *id.* at 1:44, for example "a walking pattern sensed by an accelerometer" or "a user reading an e-mail," *id.* at 3:9–11, 3:15. The "recommender" is described by its function—an "application that recommends items or activities," *id.* at 3:23–25, not by how it performs that function. The "registration" for notification of changes serves as a flag for notification: if is set, send notification of change. *Id.* at 4:53–55. And contrary to PARC's contention, the "context graph" is not an inventive concept. It is a stored information "about [a] user," akin to human memory, *Id.* at 3:20-22, 7:25-40, and not an improvement to any method for storing conventional "user model" data.

Nor does the ordered combination supply an inventive concept. As described above, the claims recite genericized data abstractions and components described by their function, not as an improvement to that function. As admitted, "context-aware

realtime event data from a "RESTful WebAPI"), 6, 12, 18 (modify the graph based on a "bulk upload" of event data).

1  systems" existed in prior art (*see id.* at 1:18–26), and the claims, as a whole, do not

2  purport to recite improvements to how such systems operated or to the functionality

3  of the mobile devices or architecture on which those systems run. All that remains in

4  the claims is—at best—a narrowing of the abstract idea of collecting, processing, and

5  sending information in context of the particular environment of context-aware

6  systems. This cannot provide an inventive concept as a matter of law. *BSG Tech*, 899

7  F.3d at 1290 ("As a matter of law, narrowing or reformulating an abstract idea does

8  not add 'significantly more' to it").

9      **C.     The '599 Patent is Invalid under 35 U.S.C. § 101**

10         The '599 patent, titled "Context and Activity-Driven Content Delivery and

11  Interaction," describes using mobile devices to present content to a user based on

12  contextual information of the user, such as their location. *See, e.g.*, '599 patent, 1:8—

13  11, Abstract. According to the '599 patent, although mobile devices could

14  "perpetuate" a "fast-paced lifestyle" for their users, users lacked something to

15  "effectively . . . cope with this increase in pace." *Id.* at 1:25–29.  For example, users

16  might "have a list of errands they need to complete, and this list may grow throughout

17  a work week because they do not remember to complete these errands." *Id.* at 1:29-

18  35. Mobile devices did not help users cope with their schedule because they could

19  not "determine when and how best to provide their users with information of suitable

20  entertainment content," as they could not "take into account the activities that their

21  users are involved in." *Id.* at 1:25–29, 1:41–46.

22         The '599 patent sought to improve users' ability to stay on top of their fast-

23  paced lives through conventional use of computing capabilities to augment or replace

24  mental processes: receiving information about the context of the user, processing that

25  information to determine whether the context satisfies a condition, and presenting

26  content to the user if it has. *See id.* at 1:50-62. For example, the claimed system might

27  "remind the user to buy groceries as the user is driving past a grocery store after

28  work." *Id.* at 5:27-32. The patent also discloses presenting a simple interactive

content in the form of a reminder that a user can interact with "by uttering 'OK'" to "delete[] the content entry." *Id.* at 13:59-14:4; Table 2. Claim 1 is recited below (*id.* at 23:20–41):

> 1. A method for delivering context-based content to a first user, the method comprising:
>
> receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;
>
> receiving a set of contextual information with respect to the first user;
>
> processing the contextual information to determine a current context for the first user;
>
> determining whether the current context satisfies the trigger condition;
>
> in response to the trigger condition being satisfied, presenting the content piece to the first user;
>
> receiving a response from the first user corresponding to the presented content piece;
>
> determining whether the received response matches the expected response; and
>
> performing an action based on an outcome of the determination.

Although the claims recite terms like "content package," "contextual information," "trigger conditions," "rules," and "expected responses," the specification makes clear these labels are used so that the claim encompasses the evaluation of generalized information using generalized rules to determine whether to perform a generalized action. For example, the specification describes "content" as "any [] content suitable for delivery in a range of contexts," including "music, study material, [or] a to-do list." *Id.* at 3:60-64. A "context" is disclosed as "an event or environmental factor associated with the user" "inferred from the contextual information" and includes things such as "whether the user is sitting down, watching TV, [or] asleep," *Id.* at 7:36–41, 7:46-49. Thus, the specification also discloses "contextual information" that may be "defined as input data that is gathered from a

computing device" and "reflects basic information associated with the user and/or the operating environment of the computing device" (*id.* at 6:15-19), which may include time of day and location information (*id.* at 6:23-39).

A "trigger condition" is disclosed in the specification as broadly including data values, such as a time of day, a day of the week, or a location like "home." *Id.* at 3:64-4:6. An "expected response" is also disclosed as broadly including data values and can be set in the same way as a "trigger condition," and can include a simple "OK" to dismiss an alert. *Id.* at 11:27–28, 12:50–56, 12:45–49; 13:64-14:4; Table 2. The specification describes the performance of an unspecified "action" as a response to receiving an "expected response": *e.g.*, "[c]ontent management system 240 can perform an action responsive to a user response or interaction with the presentation of content 253." *Id.* at 12:66–13:1. "Actions" include presenting more content (*id.* at 5:63-67) or deleting viewed content (*id.* at 13:64-14:4). Figure 3 provides a flow diagram that illustrates the key limitations of claim 1.

### 1.      The claims are directed to the abstract idea of presenting interactive content to a user based on their context

The '599 patent describes the use of existing computer technology to assist with commonplace human processes to cope with a fast paced life (*id.* at 1:27-29), such as by providing reminders to monitor multiple sources of information (*id.* at 1:29-32), reminding about errands during the week (*id.* at 1:32-35), and advancing skills while juggling work and social schedules (*id.* at 1:35-38).

To achieve these results, the claims focus on the longstanding practice of presenting interactive content to a user based on the user's context—all in a generic mobile environment. This focus of the claims is a longstanding, fundamental part of human activity. For example, humans often choose their words ("content") based on the context of their conversation, speaking differently to a child than to a supervisor. In commerce, businesses have long tailored advertising content based on the "context" of their potential customers, such as presenting commercials at certain

times of day, or advertising in newspapers in certain locales. The Federal Circuit has repeatedly found claims like those of the '599 patent to be directed to abstract ideas related to tailoring information to users based on information known about the user.

In *Intellectual Ventures I v. Capital One Bank (USA), N.A.*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) ("*IV/CapOneBank*"), the claims recited user "web site navigation data" being used to create a "dynamic web site" that "present[ed] the web pages tailored to an individual user" as a "function of the user's personal characteristics." Despite the recitation of a dynamic web site, the Federal Circuit found the claims directed to the abstract idea of "tailoring content based on the user's location or address"—*i.e.*, "the user's personal characteristics"—which it characterized as a "fundamental . . . practice long prevalent in our system[.]" *Id.* "There is no dispute that newspaper inserts have often been tailored based on information known about the customer—for example, a newspaper might advertise based on the customer's location. Providing this minimal tailoring . . . is an abstract idea." *Id.*; *id.* at 1370 ("Tailoring information based on the time of day of viewing is also an abstract, overly broad concept long practiced in our society.").

Content tailoring based on user data has been found to be abstract in many different formulations and computer environment contexts. For example, in *Bridge & Post., Inc. v. Verizon Communs., Inc.*, the claims recited use of specific aspects of protocols used for network communication over the Internet, including "persistent device identifiers" "network addresses" of devices, and "Media Access Control (MAC) layer process[es]" to deliver targeted media, such as tailored advertisements, to users. 778 F. App'x 882, 884–85, 889 (Fed. Cir. July 5, 2019). Despite the terminology, the Federal Circuit found that the focus of the claims was the abstraction of "tracking a user's computer network activity and using information gained about the user to deliver targeted media, such as advertisements." *Id.* at 884. It noted that the "concept of tailoring advertisements based on user data . . . dates back to at least local radio and television ad[s], which played for users located in specific cities and

1   that in the "computer context, prior art systems tracked users using "cookies," which
2   allowed "a user's location [to] be approximately determined by the IP address of their
3   device." *Id.* at 884. *See Customedia*, F.3d at 1363–64 ("using a computer to deliver
4   targeted advertising to a user" is abstract idea, not "improvement in the functioning
5   of a computer"); *BlackBerry*, -- 2019 WL 11670622, at *7, *aff'd*, 831 F. App'x 502
6   (invalidating claims directed to "saving and organizing information and choosing
7   some of that information to send to a person based on the person's location or a
8   'triggering event'").

9        The '599 patent's claims cannot be
10  meaningfully distinguished from the patent-ineligible
11  claims in *IV/CapOneBank* and its progeny. While
12  using different terminology, the '599 patent claims
13  recite the same core concept of tailoring information
14  to present to a user. The claims recite, in simple
15  functional terms, ***determining a context for a user***
16  ("receiving a set of contextual information with
17  respect to the first user" and "processing the



FIG. 3

18  contextual information to determine a current context for the first user," ('599 patent,
19  24:50–51)), ***tailoring information to the user based on that context*** ("receiving at
20  least one content package . . . and a set of rules associated with the content package,
21  wherein the set of rules includes a trigger condition and an expected response, and
22  wherein the trigger condition specifies a context that triggers a presentation of the
23  content piece" and "determining whether the current context satisfies the trigger
24  condition" (*id.* at 24:44–49; 24:54–55)), and ***presenting the tailored content to the***
25  ***user*** ("in response to the trigger condition being satisfied, presenting the content
26  piece to the first user" (*id.* at 24:56–57)).

27        That the presented "content" may be "interactive" does not change the focus
28  of the claims. "Interactive content" is content "where a user can interact with the

1    interactive content using [an] input mechanism . . . (e.g., pressing buttons, touching
2    a location of a touch screen, or communicating verbal utterances into a microphone)."
3    *Id.* at 7:64–8:3. That the tailored content is functionally "interactive" does not shift
4    the focus of the claims from delivering tailored content. Indeed, the 'interaction'
5    encompasses the functional result of taking a non-specific "action" if the user's actual
6    response matches an "expected response": "if [response is expected response], then
7    do [action]." *Id.* at 24:58-61 ("receiving a response from the first user corresponding
8    to the presented content piece; determining whether the received response matches
9    the expected response; and performing an action based on an outcome of the
10   determination"). The breadth and lack of specificity of the claimed "interaction"
11   highlights that it is the content tailoring, *not* the user interactivity, that is the focus of
12   the claims. *Simio*, 983 F.3d at 1359 ("directed to" inquiry focuses on "claimed
13   advance over the prior art").

14        Moreover, targeted interactions are a longstanding practice. In addition to the
15   "long prevalent practice" of "tailor[ing]" newspaper inserts "based on information
16   known about the customer," *IV/CapOneBank*, 792 F.3d at 1369, it was also natural
17   for those companies to track the number of customers that redeemed a coupon
18   included with an insert to determine the effectiveness of the content "tailoring."
19   Those companies thus performed an action based on the customer's response to the
20   tailored content (i.e., redemption of the coupon).

21        PARC's view that the '599 patent solves an internet-specific problem with an
22   internet-specific solution is unsupported by the claims and specification. The '599
23   patent describes the nonspecific, results-oriented automation of longstanding human
24   activity using generic computers. In *Trading Techs.*, 921 F.3d at 1384–85, the Federal
25   Circuit found claims abstract when they "improve[d] usability, visualization, and
26   efficiency" of a process, but did "not improve the functioning of the computer, make
27   it operate more efficiently, or solve any technological problem." The flaw in the
28   claims, according to the Federal Circuit, was that they "focuse[d] on improving the

trader [*i.e.*, the user], not the functioning of the computer." *Id.* at 1383; *id.* at 1384 ("The claims are focused on providing information to traders in a way that helps them process information more quickly, . . . not on improving computers or technology."); s*ee also Trading Techs. Int'l*, 921 F.3d at 1093 (using technology to "assist[] traders in processing information more quickly" does not improve functioning of computer and is abstract).

Likewise, the '599 patent does not purport to improve the *functioning* of any mobile device, but rather employs existing mobile devices to improve a *user's* ability to manage their schedule. For example, the problems in the prior art solved by the '599 patent are focused on *humans*, not on the functioning of a mobile device: coping with fast-paced lives ('599 patent, 1:27–29); reminding themselves to monitor multiple sources of information (*id.* at 1:29-32); remembering to complete errands (*id.* at 1:32-35); and advancing skills while juggling other responsibilities (*id.* at 1:35-38). The disclosed embodiments in the specification focus on use of particular information to automate common human practices, not on hardware or software that improves mobile device technology: providing task lists (*id.* at 5:63-67), presenting flash cards for studying educational content (*id.* at 8:50-60), presenting reminders (*id.* at 13:64-14:4, Table 2), and learning a foreign language (*id.* at 11:33-41, Table 1)—all of which are examples of human activity that has long been performed by humans without the assistance of mobile devices.

Nor do the claims recite a particular solution for achieving the abstract result of presenting interactive content based on a user's context and taking an action based on the user's response. The '599 patent does not purport to invent a new mobile device, but rather admits the claimed mobile device includes generic devices like "a mobile phone, a personal digital assistant (PDA), an MP3 player, a handheld game console, [or] a laptop computer." *Id.* at 1:19–22. The '599 patent describes its "computing device" using generic components: processor, memory, storage, a display, a network interface, input mechanisms, sensors, a speaker, and a camera. *Id.*

-23-

1  at 19:8–27. And claim 1 of the '599 patent does not recite a computing device at all.

2          The dependent claims do not change the focus of the claimed invention of the

3  independent claims. They merely recite ideas for creating and storing types of content

4  and contextual information, but "[i]nformation as such is an intangible, hence

5  abstract." *SAP Am.*, 898 F.3d at 1167 (citation and internal quotes omitted)[6]

6                    **2.      The '599 patent recites no inventive concept**

7          Nor do the '599 claims recite an inventive concept. Rather, the '599 claims

8  recite, in functional terms, using unspecified hardware and/or software, the collection

9  of contextual information, presenting content based on the contextual information,

10  and an interaction with the content. For example, the claims do not recite any

11  improvement to mobile phones ('599 patent, 1:17–22), and asserts the claimed

12  system can be implemented by hardware modules that can include any hardware

13  "now known or later developed." *Id.* at 3:43–47.

14          Similarly, the specification confirms the claims do not add "significantly

15  more" to the claimed abstract concept. The recited "contextual information" can be

16  collected using known techniques such as "the network time protocol (NTP)" and

17  "GPS, cellular tower triangulation, Wi-Fi triangulation, or other means now known

18  or later developed." *Id.* at 6:23–35. The claims recite presentation in a functional

19  manner, admit that mobile devices "often include[d] presentation mechanisms for

20  reproducing audio and/or video content." *Id.* at 7:60–61. An "expected response" can

21  include a user completing a task (*id.* at 5:63-67), saying the word "okay" in

22  acknowledgement of content (*id.* at 13:64–14:4. 11:33–41), or answering a flash card

23  question correctly (*id.* at 8:50–60). The process for determining whether an "expected

24  response" should result in an action can include whether two words or text strings

25  _____

26  [6] *See* '599, claims 2, 13, and 20 (create content packages), 3, 14, and 13 ("sharable"
content packages), 4, 15, and 22 (define a context), 5, 16, and 23 (update entries in

27  a database), 6-8 (define contexts and rules using "high-level abstractions" and
"parameters"), 9 (share content with a remote device), 10, 17, and 24 (use various

28  types of contextual information), 11, 18, and 25 (various types of content).

1  "match." *Id.* at 12:50–65. An action can be a "predefined capability of [a] content
2  management system." *Id.* at 13:12–13.

3      Whether "taken individually or in combination, the recited limitations neither
4  improve the functions of the computer itself, nor provide specific programming,
5  tailored software, or meaningful guidance for implementing the abstract concept."
6  *IV/CapOne*, 850 F.3d at 1342. Rather, as an ordered combination, the claims recite
7  no more than the desired results of the claimed abstract idea in a functional manner
8  using generic and known technology. This cannot supply an inventive concept. *See*
9  *Interval Licensing*, 896 F.3d at 1346–47.

10  **IV.   CONCLUSION**

11      For the foregoing reasons, Snap respectfully requests that the Court dismiss
12  the complaint with prejudice as to the '362, '439, and '599 patents.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | Dated: February 16, 2021 |
| 2 | |
| 3 | By: /s/ *Yar R. Chaikovsky* |
| 4 | Yar R. Chaikovsky (SB# 175421) |
| 5 | yarchaikovsky@paulhastings.com |
| | Philip Ou (SB# 259896) |
| 6 | philipou@paulhastings.com |
| 7 | David Okano (SB#278485) |
| | davidokano@paulhastings.com |
| 8 | Bruce Yen (SB# 277920) |
| 9 | bruceyen@paulhastings.com |
| | PAUL HASTINGS LLP |
| 10 | 1117 S. California Avenue |
| 11 | Palo Alto, California 94304-1106 |
| | Telephone: 1(650) 320-1800 |
| 12 | Facsimile: 1(650) 320-1900 |
| 13 | *Attorneys for Defendant* |
| 14 | SNAP INC. |