UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-10753-AB-MRW | Date: | March 16, 2021 |
|---|---|---|---|
| | 2:20-cv-10754-AB-MRW | | |
| | 2:20-cv-10755-AB-MRW | | |

| Title: | *PALO ALTO RESEARCH CENTER, INC. v. FACEBOOK, INC.* |
|---|---|
| | *PALO ALTO RESEARCH CENTER, INC. v. TWITTER, INC.* |
| | *PALO ALTO RESEARCH CENTER, INC. v. SNAP INC.* |

| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |
|---|---|

| | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

Proceedings:   **[In Chambers Order Regarding Motions to Dismiss:
DENYING Facebook's Motion, No. 20-1753, Dkt. No. 34;
GRANTING-IN-PART Twitter's Motion, No. 20-10754 Dkt. No. 43
and Snap's Motion, No. 20-10755 Dkt. No. 31; and
GRANTING Unopposed Requests for Judicial Notice, No. 20-
10753, Dkt. No. 37; No. 20-10754, Dkt. No. 47; and No. 20-10755,
Dkt. No. 34]**

## I.      Introduction

Plaintiff Palo Alto Research Center, Inc. ("PARC") has filed three patent infringement actions before this Court. *See PARC v. Facebook, Inc.*, 2:20-cv-10753-AB-MRW; *PARC v. Twitter. Inc.*, 2:20-cv-10754-AB-MRW; *PARC v. Snap Inc.*,

2:20-cv-10755-AB-MRW.[1] Before the Court are Motions to Dismiss based on patent ineligibility filed by each Defendant. *See* FB Dkt. No. 34 ("FB Mot."), FB Dkt. No. 36 ("FB Opp."), FB Dkt. No. 38 ("FB Reply"); TW Dkt. No. 43 ("TW Mot."), TW Dkt. No. 46 ("TW Opp."), TW Dkt. No. 48 ("TW Reply")[2]; SN Dkt. No. 31 ("SN Mot."), SN Dkt. No. 33 ("SN Opp."), SN Dkt. No. 35 ("SN Reply"). Also before the Court are PARC's requests for judicial notice, filed in each of the three cases. *See* FB Dkt. No. 37; TW Dkt. No. 47; SN Dkt. No. 34.

The Court finds these matters appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; Local Rule 7-15. The Court therefore removes these matters from the March 19, 2021 hearing calendar. For the reasons stated below, the Court **DENIES** Facebook's motion and **GRANTS-IN-PART** Twitter's motion and Snap's motion. The Court **GRANTS** PARC's requests for judicial notice**.**

## II.   <u>Background</u>

PARC is a wholly owned subsidiary of Xerox Corporation. FB Dkt. No. 1 ("FB Compl.") ¶ 5. According to PARC, PARC and Xerox "have made some of the most important technological breakthroughs of the past 100 years, including the first personal computer; [and] the advent of laser printing, [and] Ethernet," among other inventions. *Id.* ¶ 6. Now, PARC is "extend[ing] that legacy to newer technologies like artificial intelligence ('AI')." *Id.* Beginning with Facebook, PARC alleges that "Facebook's targeted and personalized advertising systems; Facebook's notifications and messaging systems; Facebook's comment organization systems; and Facebook's systems that identify false or misleading information," all infringe PARC's patents. *Id.* ¶ 12. Specifically, as relevant here, PARC alleges that Facebook infringes:

---

[1] Throughout this Order, the Court distinguishes between filings in each of the three cases by preceding the docket entry number with an identifier for the relevant Defendant (*i.e.*, Facebook – "FB"; Twitter – "TW"; Snap – "SN"). Therefore, a citation to FB Dkt. No. 34 refers to docket entry 34 on the *PARC v. Facebook* docket.

[2] "To reduce repetitive briefing," Twitter joins Facebook's motion as to the '599 and '439 Patents. *See* TW Mot. at 1 n.1. The Court appreciates Twitter's efficient decision to simply join Facebook's briefing and encourages collaboration by Defendants across all three cases to further reduce repetitive briefing where possible.

- U.S. Patent No. 8,489,599 (the "'599 Patent"), relating to "a computing device that delivers personally-defined context-based content to a user;"
- U.S. Patent No. 9,208,439 ("the '439 Patent"), relating to "a system for providing user information to a recommender;"
- U.S. Patent No. 7,043,475 ("the '475 Patent"), relating to "[t]echniques for clustering user sessions using multi-modal information including proximal cue information;"
- U.S. Patent No. 8,606,781 ("the '781 Patent"), relating to "[t]echniques . . . to provide personalized search results to a user;" and,
- U.S. Patent No. 7,167,871 ("the '871 Patent"), relating to "[s]ystems and methods for determining the authoritativeness of a document based on textual, non-topical cues."

*See, e.g.*, FB Compl. at ¶¶ 39, 66, 151, 179, 215.

PARC makes similar allegations against Twitter and Snap. Specifically, PARC alleges that Twitter infringes the '599 Patent, the '439 Patent, the '781 Patent, the '475 Patent, the '871 Patent, and U.S. Patent No. 8,966,362 (the "'362 Patent"), relating to a method and system for disseminating tagged content over networks. *See* TW Dkt. No. 1 ("TW Compl.") at p. 1. PARC alleges that Twitter's targeted advertising, tagging, and machine learning tools infringe these patents. *See, e.g., id.* at ¶¶ 39-40, 66-67, 91-92, 117-118, 146-147, 176-182. PARC alleges that Snap infringes the '599 Patent, the '439 Patent, and the '362 Patent. *See* SN Dkt. No. 1 ("SN Compl.") at p. 1. PARC alleges that Snap's targeted advertising and tagging tools infringe these patents. *See, e.g., id.* at ¶¶ 38-39, 65-66, 90-91.

In response to PARC's complaints, each Defendant has filed a motion to dismiss certain of PARC's patents, arguing that the relevant patents claim patent-ineligible subject matter and thus are invalid.

## III.   **Legal Standards**

### A. Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a cause of action where the plaintiff has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In deciding a Rule 12(b)(6) motion, the Court

must first assume the truth of all non-conclusory, factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009). Considering these assumptions, the Court must determine whether the complaint is "plausible on its face," allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Similarly, a court is "not bound to accept as true a legal conclusion couched as a factual allegation[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In patent infringement actions, an accused infringer may move to dismiss under 35 U.S.C. § 101 on the basis that the claimed invention is ineligible for patent protection and thus the patent is invalid. In this context, the moving party "bear[s] the burden of establishing that the claims are patent-ineligible under § 101." *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347 DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015). "[I]n applying § 101 jurisprudence at the pleading stage, the Court construes the patent claims in a manner most favorable to Plaintiff." *Id.* at *8 (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014)).

## B. Request for Judicial Notice

When deciding a motion to dismiss, a court typically does not look beyond the complaint in order to avoid converting a motion to dismiss into a motion for summary judgment. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). But a court may properly consider (1) material included as part of the complaint, (2) documents incorporated by reference into the complaint, and (3) material subject to judicial notice under Federal Rule of Evidence 201. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). Federal Rule of Evidence 201 provides that the Court may take judicial notice of "a fact that is not subject to reasonable dispute because" either (1) it "is generally known within the trial court's territorial jurisdiction; or" (2) it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Proper subjects of judicial notice include "court filings and other

matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

## IV. <u>Discussion</u>

### A. Requests for Judicial Notice

PARC asks the Court to take judicial notice of the prosecution histories of the disputed patents. *See* FB Dkt. No. 37 (the '599 Patent, the '439 Patent); TW Dkt. No. 47 (the '599 Patent, the '439 Patent, and the '362 Patent); SN Dkt. No. 34 (same). PARC explains that, "all [of the materials were] obtained from the United States Patent and Trademark Office's ('USPTO') Public Patent Application Information Retrieval website (https://portal.uspto.gov/pair/PublicPair)." *See, e.g.*, TW Dkt. No. 47 at 2. No Defendant has filed a response to PARC's Requests for Judicial Notice.

The Court has reviewed PARC's requests and agrees that the file histories of the disputed patents are public records of which the Court may take judicial notice. *See* Fed. R. Evid. 201; *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992). Therefore, the Court **GRANTS** PARC's requests.

### B. Local Rule 7-3 Dispute

In its Oppositions to Defendants' Motions to Dismiss, PARC argues that the Court should deny the motions based on Defendants' purported failure to comply with the meet and confer obligation mandated by Local Rule 7-3 and this Court's Standing Order. *See* FB Opp. at 5-7; TW Opp. at 4-6; SN Opp. at 4-6.

The Court has reviewed the declarations, letters, and emails concerning the parties' meet and confer process and concludes that Defendants complied sufficiently with L.R. 7-3. *See, e.g.*, Mead Decl., FB Dkt. No. 34-3 at ¶¶ 2-6 and Exs. A-D; Supp. Mead Decl., FB Dkt. No. 38-1 at ¶ 2; Groombridge Decl., TW Dkt. No. 43-2 at ¶¶ 2-5 and Exs. A-C; Yen Decl., SN Dkt. No. 31-2 at ¶¶ 2-8 and Exs. A-F. The Court observes that, as intended, the meet and confer process appears to have narrowed the issues in certain respects. For example, Defendants did not move to dismiss concerning PARC's willfulness and inducement allegations, some of the purported pleading deficiencies raised during the meet and confer process but absent

from the motions. Thus, the Court declines to deny any of the motions to dismiss on this basis.

## C. Analytical Framework for § 101 Motions to Dismiss

In their respective motions, Facebook, Twitter, and Snap move to dismiss certain causes of actions of PARC's complaints, arguing that the asserted patents claim ineligible subject matter because they are directed to abstract ideas. To resolve these questions, the Court turns to 35 U.S.C. § 101.

Under 35 U.S.C. §101, Congress granted broad patent eligibility to inventions or discoveries including "processes, machines, manufactures, and compositions of matter." *See Bilski v. Kappos*, 561 U.S. 593, 601 (2010). These broad categories notwithstanding, the Supreme Court has carved out three exceptions to patent eligibility under § 101: "'laws of nature, physical phenomena, and abstract ideas.'" *Id.* (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)). The last exception, abstract ideas, is relevant here.

"[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept. Applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (asking whether the invention "claim[s] the 'buildin[g] block[s]' of human ingenuity" or "integrate[s] the building blocks into something more"). In *Alice*, the Supreme Court set forth a two-step framework for determining patent eligibility under § 101. A claim is ineligible under section 101 if "(1) it is 'directed to' a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea, and (2), if so, the particular elements of the claim, considered 'both individually and as an ordered combination,' do not add enough to 'transform the nature of the claim' into a patent-eligible application.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 217 (internal quotations omitted)).

Patent eligibility is a question of law that may include underlying questions of fact. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, No. 2017-1452, 2018 WL 843288, at *5 (Fed. Cir. Feb. 14, 2018) ("While the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination."); *accord Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir.

2018). Patent eligibility can be determined on a motion to dismiss "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software*, 2018 WL 843288 at *2.

Under step one, "courts may ask whether the claims 'focus on a specific means or method that improves the relevant technology' or are 'directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.'" *Nagravision SA v. NFL Enterprises, LLC*, No. CV 17-03919-AB (SKX), 2018 WL 1807285, at *3 (C.D. Cal. Mar. 9, 2018) (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). In the software context, this step often "turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies as an abstract idea for which computers are invoked merely as a tool." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020) (quotation marks omitted).

If the claims fail step one, under step two, "the court must search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." accord *Timeplay, Inc. v. Audience Entm't LLC*, No. CV 15-05202 SJO (JCx), 2015 WL 9695321, at *3 (C.D. Cal. Nov. 10, 2015). This step is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014). "Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact." *Aatrix Software*, 2018 WL 843288, at *5.

### D. Facebook's Motion to Dismiss

Facebook moves to dismiss as to the '599 Patent and the '439 Patent.

#### 1. '599 Patent

##### a. Parties' Arguments

Facebook argues that the '599 Patent is patent ineligible because "[t]he claims are directed to the abstract idea of presenting interactive content to a user based on their context." FB Mot. at 11-12. Because the claims contain "result-focused, 'functional' language," rather than language "enabl[ing] computers to operate more quickly or efficiently," or "solv[ing] any technological problem," Facebook seeks

dismissal. *Id.* at 12 (distinguishing between claiming a result and a *way* to achieve that result). Facebook contends that the specification confirms this problem. *Id.* at 14. For example, Facebook points to Figure 3, which only "illustrates a series of high-level functional steps," which may involve 'present[ing] interactive content to the user, where a user can interact with the interactive content' through questions and responses, such as an interactive Japanese language lesson or a 'reminder' where the user can respond 'OK.'" *Id.* (quoting '599 Patent at 7:65-8:3, 8:54-60, 10:58-11:41, 13:59-14:38). Facebook contends that these functions mimic human behavior, but in a computer environment. *Id.* at 15.[3]

PARC responds that the claims are patent eligible because they are "directed to computer-specific problems, recite[] concrete techniques for solving those problems, and provide[] an advance over conventional systems." FB Opp. at 1. Specifically, PARC contends that "[t]he '599 [Patent] claims solve computer-related problems (mobile devices being unable to learn and understand user behavior to enable better relevant content) with computer-related solutions (using mobile-device specific information to make presentation decisions), and are therefore patent eligible." *Id.* at 8. PARC explains that, "When the '599 patent was filed, mobile device makers had begun adding 'computation power and a growing number of communication features,'" but, at the time, mobile devices were "'not capable of learning and understanding the behavior of their users.'" *Id.* (quoting '599 Patent at 1:19-24, 1:41-43). PARC contends that the claims are directed to "'provid[ing] a content management system for organizing and delivering packages of audio and visual content to a user in response to activities being performed by the user, and in response to a number of environmental factors associated with the user.'" *Id.* (quoting '599 Patent at 3:51-55). Specifically, according to PARC, the claims "recit[e] a specific technique for receiving an information package, and then presenting that information only when certain triggering conditions based on users' mobile device context are met." *Id.* at 9. Because the claims "are directed to improving a basic function of mobile devices by teaching how to use mobile device input sources (*e.g.*, GPS and accelerometer) to account for specific mobile device conditions that can then trigger the presentation of content," PARC argues they are patent eligible. *Id.* at 10. Further, PARC contends that the claims are not "merely functional" because they disclose that, "Certain types of content and triggering information is received, mobile device contextual information is received and

---

[3] In its Motion to Dismiss, Snap makes similar arguments concerning the '599 Patent. *See* SN Mot. at 17-25; *see also* SN Reply at 10-14. The Court has considered all of Snap's arguments in reaching its ruling, but does not repeat them here in the interest of brevity.

processed to determine the device's context, and information is presented if a trigger condition is met." *Id.* at 12; *see also id.* at 16 ("the claims recite a specific, detailed set of steps that explain *how* to trigger and display information").

PARC argues that dismissal is improper for the additional reason that Facebook contests PARC's interpretation of claim terms, including "contextual information," "trigger condition," and "context." *Id.* at 15 & n.6.

In reply, Facebook argues that PARC's failure to quote specific claim language shows that the claims "recite only functional aspirations: 'receiving,' 'processing,' 'determining,' and 'presenting' information, and 'performing' some action," thereby demonstrating that they claim only a result as opposed to a way to achieve that result. FB Reply at 1. Facebook concedes that, "The ['599 Patent] background does state that 'mobile devices are not capable of learning and understanding the behavior of their users,'" but Facebook argues "the claims do not solve that problem" because they do not "provide[] any technological solution that enables a mobile device to learn and understand users' behavior." *Id.* at 1-2.

Regarding PARC's claim construction argument, Facebook contends that "'Contextual information' and 'current context' are merely types of information that are ubiquitous in human life." *Id.* at 5. Further, Facebook explains that "trigger conditions" are "abstract information, essentially 'if-then' logical rules," which are likewise ineligible. *Id.* at 5-6.

### b. *Alice* Step One

A review of the claims suggests that they are not "directed to an improvement to computer functionality," but rather appear "directed to an abstract idea." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)). A claim is directed to an abstract idea if it "consist[s] only of 'generalized steps to be performed on a computer using conventional computer activity.'" *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1260 (Fed. Cir. 2016) (citing *TLI*, 823 F.3d at 612).

Here, Claim 1 discloses "[a] method for delivering context-based content" to a user. *See* '599 Patent, Claim 1. To accomplish this, Claim 1 recites the following steps:

> receiving at least one content package, wherein the content
>    package includes at least one content piece and a set of

> rules associated with the content package, wherein the
> set of rules includes a **trigger condition** and an expected
> response, and wherein the trigger condition specifies a
> **context** that triggers a presentation of the content piece;
> receiving a set of **contextual information** with respect to the
>   first user;
> processing the **contextual information** to determine a cur-
>   rent context for the first user;
> determining whether the current **context** satisfies the **trig-
>   ger condition**;
> in response to the **trigger condition** being satisfied, presenting
>   the content piece to the first user,
> receiving a response from the first user corresponding to
>   the presented content piece;
> determining whether the received response matches the
>   expected response; and
> performing an action based on an outcome of the determination.

*Id.* The other independent claims, Claims 12 and 19, similarly relate to delivering context-based content and disclose a "computer-readable storage medium storing instructions" and "an apparatus" for doing so, respectively. *See id.* at Claims 12 & 19.

Although PARC asserts that "the claims recite a specific, detailed set of steps that explain *how* to trigger and display information," FB Opp. at 16, the Court tends to agree with Facebook that the claims do not do this, but rather disclose "the abstract idea of presenting interactive content to a user based on their context." FB Mot. at 11. This is evident from the claim language, which recites receiving information, satisfying a condition, and presenting content to a user. This claim language is "result-focused, [and] functional." *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1296-97 (Fed. Cir. 2020). Absent from the claims are the technical means for performing those functions and achieving those desired results. For example, Claim 1 discloses the functions of receiving and processing contextual information, without explaining how to perform the claimed functions. *See Secured Mail Solutions LLC v. Univ. Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017) (limitation directed to abstract idea where it failed to provide "description of how the [claimed] unique identifier is generated").

The specification does not appear to remedy this issue. For example, Figures 1 and 3 depict the claimed content management system and claimed steps as follows,

but neither the claim language nor the accompanying written description provides clues regarding the missing technical means.



FIG. 1

FIG. 3

The specification provides, *e.g.*, that, "[t]he methods and processes [for the content management system] described in the detailed description section can be embodied as code and/or data, which can be stored in a computer-readable storage medium as described above." '599 Patent at 3:34-37. But the specification does not explain how to create such code or data that would allow the system to operate as claimed. Moreover, that the invention claims tailoring content based on commonly used contexts such as time of day suggests further that the claims disclose an abstract idea. *See, e.g.*, *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015) ("Tailoring information based on the time of day of viewing is also an abstract, overly broad concept long-practiced in our society.").

Based on the foregoing, at Step One, the Court assumes for the purposes of the motion to dismiss that the '599 Patent claims disclose an abstract idea. Because factual issues remain at Step Two, however, the Court must deny the motion.

c. *Alice* Step Two

The second step of the *Alice* inquiry asks "whether the claims do significantly more than simply describe [the] abstract method and thus transform the abstract idea into patentable subject matter." *Affinity Labs*, 838 F.3d at 1262 (citing *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (internal quotation marks omitted)). The inventive concept "may arise in one or more of the individual claim limitations or in the ordered combination of the limitations." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016). But "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI*, 823 F.3d at 613. "Rather, the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry." *Id.*

At Step Two, Facebook argues that certain generic items like a "processor" and "computer" do not provide an inventive concept. FB Mot. at 20. Quoting selective generic words from the patent does not end the inquiry, however. Having considered the '599 Patent in its entirety, the Court concludes that issues of fact exist, precluding granting the motion to dismiss. For example, PARC alleges that its inventive concept over the prior art is "using certain types of mobile device contextual information to ascertain context and trigger the display of certain types of content." FB Opp. at 14. Facebook does not analyze the claimed ordered combination of the limitations in light of the prior art.

Considering the prior art, the specification notes that, mobile devices "[were] not capable of learning and understanding the behavior of their users" and thus were unable to "determine when and how best to provide their users with information or suitable entertainment content, because the[] [devices] do not take into account the activities that their users are involved in." '599 Patent at 1:41-46. PARC contends that, "It was these difficulties faced by mobile devices at the time that ma[d]e the '599 patent so unique." FB Opp. at 14 (citing *Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016) (even where "[t]he solution requires arguably generic components, including network devices[,] . . . these generic components operate in an unconventional manner to achieve an improvement in computer functionality")). Facebook does not meaningfully respond to this contention. *See* FB Reply at 7-8. Additionally, Facebook's reply arguments

suggest a disagreement between the parties concerning construction of certain claim terms (*e.g.*, "contextual information," "context," and "trigger condition"), which is another factual issue that cannot be resolved at this stage.

Because it is not clear on this record "[w]hether the claim elements or the claimed combination [were] well-understood, routine, [or] conventional," which "is a question of fact," the Court **DENIES** Facebook's Motion to Dismiss. *See Aatrix*, 882 F.3d at 1128; *see also Allconnect, Inc. v. Consumer Brands, LLC*, No. 2:18-cv-5959-DOC, 2018 WL 7377934, at *7 (C.D. Cal. Dec. 14, 2018) (denying motion to dismiss "given the express recitation of databases and the allegations that the claims entail an unconventional technological solution through a specialized database permitting powerful data analytics and comparing, via a computer processor, the received capabilities, the claims are not properly dismissed at this stage").

For the same reasons, the Court **DENIES** Snap's motion as to the '599 Patent.

## 2. '439 Patent

### a. Parties' Arguments

Facebook argues that the '439 Patent "claims [are] directed to ideas for collecting, storing, analyzing, and transmitting information [and therefore] fail *Alice* step one." FB Mot. at 17. Facebook asserts that the claims fail because they do not solve a technological problem or allow computers to operate more efficiently, but rather offer only a "generic" abstraction that reflects basic human behavior. *Id.* at 17-18. Noting that the '439 Patent defines the claimed "context graph" as "a stored 'model' about 'a user's behavior and interests,'" Facebook argues this is nothing more than abstract information. *Id.* at 18 (quoting '439 Patent at 3:20-22). Moreover, Facebook contends that the "purely functional and result-oriented claims of the '439 patent do not recite anything 'significantly more' than the abstract idea itself that would be sufficient to 'transform' the idea into a patent-eligible invention" with an inventive concept. *Id.* at 21.[4]

---

[4] In its Motion to Dismiss, Snap makes similar arguments concerning the '439 Patent. *See* SN Mot. at 10-17; *see also* SN Reply at 7-10. Snap contends that "Snap's and Facebook's formulation of the abstract idea are different, but both capture the focus of the claims." SN Mot. at 13 n.4. The Court has considered all of Snap's arguments in reaching its ruling, but does not repeat them here in the interest of brevity.

PARC responds that, "The '439 [Patent] claims solve specific, computer-related problems (developing context-aware systems for mobile devices) with computer-related solutions (storing, in an unconventional 'context graph,' information gathered from a mobile device to then determine when to notify recommenders of changes to the context graph), and are therefore patent eligible." FB Opp. at 16. PARC explains that the inventors concluded that "[o]ne way to improve the mobile device user lifestyle was a 'context-aware system' that 'adapts to changing conditions detected from the environment, such as location and movement of the mobile device, nearby devices, and other surrounding conditions.'" *Id.* at 16-17 (quoting '439 Patent at 1:22-26). PARC contends that "[t]he '439 patent inventors therefore sought to solve this problem, *i.e.*, by claiming a specific technique for receiving certain mobile device-specific context information, storing that data in an unconventional context graph, and then notifying relevant individuals of certain changes in the mobile device's context." *Id.* at 17 (citing '439 Patent, Claim 1).

In reply, Facebook argues that PARC's opposition "never identifies anything in the claims beyond the abstract functions of collecting information ('receiving, from a mobile device, event data . . .'), processing information ('modifying a context graph . . . using the event data' and 'in response to determining that there exists a registration for notification of changes that matches the modification . . .'), and transmitting information ('. . . sending a notification of context graph change to a recommender')." Reply at 8-9. Facebook concedes that the '439 Patent "states that its disclosure would 'solve the problem of efficiently developing context aware systems," but Facebook contends the solution as disclosed is patent ineligible because the patent only "proposes a 'generic' approach that supposedly allows humans to save 'time and expense in developing' a system." *Id.* at 9 (quoting '439 Patent at 2:49-51, 3:43-45). Moreover, Facebook contends that a "context graph" is nothing new because it "is just stored information." *Id.* at 9. And according to Facebook, there is no difference between the claimed "context graph" and the prior art "user model," or the claimed "recommender" and the prior art "recommendation software." *Id.* at 10. Facebook also notes that, when analyzing the context graph, details from the specification cannot be imported into the claims. *Id.*

### b. *Alice* Step One

The Court concludes that factual issues at Step One preclude it from resolving eligibility on a motion to dismiss. Specifically, the parties have identified factual disputes relating to claim terms and the claimed improvements provided by the invention.

The '439 Patent recognized that "software on [] mobile devices that detect[s] and make[s] use of physical surroundings can increasingly contribute to improving the lifestyle of mobile device users." '439 Patent at 1:15-17. The inventors sought to further improve this lifestyle by solving the technological "problem of efficiently developing context aware systems by providing a generic contextual intelligence platform that may be adapted for specific applications. Such a contextual intelligence system facilitates real-time processing of contextual information and support[s] contextual application development for Web and mobile applications." *Id.* at 2:49-55. As a further improvement, the inventors used an adaptable "generic" platform to avoid the "considerable time and expense" typically required "to develop such context-aware systems" based on a "user model." *See id.* at 1:29-34. Accordingly, Claim 1 discloses:

> A method, comprising:
> receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;
> modifying a **context graph** that stores facts and assertions about a user's behavior and interests using the event data;
> in response to determining that there exists a registration for notification of changes that matches the modification to the **context graph**, sending a notification of **context graph** change to a **recommender**.

'439 Patent at Claim 1 (emphasis added). The other independent claims, Claims 7 and 13, disclose a "non-transitory computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a [similar] method," and "one or more processors" that can do the same.

The patent distinguishes the claimed platform from the prior art user model through the claimed "context graph," which the patent defines as "an in-memory model that stores facts and assertions about a user's behavior and interests." '439 Patent at 3:20-22. PARC asserts that the context graph, which PARC characterizes as "then-unconventional," "improves the way that data is stored and used." FB Opp. at 18. The Court agrees that technological improvements such as improving how smartphones store and use data are patent eligible. *See, e.g., Enfish*, 822 F.3d at 1333 (finding patent eligible claims disclosing self-referential tables that improved the way computers operated and handled data). Although Facebook argues that there is

nothing unconventional about the claimed context graph that distinguishes it from prior art user models, that is a factual question that the Court cannot resolve at this stage. Similarly, Facebook's dispute regarding the meaning of "recommender" and its relation to the prior art cannot be resolved at this stage.

       c.  *Alice* Step Two

Given the factual issues identified above, the Court declines to analyze Step Two. The Court observes, however, that if it reached Step 2, similar factual issues would persist (*e.g.*, whether and how the claimed context graph contributes to an overall inventive concept).

Accordingly, the Court **DENIES** Facebook's motion as to the '439 Patent. For the same reasons, the Court **DENIES** Snap's motion as to the '439 Patent.

## E. Twitter's Motion to Dismiss

Twitter moves to dismiss as to the '871 Patent, '781 Patent, and '362 Patent.

### 1. '871 Patent

#### a. Parties' Arguments

Twitter contends that the '871 Patent claims relate to "the fundamental practice of determining the authoritativeness of a document based on textual features within the document." TW Mot. at 6. Twitter argues that the concept is "directly analogous to to what people do when they read research papers, news articles, and other textual works that are intended to be authoritative." *Id.* Indeed, Twitter asserts that "all of the steps of Claim 1 could be performed by a human." *Id.* at 6-7. Twitter acknowledges that Claims 16 and 21 require the use of computer components, but argues that the claims fail where they "merely attempt to capture what people have done for centuries," adding only "a bare instruction to do it on a computer." *Id.* at 9 (internal quotations omitted). Twitter argues that the claims do not "provide any details as to how the alleged invention determines the 'document content feature values,' or the 'authoritativeness' or 'reliability' of the document, just that it happens," nor do the claims explain "how the trained model is used, or even trained, to determine that information is authoritative, just that it is used." *Id.* at 7-8. Finally, Twitter contends that none of the claims "supply an inventive concept beyond the concept of authoritativeness," and the claims "fail to recite any elements, individually or as an ordered combination, that transform the claimed abstract idea into a patent-eligible application of that idea." *Id.* (internal quotations omitted).

PARC rejects Twitter's assertions that the patent involves an age-old problem; rather, "the problem of the '871 patent, and its solution, are both specific to computer networks," and that "the social-reach versus content authoritativeness problem has no pre-computer analogue." TW Opp. at 11. PARC argues that the claims "solve this network problem in a particular way by reciting specific steps detailing the method of determining a document's authoritativeness." *Id.* at 9-10. PARC explains that, "the steps claimed in the '871 patent include determining document content feature values based on the textual contents of the document, and using a trained document textual authority model to determine authoritativeness based on the feature values." *Id.* at 11. PARC asserts that "Twitter ignores that the Internet exacerbates the authoritativeness problem exponentially because it uses social networks and link structure (instead of content) to measure authoritativeness." *Id.* at 10. PARC explains that "[t]he '871 patent provides a functional improvement to that prior art by considering the document's content, whose feature values are provided to a trained model to determine authoritativeness." *Id.* PARC also asks the Court to "construe the terms 'document,' 'document content feature values,' and/or 'trained document textual authority model' before the Court rules that the claims do not recite network-specific features. *Id.* at 12. Finally, PARC contends that the '871 Patent has an inventive concept, namely "analyzing the text of the document itself for cues of its reliability rather than determining reliability based on the popularity or wide-spread circulation of Internet-based information," thereby solving a common search problem. *Id.* at 13 (internal quotations omitted).

In reply, Twitter argues that (1) the asserted problem is longstanding and not unique to the internet; (2) the analysis does not change even when the internet exacerbates a problem; (3) the '871 Patent teaches that the difficulty in determining authoritativeness is due to sheer volume, and not the technological nature of the internet; and (4) an age-old problem appearing on the internet does not make a claim non-abstract. TW Reply at 2-3. Twitter reiterates that the claims are "results oriented" because the "claims do not explain how to accomplish any of the steps. *Id.* at 4. Twitter dismisses PARC's argument that "the social-reach versus content authoritativeness problem has no pre-computer analogue," and asserts that the "ineligibility of these claims is based on their recitation of the exact same solution that humans have always used to determine authority, as the '871 specification itself explains." *Id.* at 6. Finally, Twitter argues that PARC's appeal to the Complaint, specification, and prosecution history about the problem faced by the inventors is unavailing because novelty has no relevance to the question of patent eligibility. *Id.* at 8.

b. *Alice* Step One

A review of the claims suggests that they are not "directed to an improvement to computer functionality," but rather "an abstract idea." *TLI*, 823 F.3d at 612.

The '871 Patent is directed to "[s]ystems and methods for determining the authoritativeness of a document based on textual, non-topical cues." '871 Patent at Abstract. This is achieved by "evaluating a set of document content features contained within each document to determine a set of document content feature values, processing the set of document content feature values through a trained document textual authority model, and determining a textual authoritativeness value and/or textual authority class for each document evaluated using the predictive models included in the trained document textual authority model." *Id.* According to the patent, previous systems "determine[d] the authoritativeness of a web page based on its link structure" without "consider[ation] of the content of the documents." *Id.* at 1:37-39. The inventors felt that "misclassifications" were "inevitable" if authoritativeness was based solely on link structure. *See, generally, id.* at 2:9-38. The claimed invention sought to fix this problem by providing a system or method for determining document authoritativeness based on various document content features. *See, generally*, *id.* at 2:65-3:6.

To that end, Claim 1 discloses:

A method for determining an authoritativeness of a document having a plurality of document content features, the method comprising:
**determining a set of document content feature values of a document based on textual contents in the document**, the document providing information regarding a Subject;
**determining an authoritativeness for the document based on the determined set of document content feature values using a trained document textual authority model**, wherein determining the authoritativeness comprises determining a reliability of the document, the reliability indicative of whether the information, as provided in the document, is reliable regarding the Subject; and
outputting the determined authoritativeness in association with the document.

'871 Patent at Claim 1 (emphasis added). The other independent claims, Claim 16 and Claim 21, disclose "[a] machine-readable medium that provides instructions for determining the authority of a document . . . executed by a processor," "[a] textual authority determining system . . . comprising: a memory[,] and a document textual

authoritativeness value determination circuit or routine." *See id.* at Claim 16 and Claim 21.

PARC contends that the claimed system for determining authoritativeness is a computer-specific solution to a computer-specific problem, noting the prior art method of "social-reach" as opposed to "content authoritativeness." But automating a process that people do manually (*e.g.,* by reading a document to see if it seems well researched or uses language in a skillful and appropriate way), does not make something patent eligible. Indeed, the steps of Claim 1 can be performed entirely in the human mind. The first step, "determining a set of document content feature values of a document based on textual contents in the document," can be performed by a human who can read the document and assign a score based on how the document reads and the language used. The second step, "determining an authoritativeness for the document based on the determined set of document content feature values using a trained document textual authority model," can be performed by a human who creates a mental framework for assessing the authoritativeness of the documents based on the assigned scores. And the third step, "outputting the determined authoritativeness," can be performed by a human who can state or write down the authoritativeness of the document. Because the steps of Claim 1 can be performed in the human mind, they are unpatentable. *See CyberSource Corp.* v. *Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) ("Methods which can be performed entirely in the human mind are unpatentable . . . because computational methods which can be performed entirely in the human mind are the types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none.").

Moreover, Claims 16 and 21 merely automate that process using generic computers which is not "a patentable improvement in computer technology." *See, e.g.*, *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology"). Nothing in the claims discloses an improvement to computer technology or the solution for a technological problem.

Although PARC focuses on the "notorious problem" of internet searches mistakenly "assum[ing] that social reach equals authoritativeness," and therefore "display[ing] unauthoritative webpages well before more reputable, authoritative sources," TW Opp. at 7, as Twitter notes, the claimed invention is *not* limited to this purported internet problem. *See* '871 Patent at 1:13–18, 2:9–10 (the problem stems from "using large heterogeneous document collections, *such as* the World Wide

Web;" "*[i]n society at large*, as evidenced on the Web, there is much more heterogeneity in knowledge and viewpoint") (emphasis added); *id.* at 2:39-41 ("This invention provides systems and methods for estimating the *authoritativeness of a document* based on textual, non-topical cues.") (emphasis added); *compare id.* at Fig. 8 ("identify a first set of relevant documents") *with id.* at Fig. 9 ("identify a first set of relevant web documents"). This undermines PARC's argument that the patent provides a technological solution unique to the internet environment.

PARC has not raised any factual issues such as claim construction disputes that would preclude the Court from granting the motion at this stage. While PARC raised several terms, it neither proposed any construction nor explained how any proposed construction would change the § 101 analysis. *See Mortg. Application Techs., LLC* v. *Meridianlink, Inc.*, No. 2020-1504, — F. App'x —, 2021 WL 97347, at *3 (Fed. Cir. Jan. 12, 2021) (no error where district court declined to engage in claim construction before conducting § 101 analysis where the plaintiff did not propose construction and explain how any proposed construction would change the analysis); *see also Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (affirming district court's § 101 determination on a motion to dismiss because plaintiff proposed no claim construction that would have changed the analysis).

Thus, the Court turns to Step Two to analyze whether the patent discloses an inventive concept.

c.   *Alice* Step Two

If either the individual claim limitations or the ordered combination thereof "do significantly more than simply describe [the] abstract method" discussed above, such that they "transform" that idea, the patent discloses patentable subject matter. *Affinity Labs*, 838 F.3d at 1262; *see Bascom*, 827 F.3d at 1349.

While PARC asserts that "[u]sing a document's textual contents to assess authoritativeness, and the trained textual authority model for making that decision, are inventive concepts," the Court disagrees. "It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech, LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

Although the claims contain various technical terms and describe how the claimed abstract idea employs, *e.g.*, computer processors and circuits, "an invocation of already-available computers that are not themselves plausibly asserted to be an advance, for use in carrying out [a computational method], amounts to a recitation of what is well-understood, routine, [and] conventional." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018) (internal quotations omitted).

PARC relies generally on the claims, specification, prosecution history, and Complaint to show an inventive concept, and articulates that concept as "analyzing the text of the document itself for cues of its reliability rather than determining reliability based on the popularity or wide-spread circulation of Internet-based information." TW Opp. at 13-14. But summarizing the claimed abstract idea does not transform it into a patent-eligible concept.

Because the '871 Patent is direct to an abstract idea and does not disclose an inventive concept, for the reasons stated above, the Court **GRANTS** Twitter's motion to dismiss as to this patent. The Court declines PARC's request for leave to amend because PARC contends that amending would allow it to "counter [Twitter's] arguments with the information noted above [*i.e.*, argued in opposition]." TW Opp. at 25. But the Court has considered that information in conducting its *Alice* analysis. PARC provides no further explanation of what factual allegations it could add in an amended complaint to address these § 101 issues.

## 2. '781 Patent

### a. Parties' Arguments

Twitter argues that the '781 Patent claims ineligible subject matter because the claims "simply recite the abstract idea of personalizing information searches by returning as-yet unseen information connected in some way to information previously viewed by the user." TW Mot. at 13. Twitter contends that, "the fundamental practice of providing suggestions for new items to someone based on what that person has seen before" is no different than, *e.g.*, "a reader ask[ing] the librarian for what book to read next," and the librarian using the reader's check-out history to make a recommendation. *Id.* Thus, Twitter concludes that "Claim 19 simply recites performing that mental method on a computer." *Id.* Twitter explains that, "gathering and analyzing information of a specified content" without providing an "inventive technology for performing those functions" is insufficient. *Id.* at 14. Further, Twitter argues that the steps disclosed in Claim 1 are "routine data-gathering" and "routine data-analyzing" steps, and thus do not constitute an

inventive concept. *Id.* at 16. Further, Claim 19's addition of "a generic memory, processor, and circuits" does not transform this abstract idea, Twitter contends. *Id.* Finally, Twitter argues that use of jargon, such as "proximal neighborhood" and "linked information elements," does not transform an abstract idea into an inventive concept. *Id.* at 17.

PARC responds that the '781 Patent addressed the problem that conventional web search engines returned search results already accessed by a user. TW Opp. at 15. PARC explains that the patent's solution is "far more complex than a librarian's suggestions," because in addition to accessing search history, the invention "determine[s] a 'proximal neighborhood' of information previously unseen by the user." *Id.* at 15. This unseen information must fall within a specified "link distance" from previously accessed web pages. *Id.* at 15-16. The user's search query is then applied to that unseen information. *Id.* at 16. Thus, PARC asserts that the patent "improves existing search capabilities by locating relevant, unseen information responsive to a user's query." *Id.* PARC argues that the claims take the invention outside of "abstract idea" territory based on the requirements that (1) "the search [must] be applied to previously unseen linked information," and (2) only to information "within a threshold distance of linked information in the user's history." *Id.* This helps provide the user with topically relevant information the user has not previously seen. *Id.* at 17. PARC contends that the claims are "rooted in computer technology" and "overcome the computer-network problem of search engines frequently returning already-viewed or irrelevant webpages rather than relevant, previously-unseen ones." *Id.* Moreover, PARC explains that, "[s]earching linked documents on a network to find unseen ones that are within a certain threshold link distance is not a 'well-known business practice.'" *Id.* PARC argues that these elements demonstrate an inventive concept. *Id.* at 18.

PARC suggests that, "if Twitter argues that the claims do not recite the features noted [by PARC]," then "the Court should construe the terms 'user history,' 'access patterns,' 'linked information elements,' and/or 'threshold distance' before ruling otherwise as a matter of law." *Id.*

In reply, Twitter maintains that the claimed method "can be performed entirely by a human." TW Reply at 9. Twitter argues that "the problem here arises from the general field of information retrieval," and using a computer to complete the same steps humans have always done does not demonstrate a solution to a computer-network problem. *Id.* For example, Twitter explains that "information can be 'linked' in an analog world, such as by reference or citation." *Id.* Twitter contends that PARC's claim construction argument is insufficient to defeat the motion

because it fails to "rais[e] a claim construction dispute or identify[] why the dispute matters." *Id.* at 10. Finally, Twitter contends that PARC has failed to raise a factual dispute about whether the patent embraces an inventive concept. *Id.* at 11.

### b. *Alice* Step One

A review of the claims suggests that they are "directed to an improvement to computer functionality," not "an abstract idea." *TLI*, 823 F.3d at 612.

The '781 Patent relates to "information retrieval" and is directed toward techniques "to provide personalized search results to a user." '781 Patent at 1:15, Abstract. The inventors recognized that, "Search engines provide a view into the wealth of constantly changing resources available over the web, intranets, file servers and other dynamic information repositories." *Id.* at 1:18-20. Unlike conventional search engines that displayed previously viewed results, however, the invention sought to offer a search that "focused on discovering new-unseen information relevant to the user's current information retrieval goals." *Id.* at 1:29-32. To do this, the invention first determines a "user history" and creates a profile for the user using keywords or concepts. The invention then determines a "proximal neighborhood based on the user's history and adjustable crawling parameters." *Id.* at Abstract. "The adjustable crawling parameters define which documents linked to documents in the user history are included within the proximal neighborhood." *Id.* A user query prompts a search of the documents in the proximal neighborhood, and based on how the results are ranked, displays results to the user. *Id.* Figure 12 provides "an overview of an exemplary query using a [the claimed] system for personalized search." *Id.* at 2:16-18.



FIG. 12

Considering that a method for "personalized search would be useful," *id.* at 1:36-37, Claim 1 discloses:

> A method for personalized search comprising the steps of:
> > receiving a query from a user;
> > identifying the user;
> > retrieving a user history for the user comprising access
> > > patterns **identifying linked information elements previously accessed** by the user within an information repository;
> > identifying a user profile comprising keywords relevant to
> > > the access patterns in the user history;
> > **determining a proximal neighborhood using the user history** in the user profile, wherein **the proximal neighborhood comprises only linked information elements previously unseen** by the user that are **within a threshold distance of the linked information** elements in the user history; and
> > applying the query **to the unseen linked information** elements
> > > in the proximal neighborhood and determining
> > > search results comprising the unseen linked information
> > > elements that match the query.

'781 Patent at Claim 1 (emphasis added). The other independent claim, Claim 19, discloses a process to accomplish a similar method by using "a memory" and "an input/output circuit." *See id.* at Claim 19.

The Court agrees with PARC that certain claim elements save the claimed method from being an abstract idea. First, the method distinguishes between previously seen and new material. Second, the search is applied only to new material that falls within a certain degree of relevancy to the user. As PARC explains, the claimed method overcame the computer-network problem of search engines frequently returning already-viewed or irrelevant webpages, as opposed to new and relevant webpages. Twitter claims that this method "can be performed entirely by a human," Reply at 9, but Twitter fails to explain how a human could constantly catalogue ever-changing content on the internet about an endless number of topics to then provide only new search results within a predetermined degree of relevancy to a particular query. *See, e.g., California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (recognizing that, "although a computer performs the same math as a human, a human cannot always achieve the same results

as a computer," and a software solution does not "become conventional simply because humans can do math"). The Court concludes that the claimed method provided a technological solution to an internet-based problem.

Even assuming the patent were directed to an abstract idea, to the extent Twitter disagrees with the claimed features as PARC recites them, the Court agrees with PARC that a factual issue exists as to the claim terms relevant to those features. *Compare* TW Opp. at 15-16 (PARC distinguishing claimed features of the invention from what a librarian can do) *with* TW Reply at 9 (Twitter arguing that, "[I]nformation can be 'linked' in an analog world" and "[t]here is nothing about the functioning of a computer or network that uniquely causes a user not to be able to locate a relevant unseen document."). *See e.g.*, *Aatrix Software*, 882 F.3d at 1128 ("concrete allegations regarding the claimed combination's improvement to the functioning of the computer" precluded granting motion to dismiss); *BlackBerry Ltd. v. Facebook, Inc.*, No. CV 18-01844 GW(KSX), 2018 WL 4846912, at *7 (C.D. Cal. Aug. 2, 2018) ("Considering the claims and allegations in the Complaint and First Amended Complaint in the light most favorable to BlackBerry, the parties have submitted a factual dispute regarding whether the [the relevant claim term] and its specific architecture as recited in the claims is a well-understood, routine, and/or conventional computer component.")

### c. *Alice* Step Two

Because the Court concludes that the '781 Patent passes Alice Step One, it need not reach Step Two.

For the reasons stated above, the Court **DENIES** Twitter's motion as to the '781 Patent.

### 3. '362 Patent

Twitter also moves to dismiss as to the '362 Patent. TW Mot. at 18-25; TW Reply at 11-14. The Court has considered all of Twitter's arguments relating to this patent; in the interest of brevity, the Court analyzes patent eligibility in connection with Snap's motion below. The Court's analysis applies to the '362 Patent claims asserted against Twitter (*i.e.*, Claims 1, 12, 23). *See* TW Compl. For the reasons stated below, the Court **GRANTS** Twitter's motion as to the '362 Patent.

### F. Snap's Motion to Dismiss

In addition to raising the '599 and '439 Patents discussed above, Snap seeks dismissal with respect to the '362 Patent.

### 1. Parties' Arguments

Snap contends that the '362 Patent's claims "reflect a non-technological practice of marking up a document with follow-up actions for a recipient." SN Mot. at 5. Snap acknowledges that the specification "describes the alleged invention as automating the task by using a computer to process the text and send" it to someone, but Snap argues the user could "could just as easily have followed the instructions in [the] note and manually sent the paragraph to [someone else] himself." *Id.* at 5. Snap contends that, "Such an automation of a manual task falls squarely at the heart of the abstract idea exception." *Id.* Snap argues that the claims fail where they do nothing but "recite a high-level automation of using notes in a document to send a portion of the document to a recipient," and do not explain "how the results are achieved." *Id.* at 6. Moreover, improving the user experience does not equate with improving computer functionality or solving a technological problem, Snap argues. *Id.* at 8. Given this deficiency, combined with the fact that the '362 Patent recites only "generic data structures" (*i.e.*, tags) and "functional results" (*i.e.*, processing), Snap contends that it lacks an inventive concept. *Id.* at 9.

PARC rejects Snap's pen-and-paper markup analogy, arguing that it "dramatically oversimplifies the invention." SN Opp. at 19. PARC explains that the claims include the "how" that Snap alleges is missing. According to PARC, Claim 1 explains that, "A user of the '362 document editing system first inputs a natural language tag. The tag is inserted inline and contains a receiving user, a command, and the portion of the document on which the command will be executed. The invention then processes the tags and disseminates the portion indicated to the receiving entity to facilitate the action specified." *Id.* at 20 (citations omitted). Also, "the invention can provide the user with context for the tagged portion of the document" to facilitate a faster and more efficient response. *Id.* PARC further explains that, "the claimed 'dissemination' of the tagged document controls the amount of information shared and the actions the recipient can take." *Id.* (citing '362 Patent at 4:13-19). PARC explains that, the "loss of context [experienced without the '362 Patent] is a computer-specific problem," and the patent solves this problem with a computer-specific solution, *i.e.*, "tags that control the amount of information shared with the recipient, and the actions he/she can take." *Id.* at 21-22. Moreover, PARC explains that the patent discloses an inventive concept, namely, "the use of

inline tags that control the amount of the document shown to the recipient and the actions that the recipient may take on the document." *Id.* at 24.

In reply, Snap argues that PARC's response avoids tying the actual claim language to its arguments, and instead improperly imports details from the specification into the claims. SN Reply at 1-2. And, Snap contends, PARC did not present any claim construction arguments that would affect the analysis. SN Reply at 1-2. Snap argues that PARC's arguments further highlight how the patent claims nothing more than "processing and manipulating information." *Id.* at 2. Even crediting PARC's proposed "computer-specific solution," Snap argues that the proposed solutions of "context-identification and control are not recited in the claims." *Id.* at 3. Snap explains that, "[t]he 'tag' itself is no more than abstract information: '[t]he term "tag" refers to a piece of descriptive text which can be inserted in a document.'" *Id.* (quoting '362 Patent at 4:24-25). Snap argues that PARC failed to explain how a "tag" is linked to the purported improvement of providing context, especially where the specification explains that the tagged document portion "can be 'any subset of a document.'" *Id.* at 3 (quoting '362 Patent at 4:5-10). With respect to an inventive concept, Snap argues that PARC "focuses on what the specification, complaint, and file history say[] was the problem in the prior art, without identifying what in the claims provides the solution to that problem." *Id.* at 6.

## 2. *Alice* Step One

A review of the claims suggests that they are not "directed to an improvement to computer functionality," but rather "an abstract idea." *TLI*, 823 F.3d at 612.

The '362 Patent is directed toward "facilitat[ing] content dissemination." '362 Patent at Abstract. To achieve this, a user adds a tag to a document, the tag contains an operation to be performed on the document, and the system processes the tag and performs the operation. *Id.* According to the patent, in conventional document management systems, "users [could] only send information at the level of entire documents," whereby users "manually extract[ed] the specific content to be shared, *e.g.*, using cut and paste, and sending it to the recipient as a separate document or in an email message." *Id.* at 1:18-24. The inventors found "[t]his manual process not only [to be] cumbersome, but [it] also ma[de] it difficult to reestablish context for the information or to incorporate responses into the original content when the recipient replies with comments or changes to the shared content." *Id.* at 1:24-28. The claimed invention sought to overcome the problems of recipient information overload, which could cause the recipient to take a long time to respond, not respond

at all, or miss the point of the shared information. *See generally id.* at 3:23-31. The invention also allows for, *inter alia*, sharing of only a portion of a sensitive document, and encourages sharing between users to improve workflow. *See id.* at 3:32-38, 3:39-61.

> To that end, Claim 1 discloses:

> > A method for facilitating content dissemination, the method comprising:
> > > receiving, within a document editing system, a user input comprising one or more **tags** to insert inline within a document, wherein the document is formulated in a natural language and wherein a respective **tag** is at least partly formulated in natural language and is visible to the user, and indicates **an action to be performed** on a partial portion of the document and **a receiving entity** corresponding to the action;
> > > **processing the one or more tags** according to one or more **rules** to determine both the action to be performed on the partial portion of the document and the receiving entity; and
> > > **disseminating the document portion** indicated by the one or more tags to the corresponding receiving entity **to facilitate performing the action** specified in the one or more tags on the document portion.

'362 Patent at Claim 1 (emphasis added). The other independent claims, Claims 12 and 23, disclose "[a] non-transitory computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a [similar] method," and "[a] computer system that facilitates content dissemination" through tagging and tag processing. *See id.* at Claims 12 and 23.

> PARC contends that the claimed inline tagging, which allows for sharing portions of documents, provides a computer-based solution to "the prior art's requirement to provide the whole document or manually clip out relevant portions while losing invaluable context," but automating a task that users do manually by, *e.g.*, sending an entire document or copying and pasting, is not patent eligible. *See, e.g.*, *Credit Acceptance Corp.*, 859 F.3d at 1055 ("mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology"). The Federal Circuit has explained that "collecting,

displaying, and manipulating data" is an "abstract concept." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017). PARC fails to undermine Snap's showing that the claims here involve similar data manipulation. For example, Claim 1 recites adding one or more tags that indicate an action to be performed on part of the document (*e.g.*, sharing), and then processing the tag(s) so that action can be taken and the information disseminated. Adding use of a computer in certain claims does not cure this deficiency. *See DDR Holdings, LLC* v. *Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014) (using a computer without offering technological improvement insufficient). Nothing in the claims discloses an improvement to computer technology or the solution for a technological problem.

PARC has not raised any factual issues such as claim construction disputes that would preclude the Court from granting the motion at this stage. The patent defines several key terms and the parties do not raise factual disputes concerning these definitions. For example, "tag" "refers to a piece of descriptive text which can be inserted in a document, often inline with the document. A tag can specify an operation to be performed on a portion of the document." '362 Patent at 4:24-27. The action of "tagging" "involves manual addition of meta-data to a piece of content." *Id.* at 4:40-41. "Document" "refers to a piece of content." *Id.* at 4:1. And a "document portion" is "any subset of a document." *Id.* at 4:5-6.

Thus, the Court turns to Step Two to analyze whether the patent discloses an inventive concept.

### 3. *Alice* Step Two

A review of the individual claim limitations and ordered combination thereof shows nothing more than a description of the of the abstract method discussed above. *See Affinity Labs*, 838 F.3d at 1262; *Bascom*, 827 F.3d at 1349.

Although the '362 Patent claims contain various technical terms and describe how the claimed abstract idea employs, *e.g.*, computers and word processing programs, the Court agrees with Snap that, whether "'taken individually or in combination, the recited limitations neither improve the functions of [a] computer itself, nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept.'" SN Mot. at 9 (quoting *Intellectual Ventures*, 850 F.3d at 1342). Claiming the process of manually adding a piece of meta-data to content and disseminating that content according to the instruction provided by the user does not transform the abstract idea of automating content sharing into an inventive concept.

PARC relies generally on "the claims, specification, prosecution history, and Complaint," to show an inventive concept, and articulates that concept as: "the use of inline tags that control the amount of the document shown to the recipient and the actions that the recipient may take on the document." SN Opp. at 24. But this description of the claimed abstract idea does not transform it into a patent-eligible concept. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) ("the § 101 inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details from the specification if those details are not claimed") (citation and quotations omitted).

Because the '362 Patent is direct to an abstract idea and does not disclose an inventive concept, for the reasons stated above, the Court **GRANTS** Snap's motion to dismiss as to this patent. For the same reasons, the Court **GRANTS** Twitter's motion to dismiss as to this patent. The Court declines PARC's request for leave to amend because PARC contends that amending would allow it to "counter [Defendants'] arguments with the information noted above [*i.e.*, argued in opposition." SN Opp. at 25. But the Court has considered that information in conducting its *Alice* analysis. PARC provides no further explanation of what factual allegations it could add in an amended complaint to address these § 101 issues.

## V.    <u>Conclusion</u>

For the foregoing reasons, the Court rules as follows:

| Motion | Ruling |
|---|---|
| Facebook's Motion to Dismiss (No. 20-1753, Dkt. No. 34) | **DENIED** as to the '599 Patent<br>**DENIED** as to the '439 Patent |
| Twitter's Motion to Dismiss (No. 20-1754, Dkt. No. 43) | **GRANTED** as to the '871 Patent<br>**DENIED** as to the '781 Patent<br>**GRANTED** as to the '362 Patent |
| Snap's Motion to Dismiss (No. 20-1755, Dkt. No. 31) | **DENIED** as to the '599 Patent<br>**DENIED** as to the '439 Patent<br>**GRANTED** as to the '362 Patent |
| PARC's Requests for Judicial Notice (No. 20-1753, Dkt. No. 37; No. 20-1754 Dkt. No. 47; No. 20-1755, Dkt. No. 34) | **GRANTED** |

For the reasons stated in this Order, the Court declines to grant leave to amend as to the '871 Patent and the '362 Patent.

**IT IS SO ORDERED**.