# EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SNAP INC.,
Petitioner

v.

PALO ALTO RESEARCH CENTER INC.,
Patent Owner

_____

Patent No. 9,208,439

_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 9,208,439**

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.   MANDATORY NOTICES ....................................................................1

III.   PAYMENT OF FEES ...........................................................................2

IV.   GROUNDS FOR STANDING...............................................................2

V.   PRECISE RELIEF REQUESTED .........................................................2

    A.   Claims for Which Review Is Requested ......................................2

    B.   Statutory Grounds of Challenge .................................................3

VI.   LEVEL OF ORDINARY SKILL ..........................................................5

VII.   OVERVIEW OF THE '439 PATENT ....................................................6

VIII.   CLAIM CONSTRUCTION ...................................................................7

IX.   DETAILED EXPLANATION OF GROUNDS.......................................8

    A.   Ground 1: The Combination of *Nitz* and *Nykanen* Render Obvious Claims 1-4, 7-10, and 13-16 ......................................8

        1.   Claim 1 ...........................................................................8

        2.   Claim 2 .........................................................................29

        3.   Claim 3 .........................................................................33

        4.   Claim 4 .........................................................................35

        5.   Claim 7 .........................................................................38

        6.   Claim 8 .........................................................................40

        7.   Claim 9 .........................................................................42

        8.   Claim 13 .......................................................................42

        9.   Claim 14 .......................................................................44

i

Petition for *Inter Partes* Review
Patent No. 9,208,439

10.   Claim 15 ..................................................................45

11.   Claims 10 and 16 ....................................................46

B.   Ground 2: The Combination of *Nitz*, *Nykanen*, and *Mishra* Render Obvious Claims 6, 12, and 18 ...............................47

1.   Claim 6 ....................................................................47

2. Claims 12 and 18 ........................................................50

C.   Ground 3: The Combination of *Nitz*, *Nykanen*, and *Chang* Render Obvious Claims 5, 11, and 17 .................................52

1.   Claim 5 ....................................................................52

2.   Claims 11 and 17 ....................................................55

D.   Ground 4: The Combination of *Nitz*, *Nykanen*, and *Mccolgan* Render Obvious Claim 19 ...............................56

1.   Claim 19 ..................................................................56

E.   Ground 5: The Combination of *Nitz, Nykanen*, and *Sathish* Render Obvious Claim 20 ...............................64

1.   Claim 20 ..................................................................64

X.   DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE..................69

XI.   CONCLUSION.............................................................74

ii

## LIST OF EXHIBITS

| Ex. 1001 | U.S. Patent No. 9,208,439 |
|----------|---------------------------|
| Ex. 1002 | Declaration of Steve Smoot. |
| Ex. 1003 | Curriculum Vitae of Steve Smoot. |
| Ex. 1004 | Prosecution History of U.S. Patent No. 9,208,439 |
| Ex. 1005 | U.S. Patent No. 9,015,099 to Nitz et al. ("*Nitz*") |
| Ex. 1006 | U.S. Patent No. 6,714,778 to Nykänen et al. ("*Nykanen*") |
| Ex. 1007 | U.S. Patent Application Publication No. 2012/0135751 to Mishra ("*Mishra*") |
| Ex. 1008 | U.S. Patent Application Publication No. 2012/0046966 to Chang et al. ("*Chang*") |
| Ex. 1009 | U.S. Patent Application Publication No. 2012/0096114 to Mccolgan et al.  ("*Mccolgan*") |
| Ex. 1010 | U.S. Patent No. 8,010,669 to Sathish ("*Sathish*") |
| Ex. 1011 | Complaint for Patent Infringement filed in *Palo Alto Research Center Inc. v. Snap Inc.*, No. 2:20-cv-10755 (C.D. Cal.), Doc. No. 1. |
| Ex. 1012 | *Palo Alto Research Center v. Snap*, Case No. 2:20-cv-10755-AB-MRW, Dkt. 44, Order Regarding Case Schedule (C.D.Cal. May 20, 2021). |
| Ex. 1013 | U.S. Patent No. 7,835,578 to Cheng et al. |
| Ex. 1014 | U.S. Patent Application Publication 2012/0131020 to Nitz et al. |
| Ex. 1015 | U.S. Patent No. 9,245,010 to Donneau-Golencer et al. |
| Ex. 1016 | U.S. Patent Application Publication 2013/0198197 to Sawhney et al. |
| Ex. 1017 | U.S. Patent No. 7,639,840 to Hanna et al. |

| Ex. 1018 | U.S. Patent No. 7,171,046 to Myers et al. |
|---|---|
| Ex. 1019 | U.S. Patent No. 6,037,976 to Wixson |
| Ex. 1020 | *Palo Alto Research Center v. Snap*, Case No. 2:20-cv-10755-AB-MRW, PARC's Infringement Contentions (May 11, 2021) |
| Ex. 1021 | Apple Introduces the New iPhone 3G, Apple Newsroom, June 9, 2008 (https://www.apple.com/newsroom/2008/06/09Apple-Introduces-the-New-iPhone-3G/) |
| Ex. 1022 | Marguerite Reardon, Motion sensing comes to mobile phones, CNET (June 11, 2007) |
| Ex. 1023 | U.S. Patent Application Publication 2006/0010240 to Chuah |
| Ex. 1024 | Ming Liu, A Study of Mobile Sensing Using Smartphones, International Journal of Distributed Sensor Networks, Vol. 2013, Article ID 272916 (accepted Jan. 15, 2013) |
| Ex. 1025 | Context-Aware Computing and Self-Managing, Systems, CRC Press, Edited by Waltenegus Dargie (2009) |
| Ex. 1026 | Thomas Strang, A Context Modeling Survey |
| Ex. 1027 | *Palo Alto Research Center v. Snap*, Case No. 2:20-cv-10755-AB-MRW, Correspondence Regarding Motion to Stay (May 19, 2021) |

## I.   INTRODUCTION

Snap Inc. ("Petitioner") requests *inter partes* review ("IPR") of claims 1-20

("challenged claims") of U.S. Patent No. 9,208,439 ("the '439 patent") (Ex. 1001),

which is assigned to Palo Alto Research Center Inc. ("Patent Owner," or "PO").  For

the reasons below, the challenged claims should be found unpatentable and canceled.

## II.   MANDATORY NOTICES

**Real Parties-in-Interest**: Pursuant to 37 C.F.R. § 42.8(b)(1), Petitioner

identifies the following as the real parties-in-interest: Snap Inc.

**Related Matters**: The '439 patent is asserted in the following civil actions:

*Palo Alto Research Center Inc. v. Snap Inc.*, No. 2:20-cv-10755 (C.D. Cal.); *Palo

Alto Research Center Inc. v. Facebook, Inc.*, No. 2:20-cv-10753 (C.D. Cal.); *Palo

Alto Research Center Inc. v. Twitter, Inc.*, No. 2:20-cv-10754 (C.D. Cal.).

The '439 patent issued from Application No. 13/873,061 filed April 29, 2013.

Petitioner is also concurrently filing an IPR petition challenging U.S. Patent No.

8,489,599 (at issue in the above-identified *Facebook*, *Twitter*, and *Snap* litigations).

**Counsel and Service Information**: Lead counsel: Naveen Modi (Reg. No.

46,224).  Backup counsel: (1) Joseph E. Palys (Reg. No. 46,508).

EXHIBIT A PAGE 6

Petition for *Inter Partes* Review
Patent No. 9,208,439

Service information is Paul Hastings LLP, 2050 M Street NW, Washington, DC 20036, Tel.: 202.551.1700, Fax: 202.551.1705, email: PH-Snap-PARC-IPR@paulhastings.com.  Petitioner consents to electronic service.

## III.   PAYMENT OF FEES

The PTO is authorized to charge any fees due during this proceeding to Deposit Account No. 50-2613.

## IV.   GROUNDS FOR STANDING

Petitioner certifies that the '439 patent is available for review and Petitioner is not barred or estopped from requesting review on the grounds identified herein.

## V.   PRECISE RELIEF REQUESTED

### A.   Claims for Which Review Is Requested

Petitioner requests review and cancellation of claims 1-20.

2

### B.     Statutory Grounds of Challenge

The challenged claims should be canceled as unpatentable in view of the following grounds:[1]

**Ground 1**: Claims 1-4, 7-10, and 13-16 are unpatentable under AIA 35 U.S.C. § 103 over U.S. Patent No. 9,015,099 to Nitz *et al*. ("*Nitz*") in view of U.S. Patent No. 6,714,778 to Nykänen et al. ("*Nykanen*");

**Ground 2**: Claims 6, 12, and 18 are unpatentable under AIA 35 U.S.C. § 103 over *Nitz* in view of *Nykanen* and U.S. Patent Application Publication No. 2012/0135751 to Mishra ("*Mishra*");

**Ground 3**: Claims 5, 11, and 17 are unpatentable under AIA 35 U.S.C. § 103 over *Nitz* in view of *Nykanen* and U.S. Patent Application Publication No. 2012/0046966 to Chang et al.  ("*Chang*");

**Ground 4**: Claim 19 is unpatentable under AIA 35 U.S.C. § 103 over *Nitz* in view of *Nykanen* and U.S. Patent Application Publication No. 2012/0096114 to Mccolgan et al.  ("*Mccolgan*"); and

---

[1] Prior art references other than those in the grounds are identified herein to demonstrate the state of the art at the time of the alleged invention of the '439 patent.

Petition for *Inter Partes* Review
Patent No. 9,208,439

**Ground 5**: Claim 20 is unpatentable under AIA 35 U.S.C. § 103 over *Nitz* in view of *Nykanen* and U.S. Patent No. 8,010,669 to Sathish ("*Sathish*").

The '439 patent issued from an application filed April 29, 2013 (Ex. 1001, Cover) and thus is subject to the AIA.  For purposes of this proceeding only, Petitioner assumes the earliest effective filing date of the '439 patent is April 29, 2013, but does not concede that the challenged claims are entitled to this date.

*Nitz* issued from an application filed on August 14, 2012 and thus qualifies as prior art at least under AIA 35 U.S.C. § 102(a)(2).  *Nykanen* issued March 30, 2004, *Sathish* issued August 30, 2011, *Chang* published February 23, 2012, *Mccolgan* published April 19, 2012, and *Mishra* published May 31, 2012, and thus each qualifies as prior art at least under AIA 35 U.S.C. § 102(a)(1).

A prior publication of *Nykanen*, 2002/0173295, was identified by the applicant during prosecution (Ex. 1004, 75, 95), but was never relied on by the examiner in any rejections and, regardless, was not considered in the same light (and combinations) presented here, including support from expert testimony. (Ex. 1001, Cover; *generally* Ex. 1004; *infra* Section IX.)  The examiner erred by failing to appreciate the teachings/suggestions of the earlier-published version of *Nykanen*, as demonstrated via *Nykanen* (Ex. 1006) here, especially in light of other prior art disclosures (such as *Nitz* which was not considered by the examiner).

4

The other asserted references were not considered during prosecution (Ex.
1001, Cover; *generally* Ex. 1004) and are not the same or substantially similar to
any art previously presented to the Office as presented in this petition, especially in
light of how they are presented here (with supporting expert testimony).   (*Infra*
Section IX.)   Accordingly, reliance on any of the asserted references here does not
warrant discretionary denial under 35 U.SC. 325(d).   *See e.g., Octicon Medical AB
v. Cochlear Ltd.*, IPR2019-00975, Paper 15 at 9-20 (Oct. 16, 2019).

## VI.   LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art at the time of the alleged invention of the
'439 patent ("POSITA") would have an undergraduate degree in electrical
engineering, computer engineering, computer science or a related field along with at
least two years of work experience in the field of remote data collection and context-
based systems/processes. (Ex. 1002, ¶¶17-19.)[2]   More practical experience can
supplement education and vice versa.   (*Id.*)

---

[2] Petitioner submits the declaration of Steve Smoot (Ex. 1002), an expert in the field
of the '439 patent.  (Ex. 1002, ¶¶3-16; Ex. 1003.)

EXHIBIT A PAGE 10

## VII.   OVERVIEW OF THE '439 PATENT

The '439 patent describes a generalized method for collecting mobile device contextual information and providing user information to a recommender.  (Ex. 1001, Abstract, 1:7–12, 1:37-67.)  The patent acknowledges that software-based context-aware systems on a mobile device that adapts to changes in physical environment/conditions detected by the device to make recommendations were known.  (*Id*, 1:13–33.)  Such systems were known to "vary according to architecture and user model."  (*Id.*, 1:27-28.)  The '439 patent thus simply discloses the provision of "a *generic* contextual intelligence platform that may be adapted for specific applications." (*Id.*, 2:49-52.)[3]   (Ex. 1002, ¶¶25-28; *see also* Ex. 1011, ¶61 (PO summarizing the '439 patent).)  Likewise, the '439 patent claims generic features already known in the prior art, such as receiving event data derived from collected contextual data, modifying a context graph based on event data derived from collected contextual data and providing to a recommender a notification of changes. (*See* Section IX; Ex. 1001, 10:30-40; Ex.1002, § IX, ¶¶20-24; Exs. 1005-1010, 1013-1019, 1021-1026.)

---

[3] Emphasis added herein unless specified otherwise.

EXHIBIT A PAGE 11

Petition for *Inter Partes* Review
Patent No. 9,208,439

## VIII.  CLAIM CONSTRUCTION

Under *Phillips*, claim terms are typically given their ordinary and customary meanings.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *see also id.* at 1312–16.  The Board, however, only construes the claims when necessary to resolve the underlying controversy.  *Toyota Motor Corp. v. Cellport Sys., Inc.*, IPR2015-00633, Paper No. 11 at 16 (Aug. 14, 2015) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).  For purposes of this proceeding, no express constructions of any claim terms are necessary to assess whether the prior art reads on the challenged claims.[4]  (Ex. 1002, ¶29.)

---

[4] Petitioner reserves all rights to raise claim construction and other arguments in district court as relevant/necessary to those proceedings.  *See, e.g.*, *Target Corp. v. Proxicom Wireless, LLC*, IPR2020-00904, Paper 11 at 11–13 (November 10, 2020).  Issues and controversies may later arise in the *Snap* litigation that may need to be addressed through claim construction(s) not presented here given the close association between the prior art and '439 patent.

EXHIBIT A PAGE 12

Petition for *Inter Partes* Review
Patent No. 9,208,439

## IX.   DETAILED EXPLANATION OF GROUNDS

### A.   Ground 1: The Combination of *Nitz* and *Nykanen* Render Obvious Claims 1-4, 7-10, and 13-16

#### 1.   Claim 1

##### a)   **"A method, comprising:"**

*Nitz* discloses the preamble of claim 1.  (Ex. 1002, ¶¶66-68)  For example, *Nitz* discloses a "device, **method**, and system for automatically inferring a mobile user's current context …." (Ex. 1005, Abstract.)  System 100 monitors sensor inputs at a mobile device, applying an activity knowledge base to determine a situation from the sensor inputs and stored user-specific information, and inferring a user-specific context relating to the situation.  (*Id.*, 1:29-39, 4:32-6:38, Fig. 1.)  *Nitz*'s system generates suggestions (e.g., notifications or recommended actions) based on the inferred user-specific context.  (*Id.*, 2:40-50; *id.*, 1:40-3:48, Fig. 3.)  Thus, *Nitz*'s system, including system 100/700 (*Id.*, Figs. 1-3, 7, 28:5-10, 28:10-29:61), performs a method like claim 1.  (*Infra* Sections IX.A.1.b-d; Ex. 1002, ¶68.) (*See also* Ex. 1002, ¶¶30-54.)

##### b)   **"receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;"**

*Nitz* discloses this limitation.  (Ex. 1002, ¶¶69-80.)  For example, *Nitz*'s system integrates multiple sources/types of information about a mobile device/user's

8

Petition for *Inter Partes* Review
Patent No. 9,208,439

virtual/physical existence. (Ex. 1005, Fig. 1 (100), 4:32-36.) The system's

components can be configured to perform processes like the claimed method. For

example, in system 100, an inference engine 110 applies aspects of a knowledge

base 130 to real-time inputs 116 received from the mobile device. (*Id.*, 4:53-65.)



FIG. 1

(*Id.*, Fig. 1; Ex. 1002, ¶69.)

9

EXHIBIT A PAGE 14

System 100's operations are applicable to various configurations where some
components are local to a mobile device and others are remote.  For example, *Nitz*
describes system 700 including a mobile device 710 that is "in connection with
which the system 100, 200 may be implemented, alone or in combination with one
or more other electronic device 754."  (Ex. 1005, Fig. 7, 28:6-10.)  Thus, system
100's features can be implemented in system 700, including those of inference
engine 110, knowledge base 130, and others.  (*Id.*, 28:10-17; Ex. 1002, ¶70.)  System
700 may be local to device 710 or portions "may be incorporated into other systems"
or "distributed across multiple computing devices 710, 750."  (Ex. 1005, 28:20-22,
28:24-27; *id.*, 28:43-29:7.)  Device 710 can be a smartphone, etc. (*id.*, 28:31-37)
consistent with the "mobile device referred to" in *Nitz*'s disclosure (*id.*, 6:23-36; Fig.
5.)  Further, the remote other device 754 may be any type of computing device or
combination of computers/devices.  (*Id.*, 29:7-13; *id.* 28:37-42.)  Inference engine
728, mobile advisor 730, knowledge base 732, and inputs and information 734 (all
of which correspond to components in system 100) may include a local portion and
one or more remote/distributed portions.  (*Id.*, 29:35-43.)  Aspects of knowledge
base 732 may be stored remote from mobile device 710.  (*Id.*, 29:43-52.)  Thus, *Nitz*
describes a system that includes a mobile device (e.g., device 710 (Fig. 7)/"mobile
device" (Fig. 1)) that can interoperate with a remotely located computing device

EXHIBIT A PAGE 15

Petition for *Inter Partes* Review
Patent No. 9,208,439

(e.g., device 754), which can provide features (discussed below in connection with

system 100), such as knowledge base 760 (relating to knowledge base 130 (Fig. 1)).



(Ex. 1005, Fig. 7; Ex. 1002, ¶¶70-71.)

*Nitz*'s system (100/700) processes perform method steps as recited in

limitations 1.b-d.  For instance, *Nitz* discloses various sensors (**detectors) that**

**detect a physical context surrounding the mobile device** such as "accelerometers"

and "GPS."  (Ex. 1005, 7:11-30.)  These sensors may be "integrated with the **mobile**

electronic **device**" (*id.*, 2:16-19) and provide real-time inputs 116 (*id.*, 7:11-24).

11

Petition for *Inter Partes* Review
Patent No. 9,208,439

(*See also id.*, Fig. 7 (inputs and information 734), 28:5-17, 28:57-60 ("one or more sensors (e.g., any of the aforementioned sensors)" are "sources of real-time inputs").) Such inputs are **contextual data** like described by the '439 patent. (*See e.g.*, Ex. 1001, 3:1-4.) (Ex. 1002, ¶¶72-73.)

*Nitz* also discloses **event data derived from contextual data**. For example, the real-time inputs from motion sensors may be interpreted to create an "associated high-level characterization" that the user "may simply be 'walking.'" (Ex. 1005, 14:21-26.) These associations "may be generated by the inference engine." (*Id.*, 14:26-31.) The event data (e.g., "walking") is **derived** from the motion sensor data because the inference engine "can use automated reasoning methods and/or other techniques to make useful inferences" and "applies artificial intelligence methods, algorithms, and/or techniques." (Ex. 1002, ¶74; Ex. 1005, 4:41-52; *see also id.*, 15:49-55 (deriving tempo information (event data) from real-time location data (contextual data).) The learning and monitoring modules of the inference engine also derive event data from contextual data.

12



(Ex. 1005, Fig. 1(excerpt); Ex. 1002, ¶75.)

The learning module observes "the real-time inputs" to "generate current context inferences." (Ex. 1005, 19:12-17; *id.*, 19:59-64; Ex. 1002, ¶76.) The monitoring module also derives current situation data (event data) from real-time inputs (contextual data). (Ex. 1005, 13:46-51; Ex. 1002, ¶76.)

To the extent PO argues or it is found that *Nitz* does not disclose multiple "detectors" to collect the contextual data used to generate the event data, it would have been obvious to a POSITA to implement such features. (Ex. 1002, ¶77.) A POSITA would have been motivated to use the multiple sensors described by *Nitz* to provide the real-time inputs (contextual data) used by the inference engine as discussed above. (e.g., Ex. 1005, 7:11-24, 14:21-31, 28:5-29:61, Figs. 1, 7.) For example, *Nitz*'s disclosure of an accelerometer and GPS sensor would have

13

motivated use of multiple accelerometer sensors and/or types of sensors to facilitate more accurate indications of user/device motion/location.  (Ex. 1005, 14:21-26, 28:58-59; Ex. 1002, ¶77.)   A POSITA would have been so motivated so that the contextual data/event data provided to the knowledge base reflected various types of contextual information that would be useful in generating appropriate candidate actions.   (*Id.*;   *supra*   Sections   IX.A.1.c-d.)     Given   *Nitz*   discloses mechanisms/processes for performing such operations, a POSITA would have had the skills/knowledge to implement such a modification and a reasonable expectation of success in doing so. (Ex. 1002, ¶77; Ex. 1005, 22:61-23:14.)

*Nitz* discloses receiving the **event data from the mobile device** because "all or portions of the inference engine" may be "embodied in the mobile electronic device" and features of the knowledge base may be remotely located (such as in other device 754).  (*Id.*, 28: 10-17; *id.*, 29:8-52, Fig. 7 (knowledge base 760 in other device 754), Fig. 1; Ex. 1002, ¶78.)  Thus, such a remotely located knowledge base receives/stores event data received by the inference engine, which can be located in the mobile device.  (*Id.*, 28:10-17, 29:35-61, Figs. 1, 7; Ex. 1002, ¶78.)  *Nitz* discloses that event data (e.g., "walking") is stored in knowledge base models in the (remote) knowledge base (Ex. 1005, 14:26-31, 29:43-52; *supra* Sections IX.A.1.a-b) and can also be stored in the template knowledge store which reflects physical

14

Petition for *Inter Partes* Review
Patent No. 9,208,439

activities (e.g., "walk around the office"). (Ex. 1005, 14:59-15:4; Ex. 1002, ¶78.)

Moreover, the learning module can "continuously improve the knowledge base" and

"adapt the knowledge base" (Ex. 1005, 19:17-24) and the monitoring module

interfaces with the knowledge base and "may use, e.g., a 'push' data transmission

paradigm wherein data is posted to the knowledge base 130 automatically as it

occurs or on a periodic basis." (*Id.*, 13:51-58; Ex. 1002, ¶79)

Given *Nitz*'s disclosures, a POSITA would have understood that *Nitz*'s

knowledge base (e.g., knowledge base 760 in remote device 754) receives, from a

mobile device, event data (e.g., information reflecting walking, etc.) derived from

contextual data (e.g., real-time inputs) collected using detectors that detect a physical

context surrounding the mobile device, and thus discloses limitation 1.b. (Ex. 1002,

¶80.)

  c) **"modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data:"**

*Nitz* discloses this limitation. (Ex. 1002, ¶¶81-97.) As the '439 patent states,

"[a] context graph is an in-memory model that stores facts and assertions about a

user's behavior and interests." (Ex. 1001, 3:20-22.) *Nitz* likewise discloses that its

knowledge base stores rules, templates, and "models," such as a "probabilistic

model," "semantic model," and "contextual model." (Ex. 1005, 14:26-31; *id.*, 17:38-

15

Petition for *Inter Partes* Review
Patent No. 9,208,439

47, 18:19-37).)  These models and related information are used to store facts and

assertions about the user's behavior and interests. (*Id.*, 17:5-23, 17:38-47, 17:60-

18:5,18:19-28; Ex. 1002, ¶81.)

*Nitz's* knowledge base contains searchable stores of knowledge such as

"databases, lookup tables, or the like." (Ex. 1005, 13:60-64.)  These include rhythm

& routine templates, models (e.g., probabilistic/statistical, contextual), security &

privacy policies, etc. as shown below.



(*Id.*, Fig. 1. excerpt.)

The knowledge base **stores facts and assertions** about a user's behavior and

interests like the claimed "context graph" because it maintains information relating

to "representations or assertions about the user's current situation and/or context."

(*Id.*, 14:3-8; Ex. 1002, ¶¶82-83.)  For example, the knowledge base may store **facts**

such as "user's geographic location, age, gender, ethnicity" in templates (Ex. 1005,

16

14:46-51) and information used to make **assertions** like how busy a user is anticipated to be (*id.*, 15:56-16:4). The knowledge base also stores information related to user behavior such as "wakeup time," "punctuality," and "tempo of activity" (*id.*, 15:11-16, 17:19-21, 15:43-44) and user interests (*id.*, 14:61-15:4, 15:17-24, 18:19-23), which reflect the **behavior and interests of the user**. (Ex. 1002, ¶¶82-83.)

Accordingly, the models and related contextual information stored in *Nitz's* knowledge base is a "**context graph**." (Ex. 1002, ¶84.)[5]

To the extent "context graph" is interpreted (*see e.g.,* Ex. 1001, 3:20-22) to require graph-based properties and/or logical structures (e.g., including things like edge/node properties and topological features), it would have been obvious to a POSITA to arrange the models and related contextual information using known graph-based structures and configurations (including e.g., logical representations including edges, nodes, and/or topological characteristics/properties)[6]. (Ex. 1002,

---

[5] PO generically refers to "rules" and a knowledge engine for a "context graph" in its infringement allegations. (Ex. 1020, 19-20).

[6] Petitioner does not concede that "context graph" recited in claim 1 should be interpreted to require such features, but nonetheless demonstrates how *Nitz* discloses

17

¶85.)  A POSITA would have been motivated to implement such features because it would have provided a known way to structure and maintain the contextual information/models in the knowledge base that would have facilitated efficient and effective access and analysis of such information for use in creating/presenting candidate actions, consistent with *Nitz*'s processes.  (*Id.*; Ex. 1005, 1:8-25, 4:31-5:43.)  *Nitz* explains that the results of monitoring and analysis of the real-time inputs are stored in the knowledge base.  (Ex. 1005, 13:32-58.)

A POSITA would have been so motivated given *Nitz* contemplates the use of known graph-based techniques for structuring and processing contextual data. (Ex. 1002, ¶¶86-91.)   For example, *Nitz* describes assembling stored user context information and problem-solving/knowledge-based approaches. (Ex. 1005, 12:2-11; Ex. 1014 (incorporated by *Nitz*), ¶¶[0006], [0014]-[0021].)   *Nitz* describes ways monitoring module may "categorize or classify" real-time inputs, create "associations between" such information "that may appear to be related or logically connected," and have "semantic meanings." (*Id.*, 12:32-41.)   *Nitz* also discusses techniques involving semantic information and inference generation, including

---

and/or suggests a "context graph" under this narrower interpretation to the extent required.  (*Supra* Section VIII, n.4.)

18

"clustering techniques" and "other suitable methods." (*Id.*, 12:41-51 (incorporating now U.S. Patent 9,245,010 (Ex. 1015)).) (*See also* Ex. 1015, 6:56-62 (updating user profiles based on inference, topic, clustering analysis and use of "probabilistic links" and topic and sub-topic processes), 7:54-8:9, Fig. 8 (graph with relationship strength links); Ex. 1005, 12:52-13:23 (describing known techniques for maintaining and processing audio/digital media (citing Exs. 1013, 1016)); Ex. 1016, ¶[0044] and Fig. 6 (graphical models with nodes/edges); Ex. 1013, Figs. 2, 6, 1:53-62, 2:61-62, 3:41-67, 7:10-37, 8:53-9:11 (describing semantic connected graph (SCG) including "nodes" and "edges"), 10:15-46 (node and edge property change detection); Ex. 1017, 1:49-57, 2:30-43, 3:18-67, Fig. 6 (object classification techniques for determining behavior/events), Ex. 1018, Abstract, 2:1-67; Ex. 1019, Abstract, 1:55-67, 4:11-5:53; Ex. 1002, ¶¶86-90.)  Consistent with *Nitz*'s disclosures, a POSITA would have appreciated that graph techniques/configurations were known in context-based systems.  (Ex. 1002, ¶¶22-24; Ex. 1025, 5-11, 79-121, 201-262, 322, 84 and 127 (citing Ex. 1026); Ex. 1026, 1-5.)

Given *Nitz's* disclosures/suggestions and a POSITA's knowledge, it would have been obvious to configure the contextual information/models in the knowledge base in a "context graph" represented logically by such known graph configurations (e.g., edge, node, topological characteristics) because such features would have

19

assisted the knowledge base's abilities in maintaining, accessing, updating, and sharing contextual data for generating accurate candidate actions. (*Infra* Section IX.A.1d; Ex. 1002, ¶91.)   Thus, a POSITA would have recognized that such a modification would have used known technologies/concepts/processes that would have complimented the semantic, rule-based, inference, and other type of processes disclosed by *Nitz* that facilitate the generation and maintenance of context data in the knowledge base for generating relevant/helpful candidate actions (Ex. 1005, 5:13-23).   (Sections IX.A.1.a-b; Ex. 1002, ¶91.)   For similar reasons, a POSITA would have had the necessary skills/knowledge to implement such features and would have done so with a reasonable expectation of success in the above-modification.[7]   (Ex. 1002, ¶91.)   *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) ("only a reasonable expectation of success, not a guarantee, is needed" in an obviousness analysis).

   *Nitz* also discloses **modifying** the "**context graph**" (discussed above) with facts/assertions about a user's behavior based on event data.   The templates, models,

---

[7] There is no evidence of nonobviousness at this time that would overcome the evidence of obviousness (in this and other grounds).   Petitioner reserves the right to address any such evidence/argument if presented later in this proceeding.

EXHIBIT A PAGE 25

rules, and patterns are "automatically modified and adapted to the user's personal lifestyle" and include representations/assertions about "the user's current situation and/or context." (Ex. 1005, 14:3-8, 14:55-58; *id.*, 3:23-25, 13:46-51, 26:9-23 (user responses used to "update[]" and "adaptively modify" knowledge base); Ex. 1002, ¶92.)

*Nitz*'s inference engine 110/756 interprets contextual data as a high-level characterization such as walking event data (*id.*, 14:21-26). (*E.g.,* Ex. 1001, 3:9-11, 3:51-60.) These associations are stored in knowledge base stores. (Ex. 1005, 14:26-31; *supra* Sections IX.A.1.a-b; Ex. 1002, ¶93.) Template knowledge stores are modified with event data (e.g., "walking") because they reflect updated physical activities (e.g., "walk around the office" (Ex. 1005, 14:59-15:4). (Ex. 1002, ¶93.) Further, *Nitz* discloses ways to "adaptively modify" the rules, patterns, and other related contextual information in the knowledge base and to "continuously monitor and analyze the real-time inputs (e.g., as they occur) and post current situation data to the knowledge base." (*Id.*, 26:9-18, 13:46-51; Ex. 1002, ¶94.) The learning module also operates to "continuously improve the knowledge base" and "adapt the knowledge base." (Ex. 1005, 19:12-24; Ex. 1002, ¶95.)

Therefore, when the knowledge base is updated using event data (e.g., "walking," "tempo information," "current situation data," "current context

21

inferences"), the **context graph** (e.g., models/related information in knowledge base

130/760) is modified.  (Ex. 1002, ¶¶96-97; Sections IX.A.1.a-b.)

> d)   **"in response to determining that there exists a registration
> for notification of changes that matches the modification
> to the context graph, sending a notification of context
> graph change to a recommender."**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation.  (Ex. 1002,

¶¶98-113.)   Mobile advisor 120/730 "acts on user-specific current situation and

context as it evolves to provide timely and relevant assistance to the user" and

includes an action generator module 122 and execution/presentation module 124.

(Ex. 1005, 5:11-20, 28:12-13.)




(*Id.*, Figs. 1, 7 (excerpted).)

Action generator 122 generates candidate actions (e.g., notifications,

recommendations, or sending a message) based on the user's current

situation/context.  (*Id.*, 5:20-55.)   Execution/presentation module 124 determines

22

Petition for *Inter Partes* Review
Patent No. 9,208,439

how to perform and present/execute the selected actions at the mobile device.  (*Id.*,
5:56-62; *id.*, 20:7-20.)



(*Id.*, Fig. 2 (illustrative embodiment of system 100); *id.* 20:30-49.)

Portions of *Nitz*'s system may be embodied as a stand-alone software
application or incorporated/accessed by other application(s) (*id.*, 28:17-20) and
features of system 100 may be implemented consistent with system 700.  (Ex. 1005,
28:6-10, 29:14-34, Fig. 7; Ex. 1002, ¶¶98-99.)  Thus, the mobile advisor (including
action generator and execution/presentation modules) and the action generator
(alone or collectively with execution/presentation module) each is an example of a
**recommender** as they are software-based processes that "recommends items or

23

Petition for *Inter Partes* Review
Patent No. 9,208,439

activities for a user" as in the '439 patent.  (Ex. 1001, 3:23-25; Ex. 1002, ¶100.)

Further, inference engine 110 and/or other modules (including mobile advisor

120/action generator 122) can perform the processes of method 300, which analyzes

real-time inputs in view of the knowledge base 130 to determine context information

(Ex. 1005, 21:25-32, 21:40-58) and can create candidate actions based on current

situation and context obtained from the knowledge base (*id.*, Ex. 1005, 5:36-55,

23:15-22).  Indeed, *Nitz* describes known push mechanisms that allow components

to transmit data to another component automatically as it occurs or periodically.  (*Id.*,

13:50-56.)  Thus, a POSITA would have understood that *Nitz* discloses providing

data from the knowledge base for use by the mobile advisor/action generator

(recommender).  (Ex. 1002, ¶101.)

While *Nitz* discloses a **recommender** and modifying a **context graph**

(Section IX.A.1.c.), and providing data from the knowledge base for use in

generating candidate actions, *Nitz* does not expressly disclose determining whether

a registration for notification of changes exists that matches the context graph

modification and sending a notification of a context graph change to a recommender.

However, it would have been obvious to a POSITA to implement such features given

*Nitz*'s and *Nykanen*'s disclosures, and a POSITA's knowledge. (Ex. 1002, ¶102.)

24

Petition for *Inter Partes* Review
Patent No. 9,208,439

*Nykanen* discloses receiving sensor signals of a wireless device's current
environment, processing the signals with a context inference engine, outputting a
current context, and providing useful information to the user in response.  (Ex. 1006,
1:54-60; Ex. 1002, ¶¶55, 103.)  The context inference engine provides user context
to application programs.  (Ex. 1006, 3:10-13.)  Application programs "may be
registered to receive any changes to specific context information."  (*Id.*, 14:1-4; *id.*,
9:42-46 (application programs "may register themselves at the Application
Programming Interface 154 to receive current context or changes in the context,"
which "enables context sensitivity in the application programs"), 17:4-9 (context
inference engine provides current context awareness information to "the application
programs registered to receive that information"), Fig. 3).)

Based on *Nykanen* and *Nitz*, a POSITA would have been motivated to modify
*Nitz's* system/method to allow the **recommender** to register for (and receive)
notifications of matching context graph changes.  (Ex. 1002, ¶¶103-104.)  This
implementation would have had foreseeable advantages and would have been
achieved through predictable/straightforward modifications via well-known
technologies/methods from which a POSITA would have reasonably expected to
successfully perform as intended.  (*Id.*)  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.
398, 416–18 (2007).

25

A POSITA would have had reason to consider *Nykanen* in context of *Nitz*
given they both disclose collecting/processing sensor information via an inference
engine to provide useful context information.   (Ex. 1002, ¶105.)   Upon
consideration, a POSITA would have recognized advantages in modifying *Nitz* to
not simply send all data, changed or otherwise, to the recommender but rather have
the **recommender** instead register to receive notifications of changes in the **context
graph**, and thus been motivated to do so.  (*Id.*)

For example, implementing such registration features would advance the
functionalities of the recommender in *Nitz*.  (*Id., ¶106.)  Nitz* discloses that candidate
actions generated by the mobile advisor/action generator are based on a "user's
*current* situation and context" stored in the knowledge base and thus the
**recommender** necessarily uses updates/modifications to the above-discussed
**context graph** in the knowledge base to generate candidate actions.  (Ex. 1005,
23:41-47, 5:20-23, 14:3-8, 23:38-41.)  A POSITA would have thus recognized the
benefit of the **recommender** registering for notifications of changes in the **context
graph** in the knowledge base, as opposed to, for example, the **recommender**
receiving *all* of the data in the knowledge base, including unchanged data.  (*Id.*)
Indeed, such features would allow the **recommender** to be timely informed of

26

Petition for *Inter Partes* Review
Patent No. 9,208,439

contextual data updates so that relevant candidate action(s) can be created.  (*Id.*; Ex.
1005, 23:41-47.)

A POSITA would have also appreciated that *Nitz* discloses that a user may
specify that only certain types of data/sources/situations/contexts be used to
determine contextual data for generating/presenting candidate actions.  (Ex. 1005,
18:46-56.)  Thus, modifying *Nitz*'s process/system as discussed would have allowed
the **recommender** to conserve processing and storage resources by avoiding (or
minimizing) the transmission of changed information when such information is not
needed to generate relevant actions.  (Ex. 1002, ¶107.)  A POSITA would have
appreciated the benefit of preserving resources (e.g., processing power, storage
space, memory, etc.) by avoiding transmission of irrelevant changes in the
contextual data, and consequently generation of unnecessary candidate actions in
accordance with user/system preferences through the use of registered notifications
of relevant changes in the context graph.  (*Id.*)

A POSITA would have also considered *Nykanen*'s disclosures of a context
inference engine that provides context information to application programs
"registered to receive that information" (Ex. 1006, 3:10-13, 14:29-32, 17:4-9) and
thus would have been motivated to configure *Nitz*'s inference engine to similarly
send a notification of relevant context graph modifications when such changes match

27

Petition for *Inter Partes* Review
Patent No. 9,208,439

a registration associated with the recommender as discussed above. (Ex. 1002,
¶108.)    Thus, a POSITA would have appreciated that *Nykanen*'s
teachings/suggestions accomplish preserving resources in a system similar to *Nitz,*
while still supporting *Nitz*'s disclosed features. (*Id.*)

To the extent PO asserts that a "notification of context graph change" is met
by simply sending the updated context graph data itself to the recommender, as
opposed to the mere notification that the context graph data has changed, it would
have been obvious to configure the *Nitz-Nykanen* combined system/process ("*Nitz-
Nykanen*") to send the updated information itself from the knowledge base's
"context graph" to the recommender based on its registration to receive certain
updated information when it occurs as *Nitz* discloses sending updated information
from the knowledge base, as discussed above. (*Supra;* Ex. 1002, ¶109.)

The above-discussed modifications would have involved the use of known
technologies/concepts to obtain the foreseeable result of providing change
notifications to registered recipients (e.g., recommender) similar to the features
described by *Nykanen*. (*Id.*)   A POSITA would have had the necessary
skills/knowledge to configure *Nitz*'s system/process to implement the above-
described registration features and had a reasonable expectation of success in the
above-modification. (*Id.* ¶¶110-113.) *See Pfizer, Inc.*, 480 F.3d at 1364.

28

Petition for *Inter Partes* Review
Patent No. 9,208,439

2.    **Claim 2**

a)    **"The method of claim 1, further comprising: receiving, from the mobile device, additional event data including application event data and/or operating system event data;"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation.  (Ex. 1002,

¶¶114-116.)  In addition to that discussed above (*supra* Section IX.A.1.b; Ex. 1005*,*

2:16-19, 7:11-24, 28:5-17, Fig. 7), *Nitz* also explains that the real-time inputs 116

can be "provided by mobile device software applications" (Ex. 1005, 10:64-65.)

Such inputs include, "application-specific automated reminders, alerts, and

messages," "social media updates," "location-related information," or

"[c]lock/calendar software application[]" data." (*Id.*, 10:65-11:14; *id.*, 14:14-16:4.)

Such non-sensor real-time inputs can generate "additional event data including

application event data" that is received from the mobile device like event data

generated from the sensor-based real-time inputs 116 in *Nitz-Nykanen*.  (*Supra*

Section IX.A.1.b; Ex. 1002, ¶114.)  A POSITA would have been motivated to

maintain/provide such functionality in *Nitz-Nykanen* for the reasons discussed for

limitation 1.d as it would have ensured the system provided additional candidate

actions based on the various application-based event data disclosed by *Nitz*.  (Ex.

1002, ¶¶115-116; Section IX.A.1.d.)

b)    **"modifying the context graph based on the additional**

29

Petition for *Inter Partes* Review
Patent No. 9,208,439

**event data;"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for reasons similar discussed for claim 1 and limitation 2.a. (Ex. 1002, ¶117; Sections IX.A.1, IX.A.2.a.) *Nitz* discloses modifying the **context graph** based on received event data from the mobile device. (*Supra* Sections IX.A.1.b-c; Ex. 1002, ¶117.) *Nitz* does not distinguish how the **context graph** is modified based on various types of real-time inputs (application-based, sensor-based, etc.). (*Id.*; *see also e.g.*, Ex. 1005, 13:60-14:31; Section IX.A.2.a.) A POSITA would have found it obvious to configure *Nitz-Nykanen* to modify the disclosed **context graph** based on the additional real-time inputs processed (**additional event data**) in the same way that *Nitz*'s modified system would update the contextual information/models in knowledge base based on processing the sensor-based real-time inputs (**event data**). (*Supra* Sections IX.A.1.b-c, IX.A.2.a; Ex. 1002, ¶117; *see also* Ex. 1005, 13:32-58 (analyzing inputs 116 and continuously post event data to knowledge base), 19:10-24 (continuously improving/adapting knowledge base).) *Nitz* discloses different types of event data (e.g., current situation, current context, "walking", etc.) used to modify the knowledge base. (*Supra* Section IX.A.1.c.) A POSITA would have recognized the benefits of updating the "context graph" with additional event data because it would have furthered *Nitz*'s functionalities of providing additional and relevant candidate

30

Petition for *Inter Partes* Review
Patent No. 9,208,439

actions based on a user's current situation/status (including device application updates (e.g., calendar updates, social media alerts, etc.).  (Ex. 1002, ¶117; Ex. 1005, 10:64-11:14, 13:60-16:4.)  Accordingly, a POSITA would have been motivated to implement such features in *Nitz-Nykanen* and would have had a reasonable expectation of success in the above-modification.   (Ex. 1002, ¶117; Section IX.A1.d.)   A POSITA would have had the requisite skills and knowledge to implement such features using known techniques and technologies, especially given *Nitz*'s disclosures above.  (*Id.*, ¶117; Section IX.A.1.)

> c)   **"determining that the modification to the context graph matches the registration; and"**
>
> d)   **"sending a second notification of context graph change to the recommender."**

*Nitz* in view of *Nykanen* discloses and/or suggests the features of limitations 2.c-d for reasons similar to that explained above for limitations 2.a-b and 1.c-d. (*Supra* Sections IX.A.1.c-d, IX.A.2.a-b; Ex. 1002, ¶¶118-120.)   *Nitz-Nykanen* discloses and/or suggests these limitations in at least two ways.

**First**, Sections IX.A.1.c-d explain how *Nitz-Nykanen* discloses and/or suggests modifying a context graph and sending a notification of context graph change to a recommender.  Section IX.A.2.b explains how *Nitz-Nykanen* would have been configured to modify the context graph based on the additional event data.

31

Petition for *Inter Partes* Review
Patent No. 9,208,439

Thus, for reasons similar to those explained in Sections IX.A.1.c-d and IX.A.2.b, a POSITA would have been motivated, and found obvious, to configure the combined system/process such that another notification (**second notification**) is also provided to the **recommender** when inference engine determines that the update to the model(s) and related context information in the knowledge base (**context graph**) is modified based on the additional event data (discussed for limitation 2.b).  (Ex. 1002, ¶119; *supra* Sections IX.A.1.c-d, IX.A.2.a-b.)  A POSITA would have had similar reasons, knowledge, and expectations of success as those explained above given the processes for providing such a notification would have been implemented in a similar fashion of other types of event data.  (*Id.*)  Such a modification would have been a foreseeable application of the notification concepts and features discussed above for limitations 1.c-d, and added versatility by expanding such notification features to other event data (e.g., application-based events) consistent with *Nitz*'s goals.  (*Id.*; *e.g.,* Ex. 1005, 1:29-3:14, 2:31-5:55.)

**Second**, because limitation 2.c does not specify which modification matches (i.e., the modification in limitations 1.c-d or in limitation 2.b), *Nitz-Nykanen* as discussed above for limitations 1.c-d discloses and/or suggests limitation 2.c for the same reasons explained for limitations 1.c-d (describing how *Nitz-Nykanen* determines that **the modification** to the context graph matches the registration

32

similar to that recited in limitation 2.c)  (*Supra* Sections IX.A.1.c-d; Ex. 1002, ¶120.)

Moreover, to the extent limitation 2.d is interpreted as sending **a second notification** of the context graph change (like that addressed for limitations 1.c-d) to the recommender, it would have been obvious to modify *Nitz-Nykanen* to provide a second notification of that context graph change in order to refresh the **recommender** as to the additional matching knowledge base update(s).  (Ex. 1002, ¶120.)  Doing so would have ensured updated current context information, including both the event data and the additional event data, is received/considered to generate/present candidate actions.  (*Id.*)  A POSITA would have recognized the benefits of providing such a second update (e.g., notifying/delivering updates despite hindered/delayed/blocked delivery of a previous notification).  (*Id.*; Ex. 1005, 5:43-50.)  Thus, given a POSITA's knowledge and *Nitz* and *Nykanen*, it would have been obvious to implement such features using known technologies and techniques (e.g., timeout processes, acknowledgment signals/processes, etc.).  (Ex. 1002, ¶120.)

### 3.   Claim 3

a)   **"The method of claim 1, wherein the event data includes high-level event data generated by the mobile device from contextual data."**

*Nitz* in view of *Nykanen* discloses and/or suggests claim 3.  (Ex. 1002, ¶¶121-122.)  The '439 patent discloses that "low-level" event data indicates events detected

33

from context, such as a selection of a button in an application or a screen capture (Ex. 1001, 3:8-12) and that "high-level" events are generated "using the contextual data" (*id.*, 3:12-13), such as a user reading e-mail (*id.*, 3:14-15), user writing a document (*id.*, 3:57-58), use of a web browser (*id.*, 9:7-9). Likewise, *Nitz* discloses storing information relating to the user's interactions with the virtual world in a contextual model within the knowledge base (e.g., contextual model 142). (*See e.g.,* Ex. 1005, 18:19-28.) Such interactions (low-level events) include "interactions with the mobile device relating to electronic content, communications, or software applications," which may be collected using "instrumented software applications, gaze analysis and/or screen scraping techniques." (*Id.*) "Information contained in the contextual model 142 may be used by the inference engine 110 in determining the user's current situation and context." (*Id.*, 18:26-28.) For example, inference engine 110 may infer based on user's map application that a shopping center where a user stopped in front of "is not the user's final destination" (high-level event data) and therefore may refrain from suggesting coupons for that shopping center (*id.*, 18:29-37), which is an example of a candidate action (*id.*, 5:33-35 ("the 'act' of doing nothing in response to a current situation and context can be considered a candidate action")). (Ex. 1002, ¶121-122.)

34

Petition for *Inter Partes* Review
Patent No. 9,208,439

Accordingly, for the reasons above and for claim 1, the combined *Nitz* and

*Nykanen* system/process discloses and/or suggests claim 3. (*Id.*; *see also supra*

Section IX.A.1.d.)

### 4. Claim 4

a) **"The method of claim 1, further comprising, receiving a query for context graph data from the recommender; and sending the context graph data to the recommender"**

*Nitz* in combination with *Nykanen* discloses and/or suggests the limitations of

claim 4. (Ex. 1002, ¶¶123-128.)  As explained, *Nitz-Nykanen* discloses and/or

suggests the limitations of claim 1, where *Nitz* discloses a context graph and

recommender. (*Supra* Section IX.A.1; Ex. 1002, ¶123.)  *Nitz* also discloses the

recommender receiving data from the knowledge base to create candidate actions.

(*Id.*; *e.g.*, Ex. 1005, 13:32-36, 13:60-14:13, 16:5-37, 18:38-63.)  While *Nitz* does not

expressly disclose receiving a query for context graph data from the recommender

and sending that data to the recommender, it would have been obvious to a POSITA

to configure *Nitz-Nykanen* to implement such features given a POSITA's

knowledge, *Nitz*'s disclosures, and *Nykanen*'s additional guidance. (Ex. 1002,

¶123.)

In addition to that described above (*see* Section IX.A.1.d), *Nykanen* discloses

that applications may provide requests for current context information and receive

EXHIBIT A PAGE 40

Petition for *Inter Partes* Review
Patent No. 9,208,439

such context information from the inference engine.  (*Nykanen*, 9:34-37 (application programs "may optionally provide application data to the context inference engine 136, along with their request for current context."), 9:37-42 (the context inference engine feeds the current context through various APIs to application programs), 7:25-26, 14:12 (application programs "may request the latest context information"), 16:43-45, 17:4-9, 19:18-25 (claim 6), Figs. 2, 2A, 3.)

A POSITA would have recognized that querying a database or similar memory for data in context-based systems was known as demonstrated by *Nykanen*'s and *Nitz*'s teachings/suggestions as discussed above (*see also supra* IX.A.1.d). (Ex. 1002, ¶124-125.)   A POSITA would have therefore been motivated to configure the recommender in *Nitz-Nykanen* to be able to query the knowledge base for context graph data and receive such requested data because it would allow the recommender to obtain specific contextual information as needed/desired to aid in generating relevant candidate actions for the user.  (*Id.*)  Doing so would have allowed the recommender to seek/obtain the **context graph** data itself—as opposed to a mere notification that the data changed, which would have conserved resources by minimizing the processing of data that is not needed or relevant to generating relevant candidate actions at given times and complimented *Nitz*'s goals of generating useful candidate actions on a timely basis.  (*Id.*)

36

Indeed, *Nitz* discloses using current context data to form candidate actions (Ex. 1005, 23:41-47) and an application portion of a mobile device's display that includes icons selectable by the user to "obtain further information about the suggestion or engage in a dialog … about the suggestion and/or an appropriate response" (*id.*, 26:40-53). Moreover, *Nitz* discloses techniques/mechanisms for one component to request (*i.e.* "pull") data from another. (*Id.*, 13:51-58.) [8] In light of such disclosures, a POSITA would have been motivated to configure the *Nitz-Nykanen* recommender to respond to such a user request by requesting and receiving additional context data from the knowledge base via the inference engine for subsequent provision to the user (via the presentation module) as disclosed by *Nitz*. (*Id.*, 5:56-6:16; Ex. 1002, ¶126.) A POSITA would have appreciated such additional information may prompt a user to further refine/customize their candidate action settings. (Ex. 1002, ¶126.)

---

[8] While this disclosure refers to the knowledge base requesting data from the monitoring module, a POSITA would have appreciated that such disclosures coupled with the teachings/suggestions of *Nykanen*, would have provided guidance to consider and implement features in *Nitz* to allow the recommender to query the knowledge base (directly or indirectly) for context graph data. (Ex. 1002, ¶126.)

EXHIBIT A PAGE 42

A POSITA would have had the necessary skills/knowledge to configure *Nitz*'s system/process to implement queries for context graph data from the recommender (and sending such data to the recommender) to ensure the resulting combination properly operated as intended.  (Ex. 1002, ¶127.)  Thus, a POSITA would have had a reasonable expectation of success in the above-modification. (*Id*.)  *See Pfizer, Inc.*, 480 F.3d at 1364.  A POSITA would have appreciated that this implementation would have been a predictable/straightforward combination of well-known technologies/methods given the disclosures and similarities of *Nitz* and *Nykanen*. (Ex. 1002, ¶¶127-128.)  *See KSR*, 550 U.S. at 416–18.

     **5.**    **Claim 7**

          a)    **"A non-transitory computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method, the method comprising:"**

To the extent limiting, *Nitz* discloses the preamble of claim 7.  (Ex. 1002, ¶¶129-130.)  The analysis for claim 1 above, and for claim 7 below, explain how *Nitz* discloses a method including steps like that recited in claims 1 and 7.  (*Supra* Sections IX.A.1.a-d; *infra* Sections IX.A.5.b-d.)  *Nitz*'s processes are performed by a computer-based system including processor(s) that execute software to perform the disclosed processes.  (Ex. 1005, Figs. 1, 7 (showing computer-based components for system 100, devices 710, 754, etc.), 4:31-6:16, 13:59-14:13, 20:7-10, Fig. 2,

Petition for *Inter Partes* Review
Patent No. 9,208,439

21:25-32, Fig. 3, 28:5-29:61 (describing system 700 in terms of software applications, processors, memory, etc.).) *Nitz* explains that its processes may be implemented as instructions stored using machine-readable media (e.g., suitable forms of volatile or non-volatile memory), which may be read/executed by one or more processors. (Ex. 1005, 30:14-24, 6:17-21.) As explained, *Nitz* discloses a system that includes a mobile computing device (e.g., device 710 (Fig. 7), "mobile device" (Fig. 1)) that can interoperate with a remotely located computing device (e.g., device 754), which can provide features (discussed further in connection with system 100), such as a knowledge base 760 (relating to knowledge base 130 (Fig. 1)). (Sections IX.A.1.b; IX.A.5.b; Ex. 1002, ¶129.) A POSITA would have understood the memory associated with the remote device 754 would be a "non-transitory computer-readable storage medium" that stores instructions executed by a computer to perform the process as described above for claim 1 and below for claim 7. (Ex. 1002, ¶129.)

Accordingly, for the reasons above, and for claim 1 and claim 7 below, *Nitz* discloses limitation 7.a. (*Id.*, ¶130.) (*See infra* Sections IX.A.5.b-d.)

b)      **"receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;"**

39

Petition for *Inter Partes* Review
Patent No. 9,208,439

*Nitz* discloses this limitation for the same reasons above for limitation 1.b and

limitation 7.a.  (*Supra* Sections IX.A.1.b, IX.A.5.a; Ex. 1002, ¶¶131.)

      c)    **"modifying a context graph that stores facts and
assertions about a user's behavior and interests using the
event data:"**

*Nitz* discloses this limitation for the same reasons above for limitation 1.c and

limitations 7.a-b. (*Supra* Sections IX.A.1.c, IX.A.5.a-b; Ex. 1002, ¶132.)

      d)    **"in response to determining that there exists a registration
for notification of changes that matches the modification
to the context graph, sending a notification of context
graph change to a recommender."**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same

reasons above for limitations 1.d and 7.a-c.  (*Supra* Sections IX.A.1.d, IX.A.5.a-c;

Ex. 1002, ¶¶133.)  For reasons similar to those explained for limitation 1.d, a

POSITA would have been motivated to configure *Nitz-Nykanen* to configure the

software instructions executed by the remote device (e.g., 754) to perform the

processes discussed for limitation 1.d (tracking limitation 7.d).  (Section IX.A.1.d;

Ex. 1002, ¶133.)

    6.    **Claim 8**

      a)    **"The non-transitory computer-readable storage medium
of claim 7, wherein the computer-readable storage
medium 15 stores additional instructions that, when
executed, cause the computer to perform additional steps
comprising:  receiving, from the mobile device, additional**

40

> **event data including application event data and/or operating system event data**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitation 2.a and claim 7. (*Supra* Sections IX.A.2.a, IX.A.5; Ex. 1002, ¶134.) For reasons similar to those explained for limitations 1.d and 7.d, a POSITA would have been motivated to configure *Nitz-Nykanen* to configure the software instructions executed by the remote device (e.g., 754) to store additional instructions that, when executed, perform the processes discussed for limitation 2.a (tracking limitation 8.a) (and those recited in limitations 8.b-d discussed below). (Sections IX.A.1.d, IX.A.5.d, IX.A.6.b-d; Ex. 1002, ¶134.)

> b) **"modifying the context graph based on the additional event data;"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitation 2.b and claim 7, limitation 8.a. (*Supra* Sections IX.A.2.b, IX.A.5, IX.A.6.a; Ex. 1002, ¶135.)

> c) **"determining that the modification to the context graph matches the registration; and"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitation 2.c and claim 7, limitations 8.a-b. (*Supra* Sections IX.A.2.c, IX.A.5, IX.A.6.a-b; Ex. 1002, ¶136.)

> d) **"sending a second notification of context graph change to**

41

Petition for *Inter Partes* Review
Patent No. 9,208,439

the recommender.”

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitation 2.d and claim 7, limitations 8.a-c.  (*Supra* Sections IX.A.2.d, IX.A.5, IX.A.6.a-c; Ex. 1002, ¶137.)

    **7.**    **Claim 9**

        a)    **“The non-transitory computer-readable storage medium of claim 7, wherein the event data includes high-level event data generated by the mobile device from contextual data.”**

*Nitz* in view of *Nykanen* discloses and/or suggests the limitations of claim 9 for the same reasons above for claim 3 and claim 7.  (*Supra* Sections IX.A.3, IX.A.5; Ex. 1002, ¶138.)

    **8.**    **Claim 13**

        a)    **“A computing system comprising:”**

        b)    **“one or more processors,”**

        c)    **“a non-transitory computer-readable medium coupled to the one or more processors having instructions stored thereon that, when executed by the one or more processors, cause the one or more processors to perform operations comprising:”**

To the extent limiting, *Nitz* discloses the preamble of claim 13 and also limitations 13.b-c.  (Ex. 1002, ¶¶139-140.)  As explained above, *Nitz's* disclosed processes are performed by a computing system, such as system 100, 700, which can

42

Petition for *Inter Partes* Review
Patent No. 9,208,439

include a computing device (e.g., device 754) remote from the mobile device that

may include the knowledge base and processor(s) and can include a non-transitory

computer-readable medium that stores instructions, when executed by the

processor(s), perform processes like that disclosed by claims 1 and 7 (tracking claim

13.)  (*See supra* Sections IX.A.1.a-d, IX.A.5.a-d; Ex. 1002, ¶140; *see also infra*

Sections IX.A.8.d-f; Ex. 1005, 3:42-48, 20:7-10, Fig. 2, 21:25-32, Fig. 3, 28:5-29:60,

Fig. 7.)

> d)  **"receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;"**

*Nitz* discloses this limitation for the same reasons above for limitations 1.b,

7.a-b and limitations 13.a-c.  (*Supra* Sections IX.A.1.b, IX.A.5.a-b, IX.A.8.a-c; Ex.

1002, ¶141.)

> e)  **"modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;"**

*Nitz* discloses this limitation for the same reasons above for limitations 1.c,

7.c and limitations 13.a-d.  (*Supra* Sections IX.A.1.c, IX.A.5.c, IX.A.8.a-d; Ex.

1002, ¶142.)

> f)  **"in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender."**

43

Petition for *Inter Partes* Review
Patent No. 9,208,439

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitation 1.d and 7.d and limitations 13.a-e.  (*Supra* Sections IX.A.1.d, IX.A.5.d; IX.A.8.a-e; Ex. 1002, ¶143.)  For reasons similar to those for limitation 1.d, a POSITA would have been motivated to configure *Nitz-Nykanen* to configure the software instructions executed by the remote device (e.g., 754) to perform the processes discussed for limitations 1.d and 7.d (tracking limitation 13.f). (Sections IX.A.1.d, IX.A.5.d, IX.A.8.a-e; Ex. 1002, ¶143.)

### 9.   Claim 14

a) **"The computer-readable storage medium of claim 13, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising: receiving, from the mobile device, additional event data including application event data and/or operating system event data;"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitations 2.a and 8.a and claim 13.  (*Supra* Sections IX.A.2.a, IX.A.6.a, IX.A.8; Ex. 1002, ¶144.)  For reasons similar to those for limitations 1.d and 13.d, a POSITA would have been motivated to configure *Nitz-Nykanen* to configure the software instructions executed by the remote device (e.g., 754) to store additional instructions that, when executed, perform the processes discussed for limitations 2.a and 8.a (tracking limitation 14.a) (and those recited in limitations

44

Petition for *Inter Partes* Review
Patent No. 9,208,439

14.b-d discussed below).  (Sections IX.A.1.d, IX.A.8.a, IX.A.8.d, Sections IX.A.9.a-d; Ex. 1002, ¶144.)

      b)    **"modifying the context graph based on the additional event data;"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitations 2.b and 8.b and claim 13, limitation 14.a.  (*Supra* Sections IX.A.2.b, IX.A.6.b, IX.A.8, IX.A.9.a; Ex. 1002, ¶145.)

      c)    **"determining that the modification to the context graph matches the registration; and"**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitations 2.c and 8.c and claim 13, limitations 14.a-b.  (*Supra* Sections IX.A.2.c, IX.A.6.c, IX.A.8, IX.A.9.a-b; Ex. 1002, ¶146.)

      d)    **"sending a second notification of context graph change to the recommender."**

*Nitz* in view of *Nykanen* discloses and/or suggests this limitation for the same reasons above for limitations 2.d and 8.d and claim 13, limitations 14.a-c.  (*Supra* Sections IX.A.2.d, IX.A.6.d, IX.A.8, IX.A.9.a-c; Ex. 1002, ¶147.)

    **10.**    **Claim 15**

      a)    **"The computer-readable storage medium of claim 13 wherein the event data includes high-level event data generated by the mobile device from contextual data."**

45

Petition for *Inter Partes* Review
Patent No. 9,208,439

*Nitz* in view of *Nykanen* discloses and/or suggests the limitations of claim 15

for the same reasons above for claims 3 and 9 and claim 13.  (*Supra* Sections IX.A.3,

IX.A.7-IX.A.8; Ex. 1002, ¶148.)

### 11.   Claims 10 and 16

    a)    **Claim 10:   "The non-transitory computer-readable storage medium of claim 7, further comprising receiving a query for context graph data from the recommender; and sending the context graph data to the recommender."**

    b)    **Claim 16:  "The computer-readable storage medium of claim 13 wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising: receiving a query for context graph data from the recommender; and sending the context graph data to the recommender."**

*Nitz* in view of *Nykanen* discloses and/or suggests the limitations of claims 10

and 16 for the same reasons above for claim 4 and claims 7 and 13.  (*Supra* Sections

IX.A.4-IX.A.5, IX.A.8; Ex. 1002, ¶¶149-150.)

*Nitz* discloses a "[non-transitory] computer-readable storage medium" of

claims 7 and 13.  (*Supra* Sections IX.A.5, IX.A.8.)  *Nitz-Nykanen* discloses and/or

suggests the claimed "receiving" and "sending" features like that recited in claims

10 and 16.  (*Supra* Section IX.A.4.)   Accordingly, a POSITA would have been

motivated to modify *Nitz*'s process/system to implement queries and sending data to

applications for the reasons above for claim 4 in context of the computer-based

46

system that executes instructions stored in memory as explained for claims 7 and 13. (*Supra* Sections IX.A.4-IX.A.5, IX.A.8; Ex. 1002, ¶150.)  For similar reasons, a POSITA would have been motivated to implement such features such that the computer-readable medium described by *Nitz* as modified in view of *Nykanen* (as discussed for claims 7 and 13) includes additional instructions that when executed would have performed the claimed "receiving" and "sending" features recited in claims 10 and 16.  (Ex. 1002, ¶150.)  Thus, for the same reasons above for claims 4 and 7, 13, the combined *Nitz- Nykanen* process/system discloses and/or suggests the limitations of claims 10 and 16.  (*Id.*; *supra* Sections IX.A.4-IX.A.5, IX.A.8.)

### B. Ground 2: The Combination of *Nitz*, *Nykanen*, and *Mishra* Render Obvious Claims 6, 12, and 18

#### 1. Claim 6

a)   "The method of claim 1, further comprising:  receiving bulk upload of event data through an event posting interface; and modifying the context graph based on the received bulk upload event data."

*Nitz* in view of *Nykanen* and *Mishra* discloses and/or suggests claim 6.  (Ex. 1002, ¶¶151-161.)

*Nitz* discloses receiving event data and modifying the context graph based on the event data and *Nitz-Nykanen* discloses the registration features recited in limitation 1.d.  (*Supra* Section IX.A.1.a-d; Ex. 1002, ¶152.)  *Nitz* also discloses a

47

network interface similar to the "event posting interface." (Ex. 1005, 28:65-29:7.) A POSITA would have understood this interface is used in *Nitz* to post events similar to the generic "event posting interface" in the '439 patent.[9] (Ex. 1002, ¶152.) While *Nitz* discloses receiving event data through an interface, it does not expressly disclose bulk uploading of event data. However, it would have been obvious to a POSITA to modify *Nitz-Nykanen* to implement such features in light of *Mishra* and a POSITA's knowledge. (Ex. 1002, ¶152.)

*Mishra* discloses a system/process that determines a current geographic location of device based on received communication data, defines location data, and defines user reaction data based on user input. (Ex. 1007, Abstract, ¶[0006].) *Mishra* also discloses maintaining context data in models that stores facts and assertions about the user's behavior and interests, like the context graph disclosed by *Nitz*. (*Id.*, ¶¶[0039], [0017]-[0018]; Ex. 1002, ¶¶56-58, 153.)

*Mishra* discloses the known concept and related technologies for providing bulk data uploads of context information to a server via an interface. (*See e.g.,* Ex.

---

[9] The '439 patent describes the "event posting interface" generically. (Ex. 1001, 2:1-4, Fig. 3, 5:42-44 (referring to black box interface 302), 3:53-54, 7:7-9, 9:10-22.)

1007, ¶¶[0020] (storing data in a **data package** on the mobile device and **uploading the package** to a server), [0048] (multiple data packages can be stored and uploaded), [0048] (uploading data packages once a predetermined number are stored locally on the device), [0059] (such **data packages may be uploaded in batches** on a daily basis); *see also id.*, Fig. 1, ¶¶[0032]-[0039] (describing smartphone client communicating with server via network interface).)  (Ex. 1002, ¶154.)

Based on the disclosures of *Mishra* and *Nitz-Nykanen*, a POSITA would have been motivated to modify *Nitz-Nykanen* to allow the knowledge base to receive bulk upload of event data and modify the context graph based on that received data.  (Ex. 1002, ¶155.)   A POSITA would have had reason to consider the *Mishra*'s suggestions/disclosures with *Nitz* and *Nykanen* given they each disclose features in a similar technological field of collecting/processing context information to provide user actions.  (Ex. 1002, ¶156; *supra* (discussions of *Mishra*); Sections IX.A.1 (regarding disclosures of *Nitz* and *Nykanen*).)   Considering these disclosures, a POSITA would have recognized advantages in modifying *Nitz-Nykanen*'s **context graph** with event data using known bulk upload technologies because such features would advance *Nitz*'s operations and goals and avoid upload each time a change occurred. (Ex. 1002, ¶157.)

A POSITA would have recognized that *Nitz* discloses data posted to the knowledge base "on a periodic basis" (Ex. 1005, 13:51-58) and that *Mishra* builds on that concept by describing known features for uploading bulk data packages in batches over a network.  (Ex. 1007, ¶¶[0020], [0032]-[0034], [0036]-[0039], [0048]; Ex. 1002, ¶158.)  Therefore, a POSITA would have been motivated to configure *Nitz-Nykanen* to modify the **context graph** in the knowledge base with a bulk upload of event data from the inference engine via an event posting interface, which would have been a foreseeable way to efficiently update the knowledge base.  (Ex. 1002, ¶158.)

This implementation would have been a predictable/straightforward application of known data communication technologies/techniques that a POSITA could implement and expect to perform as intended.  (*Id.*, ¶¶159-160)  *See KSR*, 550 U.S. at 416–18.  Thus, a POSITA would have had a reasonable expectation of success in implementing the modification.  (Ex. 1002, ¶¶160-161.)  *See Pfizer, Inc.*, 480 F.3d at 1364.

### 2. Claims 12 and 18

a)   **Claim 12:  "The non-transitory computer-readable storage medium of claim 7, further comprising:  receiving bulk upload of event data through an event posting interface; and modifying the context graph based on the received bulk upload event data."**

50

b)  **Claim 18:  "The computer-readable storage medium of
claim 13, wherein the computer-readable storage medium
stores additional instructions that, when executed, cause
the computer to perform additional steps comprising
receiving bulk upload of event data through an event
posting interface; and modifying the context graph based
on the received bulk upload event data."**

*Nitz* discloses a "[non-transitory] computer-readable storage medium" of

claims 7 and 13.  (*Supra* Sections IX.A.5, IX.A.8.)  The *Nitz-Nykanen-Mishra*

combination discloses and/or suggests the claimed "receiving" and "modifying"

features like that recited in claims 12 and 18.  (*Supra* Section IX.B.1.)  A POSITA

would have been motivated to modify *Nitz-Nykanen* to implement the claimed

"receiving" of bulk upload of event data and "modifying" features recited in claims

12 and 18 for the reasons above for claim 6 in context of the computer-based *Nitz-*

*Nykanen* system that executes instructions stored in memory as explained for claims

7 and 13.  (*Supra* Sections IX.A.5, IX.A.8, IX.B.1; Ex. 1002, ¶162.)  For the same

reasons, a POSITA would have been motivated to implement such features such that

the computer-readable medium described by *Nitz* as modified in view of *Nykanen*

(as discussed for claims 7 and 13) includes additional instructions that when

executed would have performed the claimed "receiving bulk upload event data" and

"modifying" features recited in claims 12 and 18.  (Ex. 1002, ¶162.)  Thus, for the

same reasons explained above for claims 6 and 7, 13, the combined *Nitz-Nykanen-*

51

Petition for *Inter Partes* Review
Patent No. 9,208,439

*Mishra* process/system discloses and/or suggests the limitations of claims 12 and 18.

(*Id.*; *supra* Sections IX.A.5, IX.A.8, IX.B.1.)

### C.   Ground 3: The Combination of *Nitz*, *Nykanen*, and *Chang* Render Obvious Claims 5, 11, and 17

#### 1.   Claim 5

##### a)   "The method of claim 1, further comprising:  receiving real-time event data through a RESTful WebAPI; and modifying the context graph based on the received real-time event data."

*Nitz* in view of *Nykanen* and *Chang* discloses and/or suggests claim 5.  (Ex. 1002, ¶¶163-170.)  *Nitz* discloses receiving event data and modifying a context graph based on the received event data.  (*Supra* Sections IX.A.1.a-c; Ex. 1002, ¶163.)  *Nitz* also discloses that the event data may be posted to the knowledge base in "real-time" because it describes input data 116 as "real-time" inputs (*see e.g.,* Ex. 1005, Figs. 1, 3 ("real-time inputs"), 1:29-33, 4:53-57), that inference engine 110 can "automatically respond to the user's current situation and context" (*id.*, 5:11-13), and that "data is posted to the knowledge base 130 automatically as it occurs" (*id.*, 13:51-58). (Ex. 1002, ¶163.)  Restful WebAPI was a known simple web service which supports HTTP methods.  (*Id.*) While *Nitz* does not expressly disclose the knowledge base (and its models/contextual information) receiving such event data via known RESTful WebAPI mechanisms/techniques, it would have been obvious

52

to a POSITA to modify *Nitz-Nykanen* to implement such features because RESTful WebAPIs were known as demonstrated by *Chang* and a POSITA's knowledge.  (Ex. 1002, ¶163.)

*Chang's* system collects/processes/stores health data and provides notifications to users.  (Ex. 1008, Abstract, ¶[0005].)  *Chang* states that an open application programming interface (API) can enable development of value added services and that "[t]o enable an open platform, in one embodiment, we adopt Web services (i.e., RESTful API) to provision the wellness management functionalities."  (*Id.*, ¶¶[0027], [0034].)  *Chang* describes a routing service to forward wellness data to the wellness record and knowledge repository 110 for later access.  (*Id.*, ¶[0047].)  *Chang* also explains that RESTful WebAPI was a known and simple web service which supports HTTP methods such as POST, GET, PUT or DELETE. (*Id.*, ¶[0036]; Ex. 1002, ¶¶59-61, 164.)

In light of such disclosures/suggestions of *Chang*, a POSITA would have been motivated and found obvious to configure *Nitz-Nykanen* such that the knowledge base receives the real-time event data through a web service using known RESTful WebAPI technologies.  (Ex. 1002, ¶165.)  This implementation would have been a predictable/straightforward application of well-known technologies/methods (e.g., RESTful APIs).  (*Id.*)  *See also KSR*, 550 U.S. at 416–18.

53

Petition for *Inter Partes* Review
Patent No. 9,208,439

A POSITA would have had reason to consider *Chang*'s suggestions/disclosures in context of *Nitz* and *Nykanen* given *Chang* discloses features in a similar technological field, for example, collecting/monitoring real-time data from sensors that is provided to a knowledge repository and used to provide services to users. (Ex. 1008, Abstract, Fig. 1, ¶¶[0041], [0043], [0046]-[0047]; *supra* Section IX.A.1 (regarding disclosures of *Nitz* and *Nykanen*); Ex. 1002, ¶166.) A POSITA would have recognized the benefits versatility in modifying *Nitz-Nykanen* to allow for updating the **context graph** by using RESTful WebAPI over the network to the remote device hosting the knowledge base. (Ex 1002, ¶166.)

A POSITA would have understood that using a RESTful WebAPI to receive the event data for these updates would have been a foreseeable/logical modification to the way the knowledge base in *Nitz-Nykanen* receives real-time event data from the mobile device and would have provided an alternate and known way to update the contextual information/models in knowledge base through known web service technologies. (Ex. 1002, ¶¶167-168.)

A POSITA would have had the necessary skills/knowledge to configure *Nitz*'s system/process to implement RESTful WebAPI. (*Id.*, ¶169.) Such a POSITA would have been able to program/design *Nitz-Nykanen* to use RESTful WebAPI technologies to communicate event data from the mobile device to the knowledge

54

Petition for *Inter Partes* Review
Patent No. 9,208,439

base. (*Id.*) Based on a POSITA's knowledge and the disclosures of *Chang, Nitz, Nykanen*, a POSITA would have had a reasonable expectation of success in the above-modification. (*Id.*, ¶¶169-170.) *See Pfizer, Inc.*, 480 F.3d at 1364.

### 2. Claims 11 and 17

a) **Claim 11: "The non-transitory computer-readable storage medium of claim 7, further comprising: receiving real-time event data through a RESTful WebAPI; and modifying the context graph based on the received real-time event data."**

b) **Claim 17: "The computer-readable storage medium of claim 13, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising: receiving real-time event data through a RESTful WebAPI; and modifying the context graph based on the received real-time event data."**

*Nitz* discloses a "[non-transitory] computer-readable storage medium" of claims 7 and 13. (*Supra* Sections IX.A.5, IX.A.8.) The *Nitz-Nykanen-Chang* combination discloses and/or suggests the claimed "real-time event data" and "RESTful Web API" features like that recited in claims 11 and 17. (*Supra* Section IX.C.1.) A POSITA would have been motivated to modify *Nitz-Nykanen* to implement the claimed "receiving" and "modifying" features recited in claims 11 and 17 for the reasons above for claim 5 in context of the computer-based *Nitz-Nykanen* system that executes instructions stored in memory as explained for claims

55

Petition for *Inter Partes* Review
Patent No. 9,208,439

7 and 13. (*Supra* Sections IX.A.5, IX.A.8, IX.C.1; Ex. 1002, ¶¶171.) A POSITA

would have been motivated to implement such features such that the computer-

readable medium described by *Nitz* as modified in view of *Nykanen* (as discussed

for claims 7 and 13) includes additional instructions that when executed would have

performed the claimed "real-time event data through a RESTful WebAPI" and

"modifying" features recited in claims 11 and 17. (Ex. 1002, ¶171.) Thus, for the

same reasons above for claims 5 and 7, 13, the combined *Nitz-Nykanen-Chang*

process/system discloses and/or suggests the limitations of claims 11 and 17. (*Id.*;

*supra* Sections IX.A.5, IX.A.8, IX.C.1.)

    **D.**    **Ground 4: The Combination of *Nitz*, *Nykanen*, and *Mccolgan***
             **Render Obvious Claim 19**

        **1.**    **Claim 19**

            a)    **"The method of claim 1, further comprising: sending a**
                    **second notification to the recommender by pushing events**
                    **into the recommender's publish/subscribe system [10]**

---

[10] Claims 1 and 19 do not provide antecedent basis for the claimed "**the**

recommender's publish/subscribe system." For purposes of this proceeding,

Petitioner interprets claim 19 as if the claimed recommender includes such a system,

but reserves the right to challenge the definiteness of this claim in other proceedings.

While the '439 patent describes publishing features that include providing event data

EXHIBIT A PAGE 61

> **asynchronously using a long-poll persistent push connection."**

*Nitz* in combination with *Nykanen* and *Mccolgan* discloses and/or suggests claim 19. (Ex. 1002, ¶¶172-185.) As explained, *Nitz* discloses a recommender and *Nitz-Nykanen* discloses and/or suggests sending notification of context graph change to the recommender. (Section IX.A.1.d.) While *Nitz* does not expressly disclose the recommender having a publish/subscribe system and pushing events into that system asynchronously using a long-poll persistent push connection, it would have been obvious to a POSITA to modify *Nitz-Nykanen* to implement such features in light of *Mccolgan*. (Ex. 1002, ¶172.)

*Mccolgan* describes a system for transporting asynchronous aspects using a context aware mechanism. (Ex. 1009, Title, Abstract.) *Mccolgan* explains that context can be found in presence applications and location applications. (*Id.*, ¶¶[0002]-[0004].) *Mccolgan*'s presence service captures presence information from sources and distributes a raw presence metadata document to authorized watchers and a presence platform that receives, stores, updates and sends out presence

---

to subscribers and that a client may include such system (*see e.g.,* Ex. 1001, Fig. 2, 4: 9-10, 4:49-67, 6:27-41, 9:9-12), it does not describe a **recommender** having a publish/subscribe system (*id.*, *generally*).

information.  (*Id.*, ¶¶[0006], [0041].)  *Mccolgan* discloses that "a contextually aware platform that exposes relevant "aspect triggers" on behalf of a content delivery service provides useful means for **notifying** or **pushing** relevant information to an associated **subscriber** base."   (Ex. 1009, ¶[0187].)   When a trigger fires, the corresponding action "may be sending or **pushing relevant information to an appropriate client device**."  (*Id.,* ¶[0188].) A presence context aware mechanism communicates with presence platform to exchange presence information flow and further communicates over network to receive policy information, rules and thresholds and to further receive and **publish** presence aspects.  (*Id.*, ¶¶[0067], [0096].)  *Mccolgan* also discloses **asynchronous** transmission of aspect trigger indications which may be facilitated through a "**long-poll**" or "open-stream" type HTTP 1.1 GET or POST operations.  (*Id.*, ¶[0259]; Ex. 1002, ¶¶62-64, 173-174.)

A POSITA would have had reasons to consider *Mccolgan* when contemplating *Nitz*, given *Mccolgan* discloses context aware mechanisms in a mobile device-based system that provides presence information on the basis of context, similar to *Nitz*'s context-based features discussed above. (Ex. 1002, ¶175.) (*See e.g., supra* IX.A.1 (discussing *Nitz*); *e.g.,* Ex. 1009, ¶¶[0001]-[0006], [0039].) Considering the collective teachings/suggestions, a POSITA would have been

EXHIBIT A PAGE 63

motivated (and found obvious) to modify *Nitz-Nykanen* to implement features like
that recited in claim 19.  (Ex. 1002, ¶175.)

A POSITA would have been motivated in light of *Mccolgan* and *Nitz* to
configure the **recommender** in *Nitz-Nykanen* to include a "**publish/subscribe
system**" to allow the recommender to publish candidate actions appropriate
applications or remote sources (e.g., subscribers).  (Ex. 1002, ¶176.)  A POSITA
would have been so motivated because *Nitz*'s execution/presentation module 124
(considered part of the claimed recommender (*see supra* IX.A.1.d))
presents/executes selected actions at the mobile device (Ex. 1005, 5:56-6:16) and
can share actions with other designated devices (*id.*, 25:56-26:8).  Thus, a POSITA
would have appreciated the suggestions/guidance provided by *Mccolgan* (e.g.,
relating to publishing data to a subscriber (subscriber database or appropriate client
device) (*e.g.*, Ex. 1009, ¶¶[0187]-[00188])) in context of *Nitz*'s presentation features.
(Ex. 1002, ¶176.)  Thus, a POSITA would have had reasons to modify *Nitz-Nykanen*
to allow the **recommender** to employ a publish/subscribe system that allows actions
and related data to be published to appropriate applications on the mobile device or
other subscribed devices.   (*Id*.)   This implementation would have been a
predictable/straightforward combination of well-known technologies/methods and a
POSITA would have expectation of success in implementing the modification

considering the features described by *Mccolgan* and *Nitz*, which provide mechanisms for facilitating the publication/presentment of information to appropriate recipients (e.g., mobile device user, remote devices, and applications). (*Id.*) *See KSR*, 550 U.S. at 416–18.

In addition, a POSITA would have been motivated to implement such features because it would have allowed for *Nitz-Nykanen* to use known techniques/technologies to provide event data from the knowledge base to the **recommender** for appropriate action processing/publishing. (Ex. 1002, ¶177.) Such features would have provided *Nitz-Nykanen* with a mechanism for timely providing updated contextual data to the **recommender** so that relevant candidate action(s) can be updated/created for publishing to appropriate recipients, and thus a POSITA would have been motivated to implement the above modifications. (*Id.*) Indeed, a POSITA would have recognized that *Nitz*'s candidate actions are based on a "user's current situation and context" which can be stored in the knowledge base (Ex. 1005, 23:41-47, 14:3-8) and that the **recommender** uses updates/modifications to the model(s) and related contextual data in the knowledge base to generate candidate actions for presentment via the presentment module (*id.*, Ex. 1005, 5:56-6:16.) (*See also supra* Sections IX.A.1.b-d; Ex. 1002, ¶178.) A POSITA would have thus recognized the benefit of allowing the knowledge base to push event data

60

to the recommender's publish/subscribe system using known push technologies to ensure relevant candidate actions can be generated/published to appropriate recipients in a timely fashion and without requiring requests from the mobile device. (1002, ¶178; *see also* Ex. 1005, 23:41-47.)  A POSITA would have thus recognized that using known push technologies/processes to update a remote device with recent information, as exemplified by *Mccolgan*, would complement *Nitz*'s modified system.  (Ex. 1009, ¶[0188]; Ex. 1002, ¶178.)

A POSITA would also have appreciated that such a configuration may have been successfully implemented in *Nitz-Nykanen* in various ways (i.e., event data is pushed from the knowledge base directly to the combined system's recommender's publish/subscribe system or pushed via the inference engine as described in 1.d). (Ex. 1002, ¶179; Section IX.A.1d.)  A POSITA would have sought to configure the above-modification to push only relevant information to the recommender's publish/subscribe system that the client device's components have registered to receive, allowing the system to focus resources on important/relevant/timely information and avoid generation of unnecessary candidate actions.  (Ex. 1002, ¶179; Ex. 1009, ¶[0187].)   Given *Nitz*'s descriptions that actions may be communicated to another system or device (e.g., sending a notification to a family member) (Ex. 1005, 24:33-40) and *Mccolgan*'s disclosures above, a POSITA would

61

have had reasons to configure the above publish/subscribe system to publish actions to relevant recipients (subscribers) including applications on the mobile device or other remote devices. (Ex. 1002, ¶179.)

A POSITA would have also recognized that by sending (e.g., pushing) a notification of context graph change to the publish/subscribe system of the combined system's recommender, the knowledge base is sending a (second) notification and the POSITA would have been motivated to make this modification because the second notification would inform the above-described recommender of new event data, consistent with *Nitz*'s operations.  (*Id.*, ¶180.) To the extent PO asserts that a notification is met by simply sending updated context graph data to the recommender, it would have been obvious to configure *Nitz-Nykanen* to push event data using known long-poll persistent push connection mechanisms (as discussed/suggested by Mccolgan) to the recommender's publish/subscribe system based on its registration to receive certain updated information when it occurs. (*Id.*, ¶181.)

For similar reasons, it would have been obvious to provide additional/second notifications by continuously asynchronously pushing notifications/updated information to the "recommender" using known long-poll persistent push connection mechanisms in order to generate timely candidate actions.  (*Id.*, ¶182.)

62

Petition for *Inter Partes* Review
Patent No. 9,208,439

A POSITA would have recognized that providing a second reminder to the combined system's recommender would help minimize effects of issues that may have hindered/delayed/prevented notification of event data or relevant context graph changes to the recommender (e.g., software/hardware failures/errors that delayed or prevented earlier notifications, etc.).  (*Id.*)

Therefore, based on *Mccolgan's* disclosures/guidance and knowledge in the art, a POSITA would have understood that pushing event data to the recommender's publish/subscribe system asynchronously using a long-poll persistent push connection in *Nitz-Nykanen* would have provided an alternate and known way to notify/provide the mobile device with information to be used to generate and present updated candidate actions.  (Ex. 1002, ¶183.)

A POSITA would have understood that such configurations would have been achieved using known technologies/techniques in a predictable/straightforward manner.  (*Id.*, ¶184.)  *See KSR*, 550 U.S. at 416–18.  For example, a POSITA would have recognized that the above-discussed publish/subscribe system would have benefited from pushing the event data asynchronously using a long-poll connection technique, as suggested/described by *Mccolgan*.  (Ex. 1009, ¶[0259], Ex. 1002, ¶184.)  This technique would have transmitted event data with reduced delay/latency, which a POSITA would have considered beneficial given *Nitz's* use

63

Petition for *Inter Partes* Review
Patent No. 9,208,439

of current contextual information.   (Ex. 1002, ¶184.)   Using such long-poll

connection features would have mitigated delays in providing event data from the

knowledge base to the **recommender** to enable the timely generation/publication of

appropriate candidate actions.  (*Id.*)  A POSITA would have had the necessary skills

and knowledge to implement the above modifications and would have had a

reasonable expectation of success in the above-modification.  (*Id.*, ¶¶184-185.)  *See*

*Pfizer, Inc.*, 480 F.3d at 1364.

### E. Ground 5: The Combination of *Nitz, Nykanen*, and *Sathish* Render Obvious Claim 20

#### 1. Claim 20

a)  **"The method of claim 1, wherein sending the notification comprises notifying the recommender of topological changes in the context graph and/or changes to individual properties of nodes and edges in the context graph."**

*Nitz* in combination with *Nykanen* and *Sathish* discloses and/or suggests claim

20.  (Ex. 1002, ¶¶186-195.)   *Nitz-Nykanen* discloses and/or suggests sending a

notification of a context graph change to a recommender.  (*Supra* Section IX.A.1.d.)

While *Nitz* does not expressly disclose the notification comprising notifying the

recommender of topological changes or changes to individual properties of nodes

and edges in the disclosed "context graph," it would have been obvious to a POSITA

64

to modify *Nitz-Nykanen* to implement such features in light of the guidance provided by *Sathish*. (Ex. 1002, ¶186.)

*Sathish* discloses a delivery context client interface (DCCI) based context model. (Ex. 1010, 2:30-38.) Applications may receive notifications such as new properties added, changes for new or existing properties, and other topology changes. (*Id.*, 9:43-49.) As explained, "[w]hen the event notification is fired or generated, the corresponding event may captured by the event listener to indicate that the new (or changed) property associated with the corresponding event is available." (*Id.*, 9:49-52; Ex. 1002, ¶¶65, 187.)

A POSITA would have been motivated to configure the context graph in *Nitz-Nykanen* to have known graph-based characteristics and features (e.g., including topological characteristics and/or nodes/edges properties) for similar reasons explained for claim element 1.c.[11] (*Supra* Section IX.A.1.c; Ex. 1002, ¶188.)

---

[11] The '439 patent does not describe any criticality associated with the format of the context graph, stating only that in one embodiment the system can manage context graphs with "greater numbers of nodes" (Ex. 1001, 7:41-43), showing a generic graph 406 (Fig. 4), and generically stating that changes in graph 406 can include

Petition for *Inter Partes* Review
Patent No. 9,208,439

A POSITA would have been further motivated in light of *Sathish* to configure *Nitz-Nykanen* to monitor, and notify the recommender (discussed in claim 1) of, topological changes or changes to individual properties of nodes and edges in the "context graph" stored in the knowledge base (as discussed for claim 1) and use these changes to generate/present candidate actions. (*Id.*, ¶189.) This implementation would have been a predictable/straightforward combination of well-known technologies/methods. (*Id.*) *See KSR*, 550 U.S. at 416–18.

For example, a POSITA would have been motivated to implement features similar to *Sathish*'s teachings/suggestions regarding topological changes and/or nodes and edges property updates in *Nitz-Nykanen* because it would have allowed the combined system/process to monitor changes in the models and related contextual information in the knowledge base. (Ex. 1002, ¶190.) As explained, *Nitz* contemplates the use of known graph-based modeling and data structuring techniques for structuring and maintaining data that can be stored in the knowledge base (*see supra* Section IX.A.1.c.) Indeed, the knowledge base in *Nitz* includes

---

"topological changes and/or changes to individual properties on objects (e.g., nodes and edges)" (*id.*, 7:58-60.)

66

Petition for *Inter Partes* Review
Patent No. 9,208,439

"indexed or otherwise searchable stores of knowledge (e.g., databases, lookup tables, or the like)" (knowledge stores). (Ex. 1005, 13:60-64.)

For reasons similar to that described for claim element 1.c, it would have been obvious to configure the models/contextual-based information in the knowledge base as a "context graph" including known topological characteristics and node/edge relationships. (Section IX.A.1.c; Ex. 1002, ¶191.)   Moreover, it was known to monitor/assess changes in node/edge properties in such graph-based models for updating information reflected by such data structures (Ex. 1002, ¶191), as recognized by *Nitz* (Ex. 1005, 59-61 (citing Ex. 1013); Ex. 1013, 10:15-46) and notify such changes, as disclosed/suggested by *Sathish* (Ex. 1010, 2:30-38, 9:43-52). A POSITA would have recognized the advantages in monitoring changes to topological characteristics and/or node/edge properties of the "context graph," including providing a known and useful way to track and notify changes in the above-described **context graph**. (Ex. 1002, ¶192; Section IX.A.1.c.)   Monitoring such changes would have been helpful in the **recommender**'s processes for creating/presenting appropriate candidate actions based on changes in the **context graph**, consistent with the goals of, and features provided by, *Nitz*'s system.  (*Id.*)

Therefore, based on *Sathish*'s and *Nitz*'s disclosures/guidance and knowledge in the art, a POSITA would have been motivated to configure *Nitz-Nykanen* to send

67

Petition for *Inter Partes* Review
Patent No. 9,208,439

the notification to the recommender (as discussed above for limitation 1.d) by notifying the recommender of changes in topological characteristics and/or individual properties of nodes and edges in the context graph.   (Ex. 1002, ¶193.)

Given *Sathish* and *Nitz*'s disclosures/suggestions, a POSITA would have recognized that the above-modification would have involved the use of known technologies/concepts/processes (e.g., event listener at a root node, event detection algorithms (e.g., Ex. 1013, 10:15-46), etc.) that would have obtained the foreseeable result of monitoring and notifying changes to node/edge properties and topological changes in the context graph of *Nitz-Nykanen* to the recommender. (*Id.*, ¶194). Likewise, consistent with such knowledge and known disclosures, a POSITA would have had the necessary skills and knowledge to implement such features into *Nitz-Nykanen* and would have done so with a reasonable expectation of success in the above-modification. (*Id.*, ¶¶194-195.)  *See Pfizer, Inc.*, 480 F.3d at 1364.

68

Petition for *Inter Partes* Review
Patent No. 9,208,439

## X.   **DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE[12]**

There is no basis for the Board to exercise its discretion to deny institution

under 35 U.S.C. §§ 314(a) as the six-factor test addressed in *Fintiv* strongly favors

institution ("*Fintiv* factor(s)").  *See Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper

11 at 5-6 (Mar. 20, 2020) (precedential).

The **first *Fintiv* factor** (stay) favors institution.  Petitioner intends to file,

shortly after this filing, a motion to stay pending resolution of this IPR at the district

court.  (Ex. 1027.)  The presiding Court has consistently granted motions to stay

pending institution and resolution of IPR.[13]  *See Guy A. Shaked Investments, Ltd. v.*

*Trade Box, LLC*, Case No. 19-CV-10593-AB, Dkt. No. 56, at 3 (C.D. Cal. Nov. 18,

2020); *DataQuill Ltd. v. TCL Commc'n Holdings Ltd.*, Case No. 19-CV-03394-AB,

Dkt No. 65, at 5 (C.D. Cal. Apr. 24, 2020); *Weserve Drone, LLC v. SZ DJI Tech.*

*Co. Ltd.*, Case No. 19-CV-04382-AB, Dkt. No. 54, at 7 (C.D. Cal. Mar. 17, 2020);

---

[12] Discretionary denial under *General Plastic Industrial Co., Ltd. v. Canon*

*Kabushiki Kaisha*, IPR2016-01357, Paper No. 19 is not applicable here given the

'439 patent is not at issue in any other proceeding pending before the Board.

[13] The Petitioner has not identified any cases where the presiding district court judge

has denied a motion to stay pending IPR institution.

69

Petition for *Inter Partes* Review
Patent No. 9,208,439

*Sleep Number Corporation v. Sizewise Rentals, LLC*, Case No. 18-CV-00356-AB, Dkt. No. 143, at 6 (C.D. Cal. Feb. 12, 2019); *General Electric Company v. Vestas Wind Systems A/S*, Case No. 17-CV-05653-AB, Dkt. No. 85, at 2 (C.D. Cal. Jun. 07, 2018); *Essity Hygiene and Health Aktiebolag v. Tarzana Enterprises, LLC*, Case No. 17-CV-04395-AB, Dkt. No. 127, at 16 (C.D. Cal. Sep. 27, 2017). *Fintiv* at 6.

The **second *Fintiv* factor** (proximity of trial dates) also weighs strongly in favor of institution. While the Court just recently scheduled trial for May 2022 (Ex. 1012), there is no evidence at this time to suggest such a trial date will be maintained. A district court will often "extend or accelerate deadlines and modify case schedules for myriad reasons." *Precision Planting* at 14; s*ee also Intri-Plex Techs. v. NHK Int'l Corp.*, 3:17-cv-01097-EMC (N.D. Cal.) (D.I. 173, 175); *Sands Revolution II, LLC, v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 at 8-10 (Jun. 16, 2020). This, coupled with the likelihood of a stay, it is less than certain that trial will precede the Board's FWD. *Dish Network, L.L.C. v. Broadband iTV, Inc.*, IPR2020-01267, Paper 15 at 17-18 (Jan. 21, 2021); *HP Inc. v. Slingshot Printing LLC*, IPR2020-01085, Paper 12 at 7 (Jan. 14, 2021) (recognizing that district court trial date "may possibly slip … [due to] months of backlogged trials" from the COVID-19 pandemic). *See also e.g., Guy A. Shaked Investments* at 2 (acknowledging "the current trial date would not stick in any event" due in part to

70

Petition for *Inter Partes* Review
Patent No. 9,208,439

"the COVID-19 pandemic" and accordingly granting stay). But even if it does, the Board has found factor 2 favored institution despite trial preceding final decision by five months. *Sand Revolution II* at 8-10. Further, the trial date deserves little weight because it does not guarantee entry of final judgment or consider lengthy post-trial briefing and because of Petitioner's diligence in filing this Petition soon— approximately 10 days—after PO served its infringement contentions (Ex. 1020). *Apple Inc. v. Maxell, Ltd.*, IPR2020-00204, Paper 11 at 16 (June 19, 2020) (refusing to exercise discretionary denial with nine month difference between trial and final decision).

The **third *Fintiv* factor** likewise weighs strongly in favor of institution. The case is in its infancy and thus at the time of this filing, significant work is ahead of the parties and the court, including claim construction, which will be heard about the same time as the Board's anticipated institution decision. (Ex. 1012.) Thus, investment by the parties in invalidity-related issues will not progress in significant fashion by that date. Other case activity that will eventually take place (outside claim construction) that does not relate to validity should "not weigh in [the Board's] consideration of this issue." *Western Digital Corp. et al. v. Martin Kuster*, IPR2020-01391, Paper 10 at 11 (February 16, 2020). Also, the likelihood of a stay would prevent investment of resources in the district court action. Such minimal

71

Petition for *Inter Partes* Review
Patent No. 9,208,439

investment is insufficient to support discretionary denial. *See e.g., Juniper Networks, Inc. v. Huawei Digital Techs. (Cheng Du) Co., Ltd.*, IPR2020-01130, Paper 13 at 12-13 (Jan. 22, 2021). Moreover, Petitioner's diligence in filing this Petition weighs against discretionary denial. *Dish* at 20-21; *Fintiv* at 11.

The **fourth *Fintiv* factor** (overlap) also weighs in favor of institution. There is, at this stage, no evidence of overlap in invalidity positions between the two proceedings. However, to mitigate concerns regarding duplicative efforts and efficiency, Petitioner stipulates that it will not pursue invalidity of the '439 patent in the district court litigation based on any instituted ground in this IPR proceeding. *Apple, Inc. v. SEVEN Networks, LLC*, IPR2020-00156, Paper 10 at 19 (June 15, 2020).

The **sixth *Fintiv* factor** (other circumstances) also favors institution. The Petition diligently sought review within months of PO's complaint and did so by presenting strong grounds demonstrating the unpatentability of the challenged claims. (*Supra* Section IX.) Further, this petition is the only challenge to the '439 patent before the Board, which is a "crucial fact" favoring institution. *Google LLC v. Uniloc 2017 LLC*, IPR2020-00115, Paper 10 at 6 (May 12, 2020).

While the **fifth *Fintiv* factor** (same parties) may weigh slightly in favor of denial, the remaining factors outweigh that factor. Accordingly, based on a "holistic

Petition for *Inter Partes* Review
Patent No. 9,208,439

view" of whether integrity of the system and efficiency is best served, institution here is proper.  *Samsung Elecs. Co. Ltd. v. Dynamics Inc.*, IPR2020-00505, Paper 11 at 15 (Aug. 12, 2020).

73

Petition for *Inter Partes* Review
Patent No. 9,208,439

## XI.   CONCLUSION

For the reasons given above, Petitioner requests institution of IPR for the challenged claims based on each of the specified grounds.

Respectfully submitted,

Dated: May 21, 2021                 By: /Joseph E. Palys/_____
                                    Joseph E. Palys (Reg. No. 46,508)
                                    Counsel for Petitioner

74

Petition for *Inter Partes* Review
Patent No. 9,208,439

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 9,208,439 contains, as measured by the word-processing system used to prepare this paper, 13,904 words. This word count does not include the items excluded by 37 C.F.R. § 42.24 as not counting towards the word limit.

Respectfully submitted,

Dated: May 21, 2021          By: /Joseph E. Palys/
                             Joseph E. Palys (Reg. No. 46,508)
                             Counsel for Petitioner

Petition for *Inter Partes* Review
Patent No. 9,208,439

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2021, I caused a true and correct copy of the

foregoing Petition for *Inter Partes* Review of U.S. Patent No. 9,208,439 and

supporting exhibits to be served via express mail on the Patent Owner at the

following correspondence address of record as listed on PAIR:

> 35699-PVF-PARC
> c/o Park, Vaughn, Fleming & Dowler LLP
> 2820 Fifth Street
> Davis CA 95618-7759

By: /Joseph E. Palys/ 
    Joseph E. Palys (Reg. No. 46,508)