# EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SNAP INC.
Petitioner

v.

PALO ALTO RESEARCH CENTER INC.
Patent Owner

_____

Patent No. 8,489,599
_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 8,489,599**

Petition for *Inter Partes* Review
Patent No. 8,489,599

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    MANDATORY NOTICES .....................................................................1

III.   PAYMENT OF FEES .............................................................................2

IV.    GROUNDS FOR STANDING.................................................................2

V.     PRECISE RELIEF REQUESTED AND GROUNDS RAISED....................2

VI.    LEVEL OF ORDINARY SKILL ............................................................3

VII.   THE '599 PATENT ................................................................................3

VIII.  CLAIM CONSTRUCTION ....................................................................4

IX.    DETAILED EXPLANATION OF GROUNDS............................................5

       A.    Ground 1: *Rosenberg* Anticipates Claims 1, 2, 4-7, 10-13, 17-20,
             22-25 .........................................................................................5

             1.    Claim 1 ............................................................................5

             2.    Claim 2 ..........................................................................17

             3.    Claim 4 ..........................................................................24

             4.    Claim 5 ..........................................................................27

             5.    Claim 6 ..........................................................................29

             6.    Claim 7 ..........................................................................31

             7.    Claim 10 ........................................................................32

             8.    Claim 11 ........................................................................32

             9.    Claim 12 ........................................................................33

             10.   Claims 13, 17, 18 ..........................................................36

             11.   Claim 19 ........................................................................37

             12.   Claim 20 ........................................................................44

i

Petition for *Inter Partes* Review
Patent No. 8,489,599

13. Claim 22 ...................................................................................48

14. Claim 23 ...................................................................................48

15. Claim 24 ...................................................................................49

16. Claim 25 ...................................................................................49

B. Ground 2: *Rosenberg* Renders Obvious Claims 4-5, 15-16, 19-20, 22-25 .......................................................................................50

1. Claim 4 .....................................................................................50

2. Claim 5 .....................................................................................52

3. Claim 15 ...................................................................................52

4. Claim 16 ...................................................................................52

5. Claim 19 ...................................................................................53

6. Claim 20 ...................................................................................54

7. Claims 22-25 .............................................................................56

C. Ground 3: *Rosenberg* in view of *Suzuki* Renders Obvious Claims 3, 8-9, 14, 21 ...........................................................................56

1. Claim 3 .....................................................................................56

2. Claim 8 .....................................................................................61

3. Claim 9 .....................................................................................62

4. Claim 14 ...................................................................................63

5. Claim 21 ...................................................................................64

X. DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE .................66

XI. CONCLUSION ....................................................................................70

ii

## LIST OF EXHIBITS

| | |
|---|---|
| Ex.1001 | U.S. Patent No. 8,489,599 |
| Ex.1002 | Declaration of Steve Smoot |
| Ex.1003 | Curriculum Vitae of Steve Smoot. |
| Ex.1004 | Prosecution History of U.S. Patent No. 8,489,599 |
| Ex.1005 | U.S. Patent No. 7,577,522 (*Rosenberg*") |
| Ex.1006 | U.S. Patent No. 6,680,675 ("*Suzuki*") |
| Ex.1007 | US 2009/0089288 to Petersen |
| Ex.1008 | Apple Introduces the New iPhone 3G, Apple Newsroom, June 9, 2008 (https://www.apple.com/newsroom/2008/06/09Apple-Introduces-the-New-iPhone-3G/) |
| Ex.1009 | Marguerite Reardon, Motion sensing comes to mobile phones, CNET (June 11, 2007) |
| Ex.1010 | U.S. Patent Pub. No. 2006/0010240 to Chuah |
| Ex.1011 | U.S. Patent Pub. No. 2002/0052781 to Aufricht |
| Ex.1012 | U.S. Patent No. 9,195,765 to Russell |
| Ex.1013 | U.S. Patent Pub. No. 2007/0124721 to Cowing |
| Ex.1014 | U.S. Patent No. 6,756,882 to Benes |
| Ex.1015 | RESERVED |
| Ex.1016 | U.S. Patent No. 8,738,431 to Elliott |
| Ex.1017 | *Palo Alto Research Center v. Snap*, Case No. 2:20-cv-10755-AB-MRW, PARC's Infringement Contentions |
| Ex. 1018 | Context-Aware Computing and Self-Managing, Systems, CRC Press, Edited by Waltenegus Dargie (2009) |

Petition for *Inter Partes* Review
Patent No. 8,489,599

| Ex.1019 | *Palo Alto Research Center v. Snap*, Case No. 2:20-cv-10755-AB-MRW, Dkt. 44, Order Regarding Case Schedule (C.D.Cal. May 20, 2021). |
| Ex. 1020 | *Palo Alto Research Center v. Snap*, Case No. 2:20-cv-10755-AB-MRW, Correspondence Regarding Motion to Stay (May 19, 2021) |

EXHIBIT B PAGE 5

Petition for *Inter Partes* Review
Patent No. 8,489,599

## I.   INTRODUCTION

Snap Inc. ("Petitioner") requests *inter partes* review of claims 1-25 ("challenged claims") of U.S. Patent No. 8,489,599 ("'599 patent") (Ex.1001), which, according to PTO records, is assigned to Palo Alto Research Center Inc. ("Patent Owner" or "PO").  For the reasons discussed below, the challenged claims should be found unpatentable and canceled.

## II.   MANDATORY NOTICES

**Real Parties-in-Interest**: Petitioner identifies the following as the real parties-in-interest: Snap Inc.

**Related Matters**: The '599 patent is at issue in *Palo Alto Research Center Inc. v. Snap Inc.*, No. 2:20-CV-10755-AB-MRW (C.D. Cal.), *Palo Alto Research Center Inc. v. Twitter, Inc.*, No. 2:20-CV-10754-AB-MRW (C.D. Cal.) and *Palo Alto Research Center Inc. v. Facebook, Inc.*, No. 2:20-CV-10753-AB-MRW (C.D. Cal.).  Petitioner is concurrently filing an IPR petition challenging U.S. Patent No. 9,208,439, which is also at issue in the above litigations.

**Counsel and Service Information**: Lead counsel: Naveen Modi (Reg. No. 46,224), and Backup counsel is (1) Joseph E. Palys (Reg. No. 46,508).  Service information is Paul Hastings LLP, 2050 M St., Washington, D.C., 20005, Tel.: 202.551.1700, Fax: 202.551.1705, email: PH-Snap-PRC-IPR@paulhastings.com. Petitioner consents to electronic service.

1

Petition for *Inter Partes* Review
Patent No. 8,489,599

## III.   PAYMENT OF FEES

The PTO is authorized to charge any fees due during this proceeding to Deposit Account No. 50-2613.

## IV.   GROUNDS FOR STANDING

Petitioner certifies that the '599 patent is available for review and Petitioner is not barred or estopped from requesting review on the grounds identified herein.

## V.   PRECISE RELIEF REQUESTED AND GROUNDS RAISED

Claims 1-25 should be canceled as unpatentable based on the following grounds:

**Ground 1**: Claims 1, 2, 4-7, 10-13, 17-20, 22-25 are unpatentable under pre-AIA 35 U.S.C. §102(e) as being anticipated by *Rosenberg*;

**Ground 2**: Claims 4-5, 15-16, 19-20, 22-25 are unpatentable under §103(a) as being obvious over *Rosenberg*; and

**Ground 3**: Claims 3, 8-9, 14, 21 are unpatentable under §103(a) as being obvious over *Rosenberg* and *Suzuki*.[1]

The '599 patent issued from an application filed December 2, 2008. *Rosenberg* issued from an application filed June 28, 2006. *Suzuki* issued on January

---

[1] Other references discussed herein are provided to show the state of the art at the time of the alleged invention of the '599 patent.

2

Petition for *Inter Partes* Review
Patent No. 8,489,599

20, 2004 from an application filed June 21, 2000.  Thus, *Rosenberg* qualifies as prior

art to the '599 patent at least under pre-AIA 35 U.S.C. §102(e) and *Suzuki* qualifies

as prior art to the '599 patent at least under pre-AIA 35 U.S.C. §§102(a)-(b), (e).

None of these references were considered during prosecution.  (*See generally*

Ex.1004.)

## VI.   LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art as of the priority date ("POSITA") would

have had an undergraduate degree in electrical engineering, computer engineering,

computer science or a related field along with at least two years of work experience

in the field of content presentation and context-based systems/processes. (Ex.1002,

¶¶30-32.)[2]  More education can supplement practical experience and vice versa.

(*Id.*)

## VII.   THE '599 PATENT

The '599 patent describes techniques for creating/presenting content to a user

based on contextual information.  (Ex.1001, 1:6-11.)   The patent describes a device

that processes contextual information to determine user activity, and if such

information satisfies a trigger condition, presents content to the user.  (*Id.*, 1:50-61.)

---

[2] Petitioner submits the declaration of Steve Smoot (Ex.1002), an expert in the field

of the '599 patent.  Ex.1002, ¶¶3-25; Ex. 1003.

3

Petition for *Inter Partes* Review
Patent No. 8,489,599

A user may create the content, which is stored in a content database with associated

trigger condition(s) (*id.*, 1:62-2:9), and share it with others (*id.*, 2:10-22).  The '599

patent claims these and other generic features, which were already known in the

prior art.  (*See* Section IX; Ex.1002, ¶¶33-40; Exs. 1005-1014, 1016, 1018.)

## VIII. CLAIM CONSTRUCTION

Under *Phillips*, claim terms are typically given their ordinary and customary

meanings.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc);

*see also id.* at 1312–16.  The Board, however, only construes claims when necessary

to resolve the underlying controversy.  *Toyota Motor Corp. v. Cellport Sys., Inc.*,

IPR2015-00633, Paper No. 11 at 16 (Aug. 14, 2015).   For purposes of this

proceeding, no express constructions of any claim terms are necessary to assess

whether the prior art reads on the challenged claims.[3]  (Ex. 1002 ¶¶41.)

---

[3] Petitioner reserves all rights to raise claim construction and other arguments in

district court as relevant and necessary to those proceedings.  *See, e.g.*, *Target Corp.*

*v. Proxicom Wireless, LLC*, IPR2020-00904, Paper 11 at 11–13 (November 10,

2020).  Issues and controversies may later arise in the *Snap* litigation that may need

to be addressed through claim construction(s) not presented here given the close

association between the prior art and '599 patent.

4

Petition for *Inter Partes* Review
Patent No. 8,489,599

## IX.   DETAILED EXPLANATION OF GROUNDS

### A.   Ground 1: *Rosenberg* Anticipates Claims 1, 2, 4-7, 10-13, 17-20, 22-25

#### 1.   Claim 1

##### a)   [1.a] A method for delivering context-based content to a first user, the method comprising:

To the extent limiting, *Rosenberg* discloses this preamble.  (Ex.1002, ¶¶51-56.)  *Rosenberg* discloses a method for delivering "personal digital reminders" to a user based on the user satisfying a location-based "trigger event."  (Ex.1005, Abstract, 2:59-3:32, 4:45-6:4.)  The '599 patent explains "content" includes digital reminders, similar to those described in *Rosenberg.*  (Ex.1001, 3:60-64, 5:63-65 ("tasks to perform"), 20:30-34 ("electronic message or reminder"), 2:47-50, 8:45-46, 13:25-28, 13:59-14:16.)  The '599 patent explains "context" includes "user activity" informed by "contextual information," such as location.  (*Id.*, 3:66-67 ("user-defined context (e.g., a user activity)"), 4:7-11, 6:23-39 ("contextual information" includes user "geographical location"), 4:32-38, 5:52-54.)

*Rosenberg*'s "trigger events" include a "user physically entering the trigger area [and/or] exiting the trigger area" (Ex.1005, 5:62-6:3), and are thus user activities informed by user location.  As explained further below, *Rosenberg* discloses a method for delivering context-based content (reminder delivered when

5

Petition for *Inter Partes* Review
Patent No. 8,489,599

its author enters and/or exits a trigger area) to a first user (reminder author).  (*Id.*,

5:16-40, 6:5-8, 8:1-23, 8:45-50, 5:16-40; Sections IX.A.1.b-i; Ex.1002, ¶¶57-106.)

> **b)**  **[1.b] receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;**

*Rosenberg* discloses this limitation. (Ex.1002,¶¶57-66.) *Rosenberg* discloses

a user creating "personal digital reminders" on portable computing device 111.

(Ex.1005, 8:1-23, 8:45-50, 5:16-6:8, 6:51-57, 13:57-62, 15:24-30, 24:14-17, 23:56-

24:1.)  Each user-created "reminder" is a "store of data" (*Id.*, 5:16-40, 10:55-62)

including the following:

(1) "reminder content": "text, audio, images, graphics, and/or video, that

describes or otherwise indicates one or more pending tasks that the user

intends to perform in the future" (*id.*, 5:17-20, 5:55-61);

(2) "associated trigger area": "physical areas in the real physical world"

"relational[ly] associat[ed]" with the reminder content (*id.*, 5:44-45; *id.*,

5:41-43, 5:45-50); and

(3) other "parameters": "flags and variables that describe how and when the

reminder should be triggered" ("trigger event") and additional "status

information about [the] reminder" (*id.*, 5:62-65, 10:55-62).

6

Petition for *Inter Partes* Review
Patent No. 8,489,599

When a user creates a reminder containing this collection of information (**"content
package"**), it is stored in a "reminder database." (*Id.*, 10:64-11:19, 8:14-18, 6:5-22,
8:64-9:28, 13:9-17.)   Portable device 111 "receiv[es]" the reminder ("content
package") when the user enters reminder content into the personal computing device
111's "user interface 103" and associates this reminder content with trigger area(s)
and other parameters. (*Id.*, 8:45-50; *id.*, 23:56-59, 23:62-23:1; Ex.1002, ¶60.)

    *Rosenberg*'s reminders (**"content packages"**) include at least one content
piece and rules associated with the package. (Ex.1002, ¶¶61-65.)   The above
"reminder content" comprises "content" as described in the '599 patent and
exemplifies a **"content piece."** (Section IX.A.1.a.)   The "trigger area" and "trigger
event" parameter(s) "specifies a context" (*e.g.*, entering and/or exiting the trigger
area") that triggers the reminder associated with the event. (*Id.*; Ex.1005, 5:62-6:4,
9:54-59, 26:49-55.)   When a reminder is triggered via occurrence of the trigger
event, "the reminder content is displayed to the user" (**"triggers a presentation of
the content piece."**) (Sections IX.A.1.e-f; Ex.1005, 6:58-61.)   Thus, the trigger
event and trigger area define the claimed **"trigger condition"** rule associated with
the content piece. (Ex.1002, ¶62.)

    The parameter(s) relating to "status information about [a] reminder"
(Ex.1005, 5:62-65, 10:55-62) provide an **"expected response"** rule associated with
the reminder ("content package"). Reminders may be presented with "reminder

7

option(s)" that allow the user to provide response(s) relating to the reminder.  (*Id.,* 6:65-7:27, 13:47-50, Fig. 5, 19:24-21:27; Section IX.A.1.g.)  One reminder option allows a user to "defer" the reminder so that it is "displayed again after a certain amount of time has elapsed." (Ex.1005, 19:61-20:48.)  The system does not require enablement of the "defer" reminder option, but a user may enable it if she expects to want to defer a particular reminder.  (*Id.*, 10:47-48, 2:32-35.)  If a user sets up this "defer" reminder option, the "status information about [a] reminder" stored in the reminder package includes a "Defer_Status_Flag" parameter expressing that the "defer" response option is enabled and a "Defer_Time" parameter defining the deferral time.  (*Id.*, 10:21-54, 11:9-19 (exemplary data structure for reminder including these parameters).)  Here, the "status information about [a] reminder" included in the reminder package includes an **"expected response"** (i.e., choose to defer) rule associated with the reminder.  (Ex. 1005, 2:32-35, 10:21-11:19, 19:61-20:15; Ex. 1002, ¶¶63-65.)  The '599 patent describes similar types of "expected response" rules.  (*E.g.* Ex.1001, 13:59-14-40 (expected response is user's choice to "suspend" (e.g., "defer") presentation of reminder); Ex.1002, ¶63.)

Accordingly, *Rosenberg*'s device 111 receives a reminder ("content package") that includes reminder content ("content piece") and a set of rules associated with the reminder ("content package"), including (1) a trigger event ("trigger condition") and (2) status information about [a] reminder activating a defer

8

response option ("expected response"), where the trigger event ("trigger condition") specifies a "context" (e.g., entering and/or exiting a "trigger area") that triggers a presentation of the reminder content ("content piece"), as claimed. (Ex.1002, ¶¶65-66.)

### c) [1.c] receiving a set of contextual information with respect to the first user;

*Rosenberg* discloses this limitation. (Ex.1002, ¶¶67-71.) *Rosenberg* discloses device 111 receiving current user location information via a "locative sensor." (Ex.1005, 8:29-40; *id.*, 3:15-20, 6:22-33, 8:51-53, 12:67-13:9, 13:50-53, 13:63-14:20.) *Rosenberg*'s Figure 6 depicts an "exemplary process for facilitating execution of" its spatially-associated reminder system. (*Id.*, 21:31-36.) In step 610, "reminder circuitry supported by the processor of the portable computing device 111 reads locative sensor data from the locative sensor" indicating "spatial coordinates representing where within the physical environment the user is currently residing." (*Id.*, 21:39-45.)

The '599 patent describes user location information as "contextual information." (*Supra* Section IX.A.1.a), as does PO in its infringement contentions (*see* Ex.1017, 55-46). Thus, *Rosenberg* discloses receiving a set of contextual information (location information) regarding the first user.

### d) [1.d] processing the contextual information to determine a current context for the first user;

Petition for *Inter Partes* Review
Patent No. 8,489,599

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶72-78.)  As discussed in Sections IX.A.1.a-b, a user's entry into and/or exit of a "trigger area" is a "context" as described in the '599 patent.  Device 111 processes the received user "contextual information" (*e.g*., location information) to determine whether the user is currently entering/exiting a trigger area.  (Ex.1005, 6:34-47, 3:16-27, 7:47-59.)  This is described in connection with Figure 6.  (*Id.*, 21:45-50 ("reminder circuitry accesses reminder database and determines, based on the locative sensor data, whether the user has passed out of any trigger areas associated with any currently active reminders"), 22:31-34 (same for entrance), 21:57-67 (determining trigger area exit by checking, based on current location, if user passed trigger area boundary previously within); 21:61-67; 22:34-38 (determining trigger area entrance by checking, based on current location, presence inside a trigger area boundary not previously within), 22:38-45; *see also id*., 7:48-58, 18:29-19:23, Fig. 7; Ex.1002, ¶¶74-76.)

Accordingly, *Rosenberg* describes processing a user's location information ("processing the contextual information") to determine whether the user is currently entering/exiting a trigger area ("to determine a current context of the user"), as claimed.  (Ex.1002, ¶¶77-78.)

       **e)**        **[1.e] determining whether the current context satisfies the trigger condition;**

10

Petition for *Inter Partes* Review
Patent No. 8,489,599

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶79-83.)  As discussed in Section IX.A.1.d, *Rosenberg* discloses determining user entrance/exit of a reminder's trigger area.  As discussed in Section IX.A.1.b, a reminder's trigger event ("trigger condition") can be whether a user is currently entering/exiting an associated trigger area.  Thus, via the process described above (Sections IX.A.1.b-IX.A.1.d), *Rosenberg* discloses determining whether the current context of the user (current location into/out-of a trigger area) satisfies the trigger condition (whether user is entering/exiting a trigger area). (*See also* Ex.1005, Fig. 6, 6:40-43, 3:14-29, 21:44-50, 22:31-34; Ex.1002, ¶¶80-83.)

> **f)      [1.f] in response to the trigger condition being satisfied, presenting the content piece to the first user;**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶79-88.) *Rosenberg* discloses presenting a reminder to a user in response to the user satisfying the "trigger event" (e.g., entering/exiting reminder's trigger area (Section IX.A.1.b)).   Device 111 includes "software adapted to automatically trigger the personal reminder based upon the defined parameters such that the reminder is displayed to the user when the user enters and/or exits the trigger area." (Ex.1005, 6:58-64; *id.*, 3:16-32, 8:19-23, 15:16-18, 15:22-44, 19:52-57, 20:17-22, 20:61-67, 21:14-19, 22:1-8, 22:46-51.) Figure 5 illustrates a triggered reminder displayed on device 111:

11

Petition for *Inter Partes* Review
Patent No. 8,489,599



## FIG. 5

(*Id.*, 17:58-61; *id.*, 17:62-18:47 (describing reminder presented in response to trigger), 19:24-29.)  Here, the presented "content piece" is the reminder to pick up items.  (*Id.*, Fig. 5.)  Indeed, in the "exemplary process for facilitating execution of" the "interface shown in Fig. 5" (*id.*, 21:28-36), *Rosenberg* explains "[i]f it is determined that the user has exited [/ entered] one or more trigger areas" associated with a reminder ("trigger condition being satisfied") (*id.*, 22:1-2, 22:47-48), "any reminders that are configured to trigger upon the user exit of [/entry to] any trigger areas that the user has just exited [/ entered] are triggered" and "displayed to the user" ("presenting the content piece to the first user") (*id.*, 22:2-8, 22:47-51).  (*See also id.*, 20:17-23 ("trigger condition" satisfaction resulting in presentation of a reminder and defer option); Ex.1002, ¶¶85-86.)  Thus, in the context of a user-

12

Petition for *Inter Partes* Review
Patent No. 8,489,599

location trigger event, device 111 performs "presenting the content piece (associated reminder content) to the first user."  (Ex. 1002, ¶¶87-88.)

### g)     [1.g] receiving a response from the first user corresponding to the presented content piece;

*Rosenberg* discloses this limitation.  (Ex. 1002, ¶¶89-94.)  As discussed, *Rosenberg* discloses presenting reminder options to a user along with the presented reminder content ("content piece").  (Sections IX.A.1.b, f.)  The interface in Figure 5 presents four exemplary reminder options (terminate, defer, last chance, edit) with a reminder:



## FIG. 5

(Ex.1005, 17:58-61; *see also id.*, 17:62-18:28, 19:24-21:27, 22:14-20, 22:58-65.)

13

Petition for *Inter Partes* Review
Patent No. 8,489,599

*Rosenberg* discloses receiving a response from the first user associated with the presented reminder when the user selects a reminder option.  For example, *Rosenberg* discloses receiving a "terminate reminder" response from the user "upon the selection of a terminate (or equivalent) reminder option" (*id.*, 19:42-60) and receiving a "defer reminder" response "upon the selection of a defer (or equivalent) reminder option" (*id.*, 19:61-20:48).  (*Also id.*, 20:22-23, 20:49-21:7 ("last chance" option), 21:8-27, 19:24-31 ("edit reminder" option).)   In discussing Figure 6, *Rosenberg* discloses "the reminder options are presented to the user" and the user "provide[s] input through the user interface" responsive to them, such as "elect[ing] to terminate," "edit," "defer," or "reset" "the currently displayed reminder."  (*Id.*, 22:14-20, 22:58-65.)  When the user selects a reminder option, device 111 receives the selection ("receiving a response from the first user") corresponding to the presented reminder ("content piece").  (*Id.*, 19:61-20:48; Ex.1002, ¶¶91-94.)

> **h)     [1.h]  determining whether the received response
> matches the expected response; and**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶95-100.)  As discussed in Section IX.A.1.b, *Rosenberg* discloses a user may enable a "defer" response option. Section IX.A.1.g explains how *Rosenberg* discloses receiving a response from a user via selection of a "reminder option" button.  Device 111 determines whether the user's selection ("received response") matches selection of the expected "defer

14

Petition for *Inter Partes* Review
Patent No. 8,489,599

reminder" response button.  (*See* Ex.1005, 19:34-41, 19:61-20:48; Ex. 1002, ¶¶96-98.)

For example, *Rosenberg* describes that "[d]epending upon what reminder options are selected by the user," actions occur, including updating the reminder database "to reflect any terminations, edits, resets, or deferments, of reminders." (*Id.*, 22:20-23, 22:65-23-1, Fig. 6; Section IX.A.1.i.)  A POSITA would have understood that, in order for *Rosenberg*'s system to perform actions dependent on which reminder option was selected, the system recognizes which reminder option was selected.  (Ex.1002, ¶97.)  In *Rosenberg*'s Wal-Mart example, device 111 determines the user selected the "defer" response, as shown by the "defer" actions taken in response to the user's selection.  (*Id.*; Ex.1005, 20:22-48.)  Similarly, if a user instead selects a different button, device 111 ascertains the user selected another option, as shown by it performing actions responsive to other buttons.  (Ex.1002, ¶97; Ex.1005, 19:38-60, 20:49-21:27.)  As discussed in Section IX.A.1.b, a POSITA would have understood that, by enabling and defining the "defer" reminder option in the reminder package, the system has a configured expectation that the user will and/or may respond by selecting this option.  (Ex.1002, ¶97.)  Thus, *Rosenberg* discloses device 111 determining whether the response received from the user (selection of a "reminder option") "matches" the "defer reminder" expected response, as discussed above in Sections IX.A.1.b-g.  (Ex.1002, ¶¶98-100.)

15

### i)  **[1.i] performing an action based on an outcome of the determination[4].**

*Rosenberg* discloses this limitation.  (Ex. 1002, ¶¶101-106.)  As discussed in Sections IX.A.1.g-h, *Rosenberg* discloses determining whether a user has chosen the "defer reminder" response (i.e., user response "matches" the expected response (*see* Section IX.A.1.b)) or has not chosen the "defer reminder" response (i.e., the user's response does not "match" the expected response).  *Rosenberg* discloses taking different actions responsive to this determination.  (Ex.1005, 19:38-41 ("each of these reminder options causes the reminder circuitry supported by the portable computing device 111 to take certain actions").)  If a user selects the "defer reminder" response, "the reminder circuitry clears the screen of the displayed reminder and sets a flag such that the reminder will be displayed again after a certain amount of time has elapsed[.]"  (*Id.*, 19:61-65; *id.*, 19:65-10:48, 20:22-25 (defer actions in Wal-Mart example).)  Here, the action performed is clearing the reminder from the screen and eventually displaying it again.  (*Id.*; Ex.1002, ¶103.)  Conversely, if a user does not select the "defer reminder" response, the actions taken will depend on what (if any) response option the user *has* selected (e.g., selection of terminate reminder option results in actions including removing reminder from

---

[4] Petitioner reserves its right to challenge the definiteness of "the determination" recited in this element in other proceedings.

database).  (Ex.1005, 19:42-49; *see also id.*, 19:50-60, 20:49-21:7 (actions relating to selection of "last chance reminder option"), 21:8-27 (same regarding "edit reminder option"); Ex.1002, ¶104.)  Further, the process of Figure 6 explains that, "[d]epending upon what reminder options are selected by the user" (i.e., "terminat[e], edit[], reset[], or defer[]"), "the reminder database is updated to reflect" the selected option.  (Ex.1005, 22:20-23, 22:65-23:1.)  This update is an action based upon whether the user selected the defer option or not.  (*Id.*; Ex.1002, ¶105.)  Thus, a POSITA would have recognized *Rosenberg* discloses that device 111 performs different actions responsive to determining that the user chose the expected defer reminder response option (Ex.1005, 19:61-20:48) and to determining that the user chose a different response option (*id.*, 19:42-60, 20:49-20:8, 21:8-27, 22:20-23, 22:65-23:1).  (Ex.1002, ¶¶105-106.)

2.   **Claim 2**

a)   **[2.a] The method of claim 1, wherein the method further comprises creating the content package for the first user, wherein creating the content package involves: recording the content piece that is provided by the first user;**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶107-111.)  As discussed, *Rosenberg* discloses creating a content package for a first user comprising reminder content ("content piece") and associated trigger event ("trigger condition" rule) and parameters including "status information about [a] reminder" such as a deferral

Petition for *Inter Partes* Review
Patent No. 8,489,599

option (e.g., Defer_Status_Flag and Defer_Time parameters) ("expected response"

rule).  (Section IX.A.1.b; Ex.1005, 5:16-65, 6:5-8, 6:51-57, 8:1-23, 8:45-50, 10:55-

11:19.)

*Rosenberg* further discloses that creating a reminder containing the described

collection of information ("content package") involves recording a content piece

provided by the first user, as *Rosenberg* discloses the user recording the reminder

content by  "author[ing]" a "text file" (Ex.1005, 5:16-30) or "record[ing]" an "audio

file" or "video" (*id.*, 5:31-40) via the "user interface 103" of "personal computing

device 111" (*id.*, 8:45-48; *id.*, 23:56-66, 6:18-20, 8:14-16).  *Rosenberg*'s recording

of user-provided reminder content discloses the claimed "recording the content piece

that is provided by the first user."  (Ex.1002, ¶¶109-111.)

> **b)      [2.b] creating an entry in a content database for the
> recorded content piece, wherein the entry includes one
> or more trigger conditions; and**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶112-117.)  As discussed in

Section IX.A.2.a, *Rosenberg* discloses recording user-provided reminder content

("recorded content piece").  As discussed in Section IX.A.1.b, *Rosenberg* refers to a

"package" of this reminder content plus associated trigger event (and other

associated information (e.g., trigger area, parameters)) as a "store of data" called a

"personal digital reminder."  (Ex.1005, 10:55-62.)  *Rosenberg* further discloses

18

Petition for *Inter Partes* Review
Patent No. 8,489,599

creating an entry in a "reminder database" ("content database") for the personal digital reminder.  One "example data structure of the reminder database" includes:

```
reminder[ID].Content_Pointer
reminder[ID].latitude_coordinate[i]
reminder[ID].longitude_coordinate[i]
reminder[ID].radius[i]
reminder[ID].Entry_Trigger_Flag
reminder[ID].Exit_Trigger_Flag
reminder[ID].Entry_Status_Flag
reminder[ID].Defer_Status_Flag
reminder[ID].Defer_Time
reminder[ID].Last_Chance_flag
```

(*Id.*, 11:8-18.)

This reminder database entry represents a reminder with a particular ID, which "is a unique identification index number [] for each reminder." (*Id.*, 11:19-23; *see also id.*, 11:23-29.)  Thus, creating an entry with ID = n discloses the claimed "creating an entry in a content database for the recorded content piece," where the recorded content piece is reminder content with ID = n.  (Ex.1002, ¶¶114-115.)  Indeed, the entry includes a "pointer" to the reminder content (reminder[ID].Content_Pointer (Ex.1005, 11:30-36)) and an associated trigger area (reminder[ID].latitude_coordinate[i],    reminder[ID].longitude_coordinate[i], reminder[ID].radius[i]    (*id.*,    11:37-50)),    and    trigger    event (reminder[ID].Entry_Trigger_Flag,  reminder[ID].Exit_Trigger_Flag  (*id.*,  11:52-

19

Petition for *Inter Partes* Review
Patent No. 8,489,599

67)). *Rosenberg* discloses that the reminder content may also be stored in the reminder database. (*Id.*, 2:63-3:4 ("a reminder database containing a personal reminder, wherein each personal reminder comprises reminder content"), 3:14-23, 10:21-22 ("personal digital reminder" is "a store of digital data ***that includes reminder content* . . .**"), 10:55-56, 6:5-8, 10:64-67, 8:64-9:5, 9:19-25, claim 1.) As described in Section IX.A.1.b, the trigger event and trigger area define a "trigger condition." Thus, *Rosenberg* discloses the entry in the content database (reminder database) includes one or more trigger conditions (trigger event and trigger area). (Ex.1002, ¶¶116-117.)

> c)    **[2.c] associating the one or more trigger conditions for the entry with a user-defined context; and**

*Rosenberg* discloses this limitation. (Ex.1002, ¶¶118-121.) As discussed, an example of a "trigger condition" includes whether a user enters/exit an area, which is defined by a "trigger event" and "trigger area" (Section IX.A.1.b), and the database entry described in this claim includes the defined trigger event and trigger area (Section IX.A.2.b). As discussed, these "trigger condition(s)" associated with a user entering/exiting a particular area reflects a "context" as described in the '599 patent. (Section IX.A.1.a; Ex.1001, 3:66-67 ("user-defined context (e.g., a user activity)").) Given that the user can set the trigger event and trigger area parameters defining the trigger condition specifying a context (Sections IX.A.2.a-b), this context is user-defined. As such, by creating the database entry that includes the "trigger

20

Petition for *Inter Partes* Review
Patent No. 8,489,599

area" and "trigger event" ("trigger condition"), *Rosenberg* discloses associating one or more trigger conditions (e.g., "trigger area" and "trigger event") for the entry (entry in the reminder database) with a user-defined context as claimed.  (Ex.1002, ¶¶120-121.)

> **d)    [2.d] wherein the method further comprises: continuously comparing previously defined trigger conditions for the entry with the ongoing context[5] of the first user, and**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶122-127.)  As discussed, *Rosenberg* discloses comparing the previously defined trigger condition(s) for a reminder (stored in an entry in a reminder database), with the current context of the first user.  (*See* Sections IX.A.1.e, IX.A.2.b.) *Rosenberg* further discloses continuing to compare these trigger condition(s) with the ongoing context of the first user.  (Ex.1002, ¶¶124-126.)   For example, *Rosenberg* discloses that the process for determining whether a user is entering/exiting a trigger area (previously defined trigger condition) involves continuously comparing these trigger conditions with the ongoing context of the first user.  (*Id.*; *e.g.* Ex.1005, 21:37-67, 22:24-47.)   The process for determining whether a user has exited "any trigger areas associated with

---

[5] The claim lacks antecedent basis for "the ongoing context."  However, for purposes of this proceeding, Petitioner interprets this phrase to refer to an ongoing context of the first user under its plain meaning.

EXHIBIT B PAGE 26

any currently active reminders" involves first checking whether a user is currently within trigger area(s) associated with active reminder(s) by comparing the user's location to entries in the reminder database. (Ex.1005, 21:45-54, Fig. 6.) If it is determined from flag values in the reminder database that the user is currently within trigger area(s), the process checks whether the user leaves the boundary of any trigger areas that the user was previously determined to be within. (*Id.*, 21:54-61.) This process involves comparing the user's current location with a defined boundary of the trigger area(s) and determining whether the user's location is still within the boundary of the trigger area. (*Id.*, 21:65-67.) Thus, the process of determining whether a user has exited a trigger area involves continuously comparing previously defined trigger conditions for the entry (defined trigger event and area associated with reminder in the reminder database) with the ongoing context[6] of the first user (whether the user is within or outside a trigger area associated with a reminder). (Ex.1002, ¶¶124-126.) The process for determining whether a user has *entered* "any trigger areas associated with currently active reminders" similarly involves

---

[6] The claim lacks antecedent basis for "the ongoing context." However, for purposes of this proceeding, Petitioner interprets this phrase to refer to an ongoing context of the first user under its plain meaning.

22

continuously comparing whether the user is within or outside of trigger areas associated with reminders. (*Id.*, Ex.1005, 22:28-47.)

Moreover, regarding the "defer" response option, *Rosenberg* explains after deferral, "the reminder will only be displayed again to the user if two conditions are met," one of which is whether the "conditions satisfying the trigger event associated with the reminder are still satisfied after the delay time has elapsed." (Ex.1005, 19:66-20:7.)  In the Wal-Mart example, this concept is captured in *Rosenberg*'s disclosure that the reminder is only triggered again "if the user is still within Wal-Mart" when the deferral time period has elapsed. (*Id.*, 20:32-34.)  A POSITA would have understood that in order to implement such features, the system must "continuously compar[e]" the "previously defined trigger conditions" for the reminder with an ongoing context of the first user, as claimed. (Ex.1002, ¶¶125-126.)

<blockquote>

e)      **[2.e] in response to the one or more trigger conditions being met, retrieving the content piece, and presenting the retrieved content piece to the first user.**

</blockquote>

*Rosenberg* discloses this limitation. (Ex.1002, ¶¶128-131.)  As discussed above, *Rosenberg* discloses continuously comparing previously defined trigger conditions (whether a user is entering/exiting a trigger area) associated with reminder content with the user's context to determine whether the trigger condition has been satisfied. (Sections IX.A.2.d, IX.A.1.e.)  As discussed in Section IX.A.1.f,

Petition for *Inter Partes* Review
Patent No. 8,489,599

*Rosenberg* discloses presenting the reminder content ("content piece") to the user

when an associated trigger condition has been satisfied.  (*See also* Ex.1005, 22:1-8,

22:47-51, 20:32-48.)   A POSITA would have understood that the content piece is

"retriev[ed]" in order to be presented to the user.  (Ex.1002, ¶129.)  Thus, *Rosenberg*

discloses a method that performs retrieving the content piece and presenting it to the

first user in response to the trigger condition(s) being met, as claimed.  (*Id.*, ¶¶129-

131.)

     **3.**    **Claim 4**

          **a)**    **[4.a] The method of claim 1, wherein the method further comprises defining a context by: creating one or more context entries in a context manager; and**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶132-137.)  As discussed in

Section IX.A.1.b, *Rosenberg* discloses "context" specified by a trigger condition

(e.g., a user entering/exiting a trigger area).  *Rosenberg* discloses a user may "define

a trigger area manually" by creating a trigger area ("context entry") on the graphical

user interface of her portable computing device 111.  (Ex.1005, 24:52-54.)  A user

may define such a trigger area on her device 111 via a number of different techniques

(*see generally id.*, 24:52-26:20), including using "applications [that] currently exist"

such as Google Earth (*id.*, 24:63-67).   Such user-defined trigger area entries

("context entries") are stored on device 111 and presented to the user via, for

example, a "menu" on the device's user interface, thereby allowing a user to later

24

select this trigger area to be associated with a reminder.  (*Id.*, 24:4-23 (describing a user creating entries for "known locations and/or establishments" (e.g., home, work) with data "defin[ing] the trigger area around" them and adding these entries to a "menu"); *id.*, 24:53-26:20.)   Thus, *Rosenberg* discloses "defining a context" (defining a trigger area) "by creating one or more context entries" (by users creating entries associated with trigger areas).  (Ex.1002, ¶131.)

The ability to create such entries and "define a trigger area in the real physical world" on device 111 is "enable[d]" by the device's "reminder circuitry" (Ex.1005, 25:60-65; *id.*, 24:20-23), which is "any type of executable instructions that can be implemented, for example, as hardware, firmware, and/or software" on device 111 (*id.*, 8:51-62).  The reminder circuitry operates to perform the functions attributed to it in *Rosenberg* (*see e.g. id.*, 3:14-32 ("reminder circuitry adapted to" perform functions in *Rosenberg*'s system), 8:55-58, 13:50-14:17, 15:14-22, 19:38-41, 21:38-49, 22:31-34, 23:19-25, 24:21-23, 25:52-63), which include defining trigger areas ("contexts") by users creating entries associated with trigger areas (*id.*, 25:52-56, 25:60-65).

A POSITA would have understood that *Rosenberg*'s "reminder circuitry" necessarily includes a "context manager" as described in the '599 patent.  (Ex.1002, ¶135.)  The '599 patent describes the "context manager" generically as a black box component in a content management system that performs certain functions without

Petition for *Inter Partes* Review
Patent No. 8,489,599

specifics to its configuration, as does PO's infringement contentions in the related

litigation.  (*Id.*; Ex.1001, Figs. 1, 2A-2B, 5, 5:42-55, 7:34-36, 8:65, 9:8-39,  10:7-9,

19:41-45; Ex.1017, 89-90.)  As discussed above, *Rosenberg*'s reminder circuitry—

which similarly is not limited to a specific configuration and is defined in terms of

functions it performs—allows users to define contexts ("trigger areas") by creating

context entries (entries for user-created trigger areas).  Thus, a POSITA would have

understood that the reminder circuitry included software, firmware, and/or hardware

capable of performing the discussed functions, and thus those components are a

"context manager" and consequently *Rosenberg* discloses defining a context by

creating one or more context entries in a context manager as claimed.   (Ex.1002,

¶¶135-137.)

> b)      **[4.b] associating a respective context entry with a set
> of contextual information.**

*Rosenberg* discloses this limitation.  (Ex. 1002, ¶¶138-141.)  As discussed in

Section IX.1.a, the '599 patent discloses that "contextual information" may comprise

"geographic location" information.  (Ex.1001, 6:23-25, 6:34-39.)  Section IX.3.a

explains how *Rosenberg* discloses that users may manually create trigger areas

("context entries").  For user-created trigger areas representing "known locations

and/or establishments," "data [is] associated with it that defines the trigger area

around or near it."  (Ex.1005, 24:24-27.)  This association may either occur

"automatically" (*id.*, 24:20-23; *see also id.*, 7:32-36) or "manually" by the user (*id.*,

26

24:52-54; *see also id.*, Fig. 8, 24:54-26:20.)  Either way, physical location data ("set of contextual information") is associated with a user-created trigger area entry ("respective context entry"), and thus as described above, and in Section IX.B.1.a, *Rosenberg*'s system performs the process of associating a respective context entry with a set of contextual information as claimed.  (Ex.1002, ¶¶139-141.)

### 4. Claim 5

  a)  **The method of claim 4, wherein the method further comprises updating entries in the content database[7] and updating the context entries in the context manager responsive to actions performed by the first user.**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶142-147.)  As discussed in Section IX.A.2.b, *Rosenberg* discloses users creating entries in a "reminder database" ("content database") that are data structures containing information about the reminder (including reminder content and associated trigger area, trigger event, and other parameters).  These reminder database entries are updated responsive to actions performed by the first user.  (Ex.1002, ¶143.)  For example, as discussed in Sections IX.A.1.b and IX.A.1.e-g, upon being presented a reminder, the user may

---

[7] The claim lacks antecedent basis for "the content database."  For purposes of this proceeding, Petitioner interprets this phrase to refer to a content database under its plain meaning.

EXHIBIT B PAGE 32

choose to "defer" this reminder so that it is triggered again later.  Upon being presented the reminder a second time, a user may terminate the reminder via the "terminate option 505."  (Ex.1005, 20:40-42.)   In response, the reminder is "remove[d] . . . from the reminder database and/or set[] . . . to an inactive state[.]" (*Id.*, 19:42-46.)  These actions are "updates" to the entry in the reminder database. (Ex.1002, ¶143.)  Thus, *Rosenberg* discloses the claimed "updating entries in the content database" (e.g., removing or setting as inactive an entry in the reminder database) "responsive to actions performed by the first user" (e.g., in response to a user choosing to "terminate" the reminder).  (*Id.*)

*Rosenberg* also discloses or suggests updating "context entries in the context manager responsive to actions performed by the first user."  (Ex.1002, ¶¶144-146.) As discussed in Section IX.B.1.a, users may create trigger area entries ("context entries") via aspects of device 111's "reminder circuity" ("context manager").  These user-created trigger areas (e.g., "home," "work") can be manually associated with location data for that area through a number of different techniques.  (Section IX.A.2.c; Ex. 1005, 24:54-26:20.)   A POSITA would have understood that *Rosenberg*'s disclosure of allowing users to manually associate a real geospatial area with a known location also discloses allowing users to change and update the real geospatial area associated with the known location.  (Ex.1002, ¶144.)  For example, a POSITA would have understood based on *Rosenberg* the user would necessarily

update the geospatial area associated with her created trigger area entries for "home"

and "work" if she moved homes or work locations.  (Ex.1002, ¶145; Ex.1005, 24:4-

13, 24:52-26:25.)  And, a POSITA at the time would have known that applications

allowing for associating geospatial areas with known locations, including the Google

Earth application disclosed in *Rosenberg* (Ex.1005, 24:53-26:20, Fig. 8), necessarily

allowed a user to edit ("update") the geospatial area associated with a known

location.  (Ex.1002, ¶145.)  A POSITA would have understood that "updating" the

real physical area associated with a user-created known trigger area entry would

necessarily "update" this entry in relevant aspects of the reminder circuitry, as the

data store associated with this entry would change.  (*Id.*)  Indeed, without such

functionalities/operations, *Rosenburg*'s user-created trigger area features would not

operate as disclosed.  (*Id.*)  Thus, *Rosenberg* discloses "updating the context entries

in the context manager" (e.g., updating data associated with a trigger area entry in

aspects of the reminder circuitry) "responsive to actions performed by the first user"

(in response to a user updating the real geospatial area associated with the user-

created trigger area).  (*Id.*, ¶¶146-147.)

5.    **Claim 6**

a)    **The method of claim 1, wherein the context is defined
as a combination of at least a high-level abstraction
which corresponds to one or more low-level contextual
information values, wherein the low-level contextual
information values can correspond to one or more
measurable parameters.**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶148-152.)  Claim 6 recites a
"high-level abstraction which corresponds to one or more low-level contextual
information values."  (Ex.1001, claim 6.) The '599 patent specification likewise
describes a "high-level abstraction" generically. (Ex. 1001, 10:41-44, 10:48-51
(exemplified as "commuting to/from work"), 10:44-45 (explaining it "can
correspond[] to a combination of multiple low-level contextual information values.")
The '599 patent states that "low-level contextual information values" may include a
"series of GPS traces" and/or "a time of day" (*Id.*, 10:44-47).  As explained below,
*Rosenberg* likewise discloses defining the context as a high-level abstraction that
corresponds to measurable GPS and time parameter data.  (Ex.1002, ¶¶149-150).

    *Rosenberg* discloses that the claimed "context" specified by the trigger
condition may include—in addition to a trigger area and trigger event (Section
IX.A.1.b)—other parameters "further restricting the conditions under which the
reminder will trigger," including, *inter alia*, a "temporal trigger condition" and a
"directional trigger condition."   (Ex.1005, 12:12-23, 12:40-60.)   The temporal
trigger condition "defin[es] a range of times during which the reminder may trigger,"
such as, "time periods that fall within the business hours of a particular
establishment." (*Id.*, 12:17-23.) The temporal trigger condition corresponds to time,
which is a parameter that is measured by "clock functionality" in the user's device
(*id.*, 12:40-43) and the directional trigger condition corresponds to a "time history

30

of locative values," which is a parameter that may be determined from GPS
transducers in the user's device (*id.*, 12:44-48, 14:1-9).  Thus, *Rosenberg* discloses
a context (specified by the trigger condition (claim 1) (Section IX.A.1.b)) defined as
"a high-level abstraction" (a user entering/exiting a trigger area during a certain time
(e.g., business hours)) that "corresponds to one or more low-level contextual
information values" ("time of day," "series of GPS traces," *see* Ex.1001, 10:44-47)
"wherein the low-level contextual information values can correspond to one or more
measurable parameters" (GPS transducer data, clock data).  (Ex.1002, ¶¶151-52.)

### 6.    Claim 7

#### a)    The method of claim 1, wherein a respective rule[8] is defined with one or more high-level abstractions.

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶153-155.)  As discussed in
Section IX.A.5, *Rosenberg* discloses that the "context" specified by the trigger
condition rule may be defined with a high-level abstraction.  Thus, the trigger
condition rule (recited in claim element 1[b]) similarly is "defined with one or more
high-level abstractions" for the reasons explained for claim 6.  (Section IX.A.5;
Ex.1002, ¶¶154-155.)

---

[8] Petitioners preserve its right to challenge the definiteness of this term in other
proceedings.  For purposes of this proceeding, Petitioner assumes a respective rule
may be any rule in the set recited in claim 1.

31

7.    **Claim 10**

a)    **The method of claim 1, wherein the contextual
information includes one or more of time, date,
location, proximity to a system-detectable tag, device
orientation, velocity, direction, distance, vibration,
altitude, temperature, pressure, humidity, sound,
luminous intensity, camera image, and video stream.**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶156-158.)  As discussed in

Section IX.A.1.c, *Rosenberg* discloses the claimed user "contextual information"

including, *inter alia*, GPS location data.  Thus, the "contextual information" includes

at least "location," as recited in this claim.  (Ex.1002, ¶¶157-158.)

8.    **Claim 11**

a)    **The method of claim 1, wherein the content piece
includes one or more of audio clip, image, video
stream, language lesson, e-mail, weather report,
calendar reminder, news feed, rich site summary
(RSS) feed, information update from a Web 2.0
application, and Internet blog.**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶159-161.)  As discussed in

Section IX.A.1.b, *Rosenberg* discloses the claimed "content piece" as "reminder

content" which may include "text, audio, images, graphics, and/or video[.]"

(Ex.1005, 5:17-20; *id.*, Figs. 1, 7; Sections IX.A.1, IX.A.2.d.)  Thus, the "content

piece includes . . . audio clip, image, [or] video stream," as claimed.  (Ex.1002,

¶160.)  A POSITA would have understood that providing an audio reminder would

necessarily include a "clip" of such information and likewise a video-based reminder

32

would necessarily include a "stream" of such video information, as those are features

necessarily present when providing such types of information.  (*Id.*)

### 9.   Claim 12

a)   **[12.a] A computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method for delivering context-based content to a first user, the method comprising:**

To the extent the preamble of claim 1 is limiting, *Rosenberg* discloses the

limitations therein.  (Ex.1002, ¶¶162-165.)  As discussed for claim 1, *Rosenberg*

discloses a system that performs a "method for delivering context-based content to

a first user," like that recited in this claim.  (*See* Section IX.A.1.)  *Rosenberg*

discloses a "portable computing device 111" that performs this method:



(*Id.*, Fig. 1; *id.*, 8:1-3; *infra* Section IX.A.9.b.)  Device 111 includes a "local

processor," "local memory," "hardware and software for generating alerts, and

33

reminder circuitry adapted to manage and trigger reminders based upon the changes in physical location of the user[.]" (*Id.*, 8:51-58.)  *Rosenberg* explains, "the term 'circuitry' refers to any type of executable instructions that can be implemented, for example, as hardware, firmware, and/or software, which are all within the scope of the various teachings described." (*Id.*, 8:59-62.)  As explained above for claim 1 and below for the remaining limitations of this claim, components of the portable computing device 111 (e.g., reminder circuitry, etc.) operate to perform features consistent with the claimed functionality.  Indeed, *Rosenberg* explains device 111 includes a central processor 5 to "interpret and execute logical instructions stored in the main memory 10." (*Id.*, 15:58-59.)

Petition for *Inter Partes* Review
Patent No. 8,489,599



**FIG. 4**

(*Id.*, Fig. 4.) "The main memory 10 is the primary general purpose storage area for

instructions and data to be processed by the central processor 5" and "is used in its

broadest sense and includes RAM, EEPROM and ROM."   (*Id.*, 15:59-63.)

*Rosenberg* also explains that device 111 includes an operating system and hardware

and software drivers necessary to use the devices coupled to communications

infrastructure and that the reminder circuitry is "operatively loaded into main

memory 10" and processor 5 is operative to read data from sensors 75 (including

sensor(s) that track current location of the device).   (*Id.*, 17:23-45.)   (*See also id.*,

21:28-36, Fig. 6; Section IX.A.2.d; Ex.1002, ¶163.)

35

EXHIBIT B PAGE 40

Accordingly, *Rosenberg* discloses a computer-readable storage medium

storing instructions (e.g., instructions stored in main memory 10) that when executed

by a computer (e.g., processor 5) cause the computer to perform a method for

delivering context-based content to a first user (*Rosenberg*'s processes discussed in

Section IX.A.1, IX.A.9.b).  (Ex.1002, ¶¶164-165.)

### b)     [12.b] – [12.i]

Claim elements 12.b to 12.i recite the same limitations as those in claim

elements 1.b to 1.i, respectively.   (*Compare* Ex.1001, 23:22-41 *with id.*, 24:44-63.)

Accordingly, *Rosenberg* discloses the limitations recited in claim elements 12.b to

12.i for the same reasons discussed above for claim elements 1.b to 1.i in Sections

IX.A.1.b-i, respectively, and for the additional reasons discussed above in Section

IX.A.9.a.  (Ex.1002, ¶166.)

### 10.    Claims 13, 17, 18

Dependent claim 13 recites "the computer-readable storage medium of claim

12" performing the same limitations as those in claim 2.  (*Compare* Ex.1001, 24:64-

25:14 *with* 23:42-58.)  Accordingly, *Rosenberg* discloses the limitations of claim 13

for the reasons discussed for claim 2 in Section IX.A.2 and for the additional reasons

discussed above in Section IX.A.9.a (claim 12).  Claims 17 and 18 recite the same

limitations as claims 10 and 11, respectively, except "the method of claim 1" is

substituted for "the computer-readable storage medium of claim 12."  (*Compare*

EXHIBIT B PAGE 41

Ex.1001, 24:29-39 *with* 25:39-50.)    Accordingly, *Rosenberg* discloses the

limitations of claims 17 and 18 for the reasons discussed for claims 10 and 11,

respectively in Sections IX.A.7-8 and for the additional reasons discussed above in

Section IX.A.9.a.  (Ex.1002, ¶¶167-168.)

11.   **Claim 19**

a)    **[19.a] An apparatus for delivering context-based content to a first user, comprising:**

As discussed in sections IX.A.1 and IX.A.9, *Rosenberg* discloses a "portable

computing device 111" ("apparatus") that performs "delivering context-based

content to a first user."  Thus, *Rosenberg* discloses this preamble.  (Ex.1002, ¶¶169-

171.)

b)    **[19.b] a processor;**

As explained, *Rosenberg* discloses that portable computing device 111

includes a "processor." (Ex.1005, 8:40-44, 15:58-63, Fig. 4; Section IX.A.9.a; Ex.

1002, ¶¶172-174.)

c)    **[19.c] an input mechanism configured to receive a set of contextual information with respect to the first user;**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶175-177.)  As discussed for

claim 1.c, *Rosenberg* discloses "contextual information with respect to the first user"

as at least the user's location information.   *Rosenberg* discloses its "portable

computing device 111" including a "locative sensor" that receives a set of user

37

Petition for *Inter Partes* Review
Patent No. 8,489,599

location information (Section IX.A.1.c; Ex.1005, 8:29-40, 6:23-33, 12:67-13:9, 13:64-14:20) and a "communications infrastructure 90" used to transfer data and control signals "among the various components and subsystems of the computing device 111" (*id.*, 15:53-57).  Device 111's locative sensor "may interface directly with the communication interface or may connect through an optimal auxiliary interface 70 to couple such sensor[] to the communications infrastructure 90." (*Id.*, 16:52-55; *id.*, Fig. 4.)  This communication interface or auxiliary interface is an "input mechanism" "configured to receive a set of contextual [location] information with respect to a first user."  (Ex.1002, ¶¶176-77.)

> **d)**  **[19.d] a receiving mechanism configured to receive at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;**

*Rosenberg* discloses this limitation.  (Ex. 1002, ¶¶178-181.)  Claim 19.b includes tracks the "receiving" limitations of claim 1.b, except for a "receiving mechanism configured to receive."   The analysis for claim 1.b explains how *Rosenberg* discloses these features.  (*See* Section IX.A.1.b; Ex.1005, 5:16-65, 6:5-8, 6:51-57, 8:1-23, 8:45-50, 10:61-62, 13:57-62, 15:24-30; Ex.1002, ¶179.)  Device 111 includes a user interface 103 and related user input devices 103 (individually or collectively a "receiving mechanism") that receives the content package via user

38

entry of the reminder content and associated trigger area, trigger event, and other

parameters from the "first" user.  (Ex.1005, 8:63-64, 15:18-20, 16:27-29, 16:34-42,

Figs. 1, 3.)  For these reasons and those discussed for claim 1.b, *Rosenberg* discloses

limitation 19.d.  (Ex.1002, ¶¶179-181.)

> e)  **[19.e] a content delivery mechanism configured to present the context-based content to a first user; and**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶182-185.)  As discussed for

claim 1.f, the *Rosenberg* discloses that device 111 presents the triggered reminder

("context-based content") to the author ("first user").  (Section IX.A.1.f.)  Device

111's display 101 presents the triggered reminder to the user.  (Ex.1005, 8:19-23,

8:51-53, 15:18-19, 15:22-24, 15:39-41, Figs. 1, 3, 5.)  *Rosenberg* explains device

111 includes a display interface 20 coupled to communication infrastructure 90 that

provides signals to display 20 for outputting graphics and characters.  (*Id.*, 16:1-11,

15:52-53, Fig. 4.)  The device 111's reminder circuitry determines which content

should be presented to the user (e.g., based on the occurrence of a trigger event).

(*Id.*, 15:14-18, 13:50-62, 8:55-58, 3:14-32.)  Thus, the display and associated

components that enable the display to present the content to the user (e.g., display

20 and interface 25, display 101, relevant software/hardware aspects of the reminder

circuitry that perform the above-discussed features) comprises the claimed "content

delivery mechanism."  (Ex. 1002, ¶183; Ex.1005, 8:51-62.)  This understanding is

Petition for *Inter Partes* Review
Patent No. 8,489,599

consistent with the exemplary descriptions of this mechanism in the '599 patent.

(Ex. 1001, Figs. 1, 2A, 5, 6:5-7, 8:18-23, 9:5-10, 9:13-17, 19:43-44; Ex. 1002, ¶183.)

> f) **[19.f] a context manager configured to process the
> contextual information to determine a current context
> for the first user, and to determine whether the
> current context satisfies the trigger condition;**

*Rosenberg* discloses this limitation.  (Ex. 1002, ¶¶186-90.)  As discussed for

claims 1.d-e and 12.d-e, *Rosenberg* discloses "process[ing] the contextual

information to determine a current context for the first user" and "determin[ing]

whether the current context satisfies the trigger condition."  (Sections IX.A.1.d-e,

IX.A.9.d-e.)  Further, as explained for claim 12.a, *Rosenberg* discloses a memory 10

storing instructions that when executed by a processor 5, cause the processor (and

device 111) to perform the processes that track the features recited in claim 12

(including the features recited in this claim element 19.f).  (*See id.*; Section

IX.A.9.a.)   Indeed, *Rosenberg* explains that "portable computing device 111"

contains "software running upon" its processor that performs these functions, which

includes the "reminder circuitry." (Ex.1005, 8:40-45.)  Thus, a POSITA would have

understood that the reminder circuitry's software, firmware, and/or hardware

capable of performing the above-discussed functions is a "context manager" as

recited in limitation 19.f.   (Ex.1002, ¶¶187-188.)   Such an understanding is

consistent with the '599 patent's generic black box descriptions of the "context

40

Petition for *Inter Partes* Review
Patent No. 8,489,599

manager." (Ex.1001, Figs. 1, 2A-2B, 5, 5:42-55, 7:34-36, 8:65, 9:8-39,  10:7-9,

19:41-45; Ex.1002, ¶188.)

> g)   **[19.g] wherein in response to the trigger condition
> being satisfied, the content delivery mechanism is
> configured to present the content piece to the first user
> and**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶191-194.)   The analysis

above for claim 1.f explains how *Rosenberg*'s device 111 presents the content piece

to the first user in response to the trigger condition being satisfied.  (Section

IX.A.1.f.)  The analysis above for claim 19.e explains how device 111 presents the

content piece via a "content delivery mechanism" (e.g., the display or the display

and associated software/hardware components responsible for presenting content to

the user (e.g., display 20 and interface 25, display 101, aspects of reminder

circuitry)).  (*See* Section IX.A.14.e.)   Thus, for the above reasons, *Rosenberg*

discloses that the device 111's "content delivery mechanism" is configured to

present the content piece to the first user in response to the trigger condition being

satisfied (as explained for claims 1.f and 19.e), as claimed in limitation 19.g.

(Ex.1002, ¶193.)

> h)   **[19.h] wherein while presenting the content piece to
> the first user, the content delivery mechanism is
> further configured to: receive a response from the
> first user corresponding to the presented content
> piece,**

41

Petition for *Inter Partes* Review
Patent No. 8,489,599

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶195-198.)   The analysis

above for claim 1.g explains how *Rosenberg* discloses "receiving a response from

the first user corresponding to the presented content piece." (*See* Section IX.A.1.g.)

As discussed for claim 19.e and 19.g, device 111's display and associated

components and software responsible for presenting content to the user (e.g., display

101, display 25, interface 20, relevant aspects of reminder circuitry) operate as a

"content delivery mechanism." (Sections IX.A.11.e, IX.A.11.g.)  *Rosenberg* also

discloses that the display (e.g., display 101) via user interface 103 receives a

"response" from the first user in connection with options that may be presented on

the display eliciting user input, such as reminder options (e.g., terminate, defer, last

chance, etc. options). (Ex.1005, 19:24-41.)  Indeed, the reminder options (which are

response options) "may be selected upon the user's engagement with the user

interface 103." (*Id.*, 19:34-39; *id.*, 19:42-21:7, 9:62-64.)  The reminder options are

presented in connection with the content piece (e.g., reminder) (*see e.g., id.* Fig. 5)

and thus allow the user to respond to those options while the content piece is

presented.  Accordingly, *Rosenberg* discloses limitation 19.h.   (Ex.1002, ¶¶197-

198.)

> i)   **[19.i] determine whether the received response**
> **matches the expected response, and**

*Rosenberg* discloses this limitation. (Ex.1002, ¶¶199-202.)  The analysis for

claim 1.f explains how *Rosenberg*'s portable computing device 111 determines

42

whether the user's selected response (e.g., reminder option response) matches the expected "defer" response, or whether the user selected a different response option ("determining whether the received response matches the expected response"). (Section IX.A.1.f; Ex.1002, ¶200.)  As discussed for claim 19.e and 19.g, device 111's display and associated components and software responsible for presenting content to the user operate as a "content delivery mechanism." (Sections IX.A.11.e, IX.A.11.g.)  Further, *Rosenberg* discloses that the reminder circuitry (an aspect of the claimed "content delivery mechanism") performs the functions recited in this claim element.  (Ex.1005, 19:38-21:27, 13:51-54, 15:20-22.)  Thus, *Rosenberg* discloses a "content delivery mechanism configured to . . . determine whether the received response matches the expected response," as claimed.  (Ex.1002, ¶¶201-202.)

### j)  [19.j] perform an action based on an outcome of the determination.

*Rosenberg* discloses this limitation. (Ex.1002, ¶¶203-205.)  As discussed in Section IX.A.1.i, *Rosenberg* discloses the "portable computing device 111's" "reminder circuitry" taking various actions if the user selects the "defer reminder" response option (i.e., received response matches expected response) and taking various other actions if the user does not select the "defer reminder" response (i.e., received response does not match expected response).  As discussed for claim elements 19.e and 19.h-i, aspects of this reminder circuitry are included in the

43

claimed "content delivery mechanism." (Sections IX.A.11.e, h-i.) Thus, *Rosenberg* discloses a "content delivery mechanism configured to . . . perform an action based on the outcome of the determination." (Ex. 1002, ¶¶204-205.)

### 12. Claim 20

   a)   **[20.a] The apparatus of claim 19, wherein the apparatus further comprises a content management mechanism configured to create the content package for the first user, wherein creating the content package involves: recording the content piece that is provided by the first user;**

*Rosenberg* discloses this limitation. (Ex.1002, ¶¶206-210.) As discussed for element 2.a, *Rosenberg* discloses, "creating the content package for the first user by recording the content piece provided by the first user. *Rosenberg*'s device 111 ("apparatus") allows a user to create reminder(s) via its "reminder circuitry." (Ex.1005, 8:51-56, 13:57-62; Section IX.A.2.a.)

As explained, *Rosenberg*'s reminder circuitry can be "any type of executable instructions that can be implemented, for example, as hardware, firmware, and/or software" on device 111. (*Id.*, 8:51-62; Section IX.A.2, IX.A.11.) A POSITA would have understood that *Rosenberg*'s "reminder circuitry" includes software/hardware that is a "content management mechanism" as claimed because the reminder circuitry performs the above-discussed functions attributed to the claimed content management mechanism. (Ex.1002, ¶208.) The '599 patent does not describe the "content management mechanism" as anything specific—it only references the

Petition for *Inter Partes* Review
Patent No. 8,489,599

mechanism one time.  (Ex.1001, 22:66; Ex.1002, ¶208.)  Thus, a POSITA would have understood that the reminder circuitry included software/hardware capable of performing the claimed function, and such components disclose the claimed "content management mechanism."  (Ex.1002, ¶¶208-210)

> **b)   [20.b] creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions;**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶211-213.)  As discussed in Section IX.A.2.b, *Rosenberg* discloses this limitation as part of the process of a user creating a reminder.  As discussed for claim element 20.a above, the device 111's "reminder circuitry" allows users to create these reminders.  (Ex.1005, 8:51-56, 13:57-62; Section IX.A.12.a.)  Such aspects performed by the reminder circuitry disclose the claimed "content management mechanism" recited in this element 20.b for the same reasons discussed for claim element 20.a.  (Section IX.A.12.a; Ex.1002, ¶212.)  That is, for similar reasons, a POSITA would have understood that aspects of the reminder circuitry that perform this limitation are part of the same "content management mechanism" discussed above for element 20.a.  (Ex.1002, ¶¶212-213)

> **c)   [20.c] associating the one or more trigger conditions for the entry with a user-defined context;**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶214-216.)  As discussed in Section IX.A.2.c, *Rosenberg* discloses this limitation as part of the process of a user creating a reminder.  As discussed for claim element 20.a above, *Rosenberg*

45

EXHIBIT B PAGE 50

discloses that the device 111's "reminder circuitry" allows users to create these reminders. (Ex.1005, 8:51-56, 13:57-62; Section IX.A.12.a.)  Since "associating the one or more trigger conditions for the entry with a user-defined context" is an aspect of creating personal digital reminders in *Rosenberg*, a POSITA would have understood *Rosenberg*'s reminder circuitry performs this function.  (Ex.1002, ¶215.)  Such aspects performed by the reminder circuitry disclose the claimed "content management mechanism" recited in this element 20.c for the same reasons discussed for claim elements 20.a-b.  (*Id.*, Sections IX.A.12.a-b.)  That is, for similar reasons, a POSITA would have understood that aspects of the reminder circuitry that perform the above-discussed features for this element 20.c, are part of the same "content management mechanism" discussed above for elements 20.a-b.  (Ex.1002, ¶¶215-216.)

> d)      **[20.d] continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user, and;**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶217-219.)  The analysis in Section IX.A.2.d explains how *Rosenberg* discloses the features recited in this limitation. As discussed for claim element 19.f above, *Rosenberg* discloses that the device 11's "reminder circuitry" continuously compares trigger conditions for personal reminders with the context of the user. (Ex.1005, 8:51-56, 3:16-27; Section IX.A.11.f.)  For reasons similar to those provided for elements 20.a-c, a POSITA

EXHIBIT B PAGE 51

would have understood that aspects of the reminder circuitry performing the features

recited in element 20.d is associated with the same claimed "content management

mechanism" discussed for elements 20.a-c.  (Sections IX.A.12.a-c; Ex.1002, ¶218.)

That is, for similar reasons, a POSITA would have understood that aspects of the

reminder circuitry that perform this element 20.d, are part of the same "content

management mechanism" discussed above for elements 20.a-c.  (Ex.1002, ¶¶218-

219.)

> e)      **[20.e] in response to the one or more trigger conditions
>         being met, retrieving the content piece and presenting
>         the retrieved content piece to the first user.**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶220-222.)  As discussed in

Section IX.A.2.e, *Rosenberg* discloses the features recited in this limitation.  As

discussed for claim element 19.g above, *Rosenberg* discloses that the device 111's

"reminder circuitry" retrieves and presents the appropriate reminder in response to

a trigger condition being met.  (Ex.1005, 8:51-56, 3:16-27; Section IX.A.11.g.)  For

reasons similar to those provided for claim elements 20.a-d, a POSITA would have

understood that aspects of the reminder circuitry performing the features recited in

element 20.e is associated with the same claimed "content management mechanism"

discussed above for elements 20.a-d.  (Sections IX.A.12.a-d; Ex.1002, ¶221.)  That

is, for similar reasons, a POSITA would have understood that aspects of the reminder

circuitry that perform the above-discussed features for this element 20.d, are part of

47

the same "content management mechanism" discussed above for elements 20.a-d. (Ex.1002, ¶¶221-222.)

### 13. Claim 22

a) **The apparatus of claim 19, wherein the context manager defines a context by: creating one or more context entries for the context; and associating a respective context entry with a set of contextual information**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶223-225.)  As discussed in sections IX.A.3, *Rosenberg* discloses that device 111's "reminder circuitry" "defines a context by creating one or more context entries in a context manager" (element 4.a) and "associating a respective context entry with a set of contextual information" (element 4.b).  For reasons similar to that explained for claims 4 and 19, a POSITA would have understood that aspects of the reminder circuitry performing the features recited in claim 22 is the same "context manager" discussed above for claim 19. (Sections IX.A.3, IX.A.11.f; Ex.1002, ¶224.)  That is, for similar reasons, a POSITA would have understood that aspects of the reminder circuitry that perform the above-discussed features for this claim 22 form part of the same "context manager" discussed above for claim 19.  (*Id*.)  Thus, for reasons discussed for claim element 4 and claim 19, *Rosenberg* discloses claim 22.

### 14. Claim 23

a) **The apparatus of claim 22, wherein the apparatus is further configured to update entries in the content**

48

Petition for *Inter Partes* Review
Patent No. 8,489,599

> **database and update the user-defined context entries in the context manager responsive to actions performed by the first user.**

*Rosenberg* discloses this limitation.  (Ex.1002, ¶¶226-228.)  The analysis for claim 5 explains how *Rosenberg* discloses that the device 111 ("apparatus")'s "reminder circuitry" performs the functions recited in this claim (tracking claim 5).  (Section IX.A.4.)  A POSITA would have understood that aspects of the reminder circuitry that perform the features of this claim form part of the same "context manager" discussed above for claims 19 and 22.   (IX.A.4, IX.A.11, IX.A.13; Ex.1002, ¶227.)  Accordingly, *Rosenberg* discloses claim 23 for the same reasons provided for claims 5, 19, and 22.  (Ex.1002, ¶¶227-228)

### 15.  Claim 24

> a)  **The apparatus of claim 19, wherein the contextual information includes one or more of time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.**

*Rosenberg* discloses this limitation for the reasons discussed for claim 10 in Section IX.A.7, which discloses similar features, and for claim 19 ("apparatus") in Section IX.A.11.  (Ex.1002, ¶¶229-231.)

### 16.  Claim 25

> a)  **The apparatus of claim 19, wherein the content piece includes one or more of audio clip, image, video stream, language lesson, e-mail, weather report,**

49

Petition for *Inter Partes* Review
Patent No. 8,489,599

> calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

*Rosenberg* discloses this limitation for the reasons discussed for claim 11 in Section IX.A.8, which discloses similar features, and for claim 19 ("apparatus") in Section IX.A.11.  (Ex.1002, ¶¶232-234.)

## B.    Ground 2: *Rosenberg* Renders Obvious Claims 4-5, 15-16, 19-20, 22-25

### 1.    Claim 4

#### a)    Claim Element [4.a]

*Rosenberg* discloses and/or suggests this limitation.  (Ex.1002, ¶¶235-236.) As explained, *Rosenberg* discloses claim 4.  (Section IX.A.3.).  However, to the extent *Rosenberg* is found not to disclose a "context manager" where the disclosed context entries may be created, it would have been obvious to a POSITA to modify *Rosenberg*'s system/process to provide such features including a "context manager" component integrated within the software/hardware components of *Rosenberg*'s system.  (Ex.1002, ¶235.)

A POSITA would have been motivated to consider and implement such a modification given the disclosures of *Rosenberg*, which explains the system (including its reminder circuitry) is configurable with software, firmware, and hardware.  (Ex.1002, ¶236; Section IX.A.3.a; Ex.1005, 6:57-61, 8:4-62, 25:60-65; 24:20-23.)   A POSITA would have appreciated that creating a dedicated

50

Petition for *Inter Partes* Review
Patent No. 8,489,599

component/module to operate in a computer-based system (like *Rosenberg*'s) was a
known design concept in the art.  (Ex.1002, ¶236; *see also* Ex.1007, [0047]-[0047]
(describing a tag management component).)  Thus, a POSITA would have had the
knowledge, capability, and reasons to implement such a modification and done so
expecting that the resulting modification would operate as intended in *Rosenberg*'s
system.  (Ex.1002, ¶236.)  For example, a POSITA would have found configuring
*Rosenberg*'s system/process with a "context manager" module/component in
software/hardware would have been a straightforward application of known
techniques that would have complimented the disclosed functionalities and
components described by *Rosenberg*.  (*Id.*; Section IX.A.3.)  Indeed, the choice to
create a dedicated module/component would have been a design consideration for a
POSITA based on various factors, including envisioned users, envisioned use of
system, and system architecture, such as those described by *Rosenberg*.  (*Id.*) *KSR
Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417–18 (2007).  Accordingly, a POSITA
would have had a reasonable expectation of success in implementing such a
modification.  (Ex.1002, ¶236.)

### b)     Claim Element [4.b]

*Rosenberg* discloses and/or suggests this limitation for the same reasons
explained in Section IX.A.3.b.  (Ex. 1002, ¶¶237.)  These features would have been

EXHIBIT B PAGE 56

incorporated into the modified *Rosenberg* system/process discussed for element 4.a

for the same reasons explained above.  (Section IX.B.1.a; Ex.1002, ¶237.)

### 2.    Claim 5

*Rosenberg* discloses and/or suggests this limitation for the same reasons

explained in Section IX.A.4.  (Ex. 1002, ¶238.)  These features would have been

incorporated into the modified *Rosenberg* system/process discussed for claim 4 for

the same reasons explained above.  (Section IX.B.1; Ex.1002, ¶238.)

### 3.    Claim 15

a)    **[15.a]  The computer-readable storage medium of claim 12, wherein the method further comprises defining a context by: creating one or more context entries in a context manager; and**

*Rosenberg* discloses and/or suggests this limitation for similar reasons

discussed in Section IX.A.9 and for element 4.a in Sections IX.A.3.a, IX.B.1.a

(reciting similar features).  (Ex.1002, ¶239.)

b)    **[15.b] associating a respective context entry with a set of contextual information.**

*Rosenberg* discloses and/or suggests this limitation for similar reasons

discussed in Section IX.A.9 and for element 4.b in Sections IX.A.3.b, IX.B.1.b

(reciting similar features).  (Ex.1002, ¶240.)

### 4.    Claim 16

a)    **The computer-readable storage medium of claim 15, wherein the method further comprises updating entries in the content database and updating the**

52

> **context entries in the context manager responsive to actions performed by the first user.**

*Rosenberg* discloses and/or suggests this limitation for similar reasons discussed in Section IX.A.9 and for claim 5 in Sections IX.A.4, IX.B.2 (reciting similar features). (Ex.1002, ¶241.)

### 5. Claim 19

*Rosenberg* discloses and/or suggests claim 19. (Ex.1002, ¶¶242-244.) As explained, *Rosenberg* discloses the limitations of claim 19. (*Supra* Section IX.A.14.) However, to the extent *Rosenberg* is found not to disclose a "content delivery mechanism" (elements 19.e, 19.g-j) and a "context manager" (element 19.f) in the sense of modules/components that perform the recited functions discussed above for claim 19, it would have been obvious to a POSITA to modify *Rosenberg*'s system/process to include a "content delivery mechanism" and a "context manager" component integrated within the software/hardware components of *Rosenberg*'s system. (Ex.1002, ¶242.) A POSITA would have been motivated to consider and implement such a modification given the disclosures of *Rosenberg*, which explains its reminder circuitry is configurable with software/hardware. (Ex.1002, ¶243; Section IX.A.3.a; Ex.1005, 6:57-61, 8:4-62, 25:60-65; 24:20-23.) Further, a POSITA would have appreciated creating a dedicated component/module to operate in a computer-based system (like *Rosenberg*'s) was a known design concept in the art. (Ex.1002, ¶243; Ex.1007, [0047]-[0047].) Thus, for similar reasons explained

53

in Section IX.B.1.a, a POSITA would have had the knowledge, capability, and reasons to implement the above modification and done so with the expectation that the resulting modification would successfully operate as intended.  (Ex.1002, ¶243.)  Likewise, a POSITA would have found implementing such a modification would have been a straightforward application of known technologies and techniques that would have complimented *Rosenberg*'s operations.  (Ex.1002, ¶244; Sections IX.A.11.f-j.)  Indeed, the choice to create dedicated module/components to perform specific operations and functions (like those discussed for claim 19) would have been a design consideration within the realm of knowledge/capabilities of a POSITA.  (*Id.*)  *KSR*, 550 U.S. at 417-18.  Thus, a POSITA would have had a reasonable expectation of success in implementing such a modification.  (Ex.1002, ¶244.)

### 6.    Claim 20

*Rosenberg* discloses and/or suggests claim 20.  (Ex.1002, ¶¶245-247.)  As explained, *Rosenberg* discloses the limitations of claim 20.  (*Supra* Section IX.A.15.)  However, to the extent *Rosenberg* is found not to disclose a "content management mechanism" configured to perform creating the content package for the first user involving the functions recited in claim 20 in the sense of a module/component that performs the above recited functions of claim 20 separate from other functions attributed to other mechanisms recited in claim 19, it would

54

have been obvious to a POSITA to modify *Rosenberg*'s system/process to include

such a "content management mechanism." (Ex.1002, ¶245.) A POSITA would have

been motivated to consider and implement such a modification given the disclosures

of *Rosenberg*, which explains its reminder circuitry is configurable with

software/hardware. (*See* Sections IX.A.3.a, IX.B.5; Ex.1002, ¶246.) Further, a

POSITA would have appreciated creating a dedicated component/module to operate

in a computer-based system (like *Rosenberg*'s) was a known design concept in the

art. (Ex.1002, ¶246; Ex.1007, [0047]-[0047].) Thus, for similar reasons explained

in Sections IX.B.1.a, IX.B.5), a POSITA would have had the knowledge, capability,

and reasons to implement the above modification and done so with the expectation

that the resulting modification would successfully operate as intended in the context

of *Rosenberg*'s system/process. (Ex.1002, ¶246.) Likewise, for similar reasons

explained for claim 19, a POSITA would have found configuring *Rosenberg*'s

system/process with a "content management mechanism" component/module in

software/hardware configured to perform the operations/functions described for

claim 20 would have been a straightforward application of known technologies and

techniques. (Ex.1002, ¶247; Section IX.B.5.) *KSR*, 550 U.S. at 417-18. For similar

reasons, a POSITA would have had a reasonable expectation of success in

implementing such a modification. (Ex.1002, ¶247.)

55

### 7. Claims 22-25

*Rosenberg* discloses and/or suggests claims 22-25 for similar reasons discussed in Sections IX.A.13-16 and for claim 19 in Sections IX.B.5.  (Ex.1002, ¶248.)  For similar reasons explained for element 19, it would have been obvious to a POSITA to modify *Rosenberg*'s system/process to include a "context manager" component integrated within the software/hardware components of *Rosenberg*'s system that performs aspects discussed above in connections with claims 22-25 in Sections IX.A.13-16.  (Section IX.B.5; Ex.1002, ¶248.)

### C. Ground 3: *Rosenberg* in view of *Suzuki* Renders Obvious Claims 3, 8-9, 14, 21

#### 1. Claim 3

##### a) [3.a] The method of claim 2, wherein the method further comprises creating a shareable content piece for the first user, wherein creating the sharable content piece involves: recording the sharable content piece that is provided by the first user; and

*Rosenberg* in view of *Suzuki* discloses this limitation.  (Ex.1002, ¶¶249-256.)  As discussed in Sections IX.A.1.b and IX.A.2, *Rosenberg* discloses creating a content package for a user, which includes a recorded "content piece" (*Rosenberg*'s "reminder content") provided by the user.  While *Rosenberg* does not expressly disclose this feature where the "content piece" is *sharable*, it would have been obvious to implement such features in view of *Suzuki*.  (*Id.*)  *Suzuki* discloses a location-based reminder system like *Rosenberg*'s (Ex.1006, Abstract, 3:22-33, 5:8-

56

22, 8:46-11:23), where reminders can be "shared by multiple users." (*Id.*, 4:3-5; *id.*, 3:50-53.)  These reminders are stored with IDs reflecting individuals responsible for indicated tasks.  (*Id.*, 4:21-26, 4:57-64, 6:12-45, 8:1-30, Figs. 3, 7; Ex. 1002, ¶250.)

Given the disclosure of *Rosenberg* and *Suzuki*, and a POSITA's knowledge, a POSITA would have been motivated to configure *Rosenberg*'s system to provide for *sharable* reminders, similar to the sharable reminders disclosed by *Suzuki*. (Ex.1002, ¶251; *KSR Int'l Co.*, 550 U.S. at 415-21 (2007).

A POSITA would have been so motivated because a POSITA would have recognized that sharing reminders among individuals would have increased efficiencies in the use of, and the versatility of, *Rosenberg*'s system.  (Ex.1002, ¶252.)  *Suzuki* describes the importance of "efficiently manag[ing] one's time and plan[ing] the tasks that need to be accomplished" (Ex.1006, 1:15-23), and that systems with unsharable tasks "fail[ed] to provide an effective method to share a to-do list among various individuals" (*Id.,* 1:26-27, 1:53-54) because they result in redundant task performance.  (*Id.,* 1:53-59).  (Ex.1002, ¶252.)

Implementing this modification would have involved combining known techniques to yield predictable results (e.g., providing content to multiple recipients). (Ex.1002, ¶253; *see KSR*, 550 U.S. at 416-17.)  The concept of sharable reminders (e.g., "personal notes and post-its placed on refrigerator doors, calendars, and the like") and methods for modifying a spatially-associated reminder system to include

a sharable aspect were known. (Ex.1006, 1:26-29; Ex.1005, 2:26-29; Ex.1002, ¶253.) For example, *Suzuki* discloses associating reminders with "IDs" of the individuals with whom the reminder should be shared. (Ex.1006, 4:21-26, 4:57-64.) These IDs are stored in a database with the reminder and other parameters. (*Id.*) As discussed in Section IX.2.b, *Rosenberg* similarly discloses a database storing reminders and associated parameters:

```
reminder[ID].Content_Pointer
reminder[ID].latitude_coordinate[i]
reminder[ID].longitude_coordinate[i]
reminder[ID].radius[i]
reminder[ID].Entry_Trigger_Flag
reminder[ID].Exit_Trigger_Flag
reminder[ID].Entry_Status_Flag
reminder[ID].Defer_Status_Flag
reminder[ID].Defer_Time
reminder[ID].Last_Chance_flag
```

(Ex.1005, 11:8-18.) A POSITA would have been motivated to configure *Rosenberg*'s reminder to be "sharable", such as by (a non-limiting example) associating a user ID parameter with the reminder. (Ex.1002, ¶¶253-254.) For example, a POSITA would have known how to add "reminder[ID].users[i]" to the entry above, where i = a string of user IDs. (*Id.*)

Modifying *Rosenberg* in light of *Suzuki* would have also involved the use of a known technique to improve similar systems in the same way. (Ex.1002, ¶255.)

*See KSR*, 550 U.S. at 417.  As discussed, techniques for making content (e.g.,

*Rosenberg*'s reminders) "sharable" were known, and *Suzuki* describes why making

reminders sharable improved prior systems.  (Ex.1002, ¶¶255.)  This improvement

would have similarly improved *Rosenberg*'s system by helping to avoid potential

redundant task performance.  Thus, compatible for example, with *Rosenberg*'s Wal-

Mart example (Ex.1005, 20:17-22), sharable reminders would have helped

coordinate the grocery list (e.g., one user purchasing an item instead of two.)

(Ex.1002, ¶¶255; *compare with* Ex.1006, 1:53-59 (inefficiency of two people

performing task).)   A POSITA would have had the knowledge, capability, and

reasons to modify *Rosenberg*'s system to allow for sharing reminders in a manner

consistent with the claimed features, and thus have been motivated to implement

them with the expectation that the resulting modification would successfully operate

as intended.  (Ex.1002, ¶¶256.)

> **b)** **[3.b]  creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;**

*Rosenberg* in view of *Suzuki* discloses this limitation.  (Ex.1002, ¶257.)  As

discussed in Section IX.A.1.b, *Rosenberg* discloses "creating a content package for

the recorded [] content piece, wherein the content package includes the recorded []

content piece, and wherein the content package includes one or more trigger

59

Petition for *Inter Partes* Review
Patent No. 8,489,599

conditions." As discussed in Section IX.C.1.a, *Suzuki* discloses sharable reminders and it would have been obvious to a POSITA to combine this aspect with *Rosenberg*'s system to arrive at the claimed "sharable content piece." Thus, the combination of *Rosenberg* and *Suzuki* discloses this claim element. (*Id.*)

       c)     **[3.c] wherein the content package allows a recipient of the content package to insert, modify, and/or remove content or trigger conditions from the content package.**

*Rosenberg* in view of *Suzuki* discloses this limitation. (Ex.1002, ¶258.) As discussed in Section IX.C.1.a, *Rosenberg* in view of *Suzuki* discloses the claimed "content package." *Rosenberg* further discloses, "allow[ing] a recipient of" the content package to at least "insert, modify, and/or remove content" from the package. (Ex.1002, ¶258.) As discussed in Sections IX.A.1.b, g-i, *Rosenberg* discloses "reminder options" presented with triggered reminders, which may include the "defer" option. *Rosenberg* also discloses an "edit reminder option" which allows the recipient of the reminder to "add material, remove material, and/or change material" in the reminder. (Ex.1005, 21:8-12.) *Rosenberg* provides an example wherein, upon entering a store area, a user is reminded to purchase several things. (*Id.*, 21:14-19.) If a user purchases some of the items but not all of them, the user "may wish to update the reminder to-do list" "by engaging the user interface 103 to select the edit reminder option 508" in order to "cross items off the digital shopping list." (*Id.*, 21:19-24.) This results in "reminder content within the personal reminder

60

[being] updated (i.e., altered) based on the user's engagement with the user

interface." (*Id.*, 21:24-27.) Here, the user is "modify[ing] . . . content" in the

"content package." (Ex.1002, ¶258.) When combined with *Suzuki* as described in

Section IX.C.1.A, the content comprises the claimed "sharable content piece." (*Id.*)

2.   **Claim 8**

a)   **The method of claim 7, further comprising allowing
the first user to share the rules with a second user,
wherein the second user can redefine the shared rules
based on the second user's low-level contextual
parameters.**

*Rosenberg* in view of *Suzuki* discloses this limitation. (Ex.1002, ¶259.) As

discussed in Section IX.A.6, *Rosenberg* discloses the method of claim 7. As

discussed in Section IX.C.1, it would have been obvious to modify *Rosenberg* in

view of *Suzuki* to create a system where *Rosenberg*'s reminders are sharable with a

second user. As discussed in Section IX.A.1.b, *Rosenberg*'s reminders comprise a

package consisting of reminder content, trigger condition rules, and other

parameters. Thus, sharing a "reminder" consists of sharing the entire package,

which includes sharing the "rules [associated with the reminder] with a second user,"

as recited in this claim. (Ex.1002, ¶259.) *Rosenberg* further discloses allowing the

recipient of a reminder to "redefine the [] rules" associated with a reminder. (*Id.*)

As discussed in Section IX.A.4, *Rosenberg* discloses that users may update the

"context" that triggers a reminder so that it is associated with a different geospatial

EXHIBIT B PAGE 66

Petition for *Inter Partes* Review
Patent No. 8,489,599

location.  A POSITA would understand that this discloses a user updating the "rule" (context that triggers a reminder) "based on the [] user's low-level contextual parameters" (GPS geospatial data, *see* Section IX.A.5).  In the combined *Rosenberg-Suzuki* system, the user updating the rule in this manner can be the "second" user with whom the reminder was shared.  (Ex.1002, ¶259.)  Thus, the *Rosenberg-Suzuki* combination discloses this limitation.  (*Id.*)

### 3.    Claim 9

a)    **The method of claim 1, wherein presenting the content piece comprises sharing the content piece with a remote device.**

*Rosenberg* in view of *Suzuki* discloses and/or suggests this limitation. (Ex.1002, ¶260.)    As discussed in Section IX.A.1.f, *Rosenberg* discloses, "presenting the content piece" as recited in claim 1.  While *Rosenberg* does not expressly disclose such presenting including sharing the content piece with a remote device, it would have been obvious to modify *Rosenberg* in view of *Suzuki* to configure *Rosenberg*'s system/process to share the reminder(s) with a second user and/or remote device.  In addition to that discussed above for claim 3 (Section IX.C.1), for example, *Suzuki* discloses sharing occurs from a "central host computer 14" to "multiple mobile terminals" via "traditional computer networks, cellular phone networks, public telephone networks, and/or satellite system networks" (Ex.1006, 4:3-9), which a POSITA would have known allowed for sharing with

62

multiple remote "mobile terminals."  (Ex.1002, ¶260.)  A POSITA would have

appreciated the benefits of such a modification (e.g., allowing multiple users to view

reminder(s)).  (*Id.*)  Thus, a POSITA would have been motivated to consider and

implement such features based on *Suzuki*'s teachings when contemplating

*Rosenberg*'s system for reasons similar to those explained for claim 3 and the

disclosures noted above.  (*Id.*, Section IX.C.1.)  For similar reasons for claim 3, a

POSITA would have had the same knowledge, capabilities, and expectation of

success in implementing such a modification.  (*Id.*)  Accordingly, it would have been

obvious to modify *Rosenberg* to implement such features, which would have

resulted in the foreseeable features of sharing reminder content with a remote device,

like that claimed.  (*Id.*)

### 4. Claim 14

a) **[14.a] The computer-readable storage medium of claim 13, wherein the method further comprises creating a shareable content piece for the first user, wherein creating the sharable content piece involves: recording the sharable content piece that is provided by the first user; and**

*Rosenberg* in view of *Suzuki* discloses and/or suggests this limitation.

(Ex.1002, ¶261.)  As discussed in Sections IX.A.9-10, *Rosenberg* discloses the

"computer-readable storage medium …" aspects of claims 12-13.  Moreover,

Section IX.C.1.a explains how it would have been obvious to modify *Rosenberg*'s

system with a "sharable" feature like that recited in element 14.a (tracking the

features in element 3.a).  (Ex.1002, ¶261.)  Thus, for the same reasons, *Rosenberg*

in view of *Suzuki* discloses and/or suggests limitation 14.a.  (*Id*.)

      **b)**     **[14.b] creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions**

*Rosenberg* in view of *Suzuki* discloses and/or suggests this limitation for the

reasons discussed in Sections IX.C.4.a and IX.C.1.b.  (Ex.1002, ¶262.)

      **c)**     **[14.c] wherein the content package allows a recipient of the content package to insert, modify, and/or remove content or trigger conditions from the content package.**

*Rosenberg* in view of *Suzuki* discloses this limitation for the reasons discussed

in Sections IX.C.4.a and IX.C.1.c.  (Ex.1002, ¶263.)

    **5.**    **Claim 21**

      **a)**     **[21.a] The apparatus of claim 20, wherein the content management mechanism is further configured to create a shareable content piece for the first user, wherein creating the sharable content piece involves: recording the sharable content piece that is provided by the first user; and**

*Rosenberg* in view of *Suzuki* discloses this limitation for the reasons discussed

in Sections IX.B.6 and IX.C.1.a.  (Ex.1002, ¶264.)

      **b)**     **[21.b] creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more**

64

Petition for *Inter Partes* Review
Patent No. 8,489,599

**trigger conditions;**

*Rosenberg* in view of *Suzuki* discloses this limitation for the reasons discussed

in Sections IX.B.6 and IX.C.1.b.  (Ex.1002, ¶265.)

c)     **[21.c]  wherein the content package allows a recipient
of the content package to insert, modify, and/or
remove content or trigger conditions from the content
package.**

*Rosenberg* in view of *Suzuki* discloses this limitation for the reasons discussed

in Sections IX.B.6 and IX.C.1.c.  (Ex.1002, ¶266.)

65

Petition for *Inter Partes* Review
Patent No. 8,489,599

## X.    DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE

There is no basis for the Board to exercise its discretion to deny institution under 35 U.S.C. §§ 314(a) as the six-factor test addressed in *Fintiv* strongly favors institution ("*Fintiv* factor(s)").  *See Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 5-6 (Mar. 20, 2020) (precedential).

The **first *Fintiv* factor** (stay) favors institution.  Petitioner intends to file, shortly after this filing, a motion to stay pending resolution of this IPR at the district court.  (Ex. 1020.)  The presiding Court has consistently granted motions to stay pending institution and resolution of IPR.[9]  *See Guy A. Shaked Investments, Ltd. v. Trade Box, LLC*, Case No. 19-CV-10593-AB, Dkt. No. 56, at 3 (C.D. Cal. Nov. 18, 2020); *DataQuill Ltd. v. TCL Commc'n Holdings Ltd.*, Case No. 19-CV-03394-AB, Dkt No. 65, at 5 (C.D. Cal. Apr. 24, 2020); *Weserve Drone, LLC v. SZ DJI Tech. Co. Ltd.*, Case No. 19-CV-04382-AB, Dkt. No. 54, at 7 (C.D. Cal. Mar. 17, 2020); *Sleep Number Corporation v. Sizewise Rentals, LLC*, Case No. 18-CV-00356-AB, Dkt. No. 143, at 6 (C.D. Cal. Feb. 12, 2019); *General Electric Company v. Vestas Wind Systems A/S*, Case No. 17-CV-05653-AB, Dkt. No. 85, at 2 (C.D. Cal. Jun. 07,

---

[9] The Petitioner has not identified any cases where the presiding district court judge has denied a motion to stay pending IPR institution.

66

Petition for *Inter Partes* Review
Patent No. 8,489,599

2018); *Essity Hygiene and Health Aktiebolag v. Tarzana Enterprises, LLC*, Case No.
17-CV-04395-AB, Dkt. No. 127, at 16 (C.D. Cal. Sep. 27, 2017). *Fintiv* at 6.

The **second *Fintiv* factor** (proximity of trial dates) also weighs in favor of
institution. While the Court just recently scheduled trial for May 2022 (Ex. 1019),
there is no evidence at this time to suggest such a trial date will be maintained. A
district court will often "extend or accelerate deadlines and modify case schedules
for myriad reasons." *Precision Planting* at 14; s*ee also Intri-Plex Techs. v. NHK
Int'l Corp.*, 3:17-cv-01097-EMC (N.D. Cal.) (D.I. 173, 175); *Sands Revolution II,
LLC, v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 at
8-10 (Jun. 16, 2020). This, coupled with the likelihood of a stay, it is less than certain
that trial will to precede the Board's FWD. *Dish Network, L.L.C. v. Broadband iTV,
Inc.*, IPR2020-01267, Paper 15 at 17-18 (Jan. 21, 2021); *HP Inc. v. Slingshot
Printing LLC*, IPR2020-01085, Paper 12 at 7 (Jan. 14, 2021) (recognizing that
district court trial date "may possibly slip … [due to] months of backlogged trials"
from the COVID-19 pandemic). *See also e.g., Guy A. Shaked Investments* at 2
(acknowledging "the current trial date would not stick in any event" due in part to
"the COVID-19 pandemic" and accordingly granting stay). But even if it does, the
Board has found factor 2 favored institution despite trial preceding final decision by
five months. *Sand Revolution II* at 8-10. Further, the trial date deserves little weight
because it does not guarantee entry of final judgment or consider lengthy post-trial

Petition for *Inter Partes* Review
Patent No. 8,489,599

briefing and because of Petitioner's diligence in filing this Petition soon—

approximately 10 days—after PO served its infringement contentions (Ex. 1017).

*Apple Inc. v. Maxell, Ltd.*, IPR2020-00204, Paper 11 at 16 (June 19, 2020) (refusing

to exercise discretionary denial with nine month difference between trial and final

decision and where claim construction and fact discovery has completed, and

petitioner's stipulation).

The **third *Fintiv* factor** likewise weighs strongly in favor of institution. The

case is in its infancy and thus at the time of this filing, significant work is ahead of

the parties and the court, including claim construction, which will be heard about the

same time as the Board's anticipated institution decision. (Ex. 1019.) Thus,

investment by the parties in invalidity-related issues will not progress in significant

fashion by that date. Other case activity that will eventually take place (outside claim

construction) that does not relate to validity should "not weigh in [the Board's]

consideration of this issue." *Western Digital Corp. et al. v. Martin Kuster*, IPR2020-

01391, Paper 10 at 11 (February 16, 2020). Also, the likelihood of a stay pending

IPR would prevent investment of resources in the district court action. Such minimal

investment is insufficient to support discretionary denial. *See e.g., Juniper

Networks, Inc. v. Huawei Digital Techs. (Cheng Du) Co., Ltd.*, IPR2020-01130,

Paper 13 at 12-13 (Jan. 22, 2021). Moreover, Petitioner's diligence in filing this

Petition weighs against discretionary denial. *Dish* at 20-21; *Fintiv* at 11.

68

Petition for *Inter Partes* Review
Patent No. 8,489,599

The **fourth *Fintiv* factor** (overlap) also weighs in favor of institution.  There
is, at this stage, no evidence of overlap in invalidity positions between the two
proceedings.  However, to mitigate concerns the Board may have regarding
duplicative efforts and efficiency, Petitioner stipulates that it will not pursue
invalidity of the '599 patent in the district court litigation based on any instituted
ground in this IPR proceeding.  *Apple, Inc. v. SEVEN Networks, LLC*, IPR2020-
00156, Paper 10 at 19 (June 15, 2020).

The **sixth *Fintiv* factor** (other circumstances) also favors institution.  The
Petition diligently sought review within months of PO's complaint and did so by
presenting strong grounds demonstrating the unpatentability of the challenged
claims.  (*Supra* Section IX.)  Further, this petition is the only challenge to the '599
patent before the Board, which is a "crucial fact" favoring institution.  *Google LLC
v. Uniloc 2017 LLC*, IPR2020-00115, Paper 10 at 6 (May 12, 2020).

While the **fifth *Fintiv* factor** (same parties) may weigh slightly in favor of
denial, the remaining factors outweigh that factor.  Accordingly, based on a "holistic
view" of whether integrity of the system and efficiency is best served, institution
here is proper.  *Samsung Elecs. Co. Ltd. v. Dynamics Inc.*, IPR2020-00505, Paper
11 at 15 (Aug. 12, 2020).

69

Petition for *Inter Partes* Review
Patent No. 8,489,599

## XI.   CONCLUSION

For the reasons above, Petitioner requests institution of IPR for the challenged

based on each of the grounds specified in this petition.

Respectfully submitted,

Dated: May 21, 2021                    By: /Joseph E. Palys/
                                            Joseph E. Palys (Reg. No. 46,508)
                                            Counsel for Petitioner

70

Petition for *Inter Partes* Review
Patent No. 8,489,599

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that the foregoing

Petition for *Inter Partes* Review of U.S. Patent No. 8,489,599 contains, as measured

by the word-processing system used to prepare this paper, 13,884 words. This word

count does not include the items excluded by 37 C.F.R. § 42.24 as not counting

towards the word limit.


Respectfully submitted,

Dated: May 21, 2021                  By: /Joseph E. Palys/
                                         Joseph E. Palys (Reg. No. 46,508)
                                         Counsel for Petitioner

Petition for *Inter Partes* Review
Patent No. 8,489,599

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2021, I caused a true and correct copy of the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 8,489,599 and supporting exhibits to be served via express mail on the Patent Owner at the following correspondence address of record as listed on PAIR:

> 35699-PVF-PARC
> c/o Park, Vaughn, Fleming & Dowler LLP
> 2820 Fifth Street
> Davis CA 95618-7759

By: ___/Joseph E. Palys/_____
Joseph E. Palys (Reg. No. 46,508)